IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

_____

THE BOARD OF EDUCATION OF THE
CITY SCHOOL DISTRICT OF THE
CITY OF NEW YORK,

                          *Plaintiff,*

    v.                                Civil Action No.

UNITED STATES DEPARTMENT OF
EDUCATION, LINDA MCMAHON, in
her capacity as Secretary of the United
States Department of Education, CRAIG
W. TRAINOR, in his capacity as Acting
Assistant Secretary for Civil Rights,
LINDSEY M. BURKE, in her capacity as
Deputy Chief of Staff for Policy and
Programs

                          *Defendants.*

_____

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Plaintiff, the Board of Education of the City School District of the City of New York,

operating as New York City Public Schools ("NYCPS"), by its attorney, Muriel Goode-Trufant,

Corporation Counsel of the City of New York, for its verified complaint against the United States

Department of Education (the "Department"); Linda McMahon, in her capacity as Secretary of the

United States Department of Education; Craig W. Trainor, in his capacity as Acting Assistant

Secretary for Civil Rights; and Lindsey M. Burke, in her capacity as Deputy Chief of Staff for

Policy and Programs, alleges upon personal knowledge as to itself and upon information and belief

as to all other matters:

## I.      PRELIMINARY STATEMENT

1.     NYCPS school students attending nineteen magnet schools in Brooklyn, the

Bronx, Manhattan and Queens, should be enjoying the excitement and anticipation that only a

new school year brings. Instead, on September 16, 2025, the United States Department of Education turned their lives upside down. On that day, two weeks after the 2025-2026 school year had already begun, the Department, through its Office for Civil Rights ("OCR") summarily, without prior notice or hearing, and contrary to law, notified NYCPS of the Department's decision to discontinue five-year Magnet Schools Assistance Program ("MSAP") grants awarded in 2022 and 2023 to five groups, or "consortiums," of NYCPS magnet schools (the "NYCPS MSAP Projects" or the "Projects") to support the operation of the nineteen NYCPS MSAP-funded schools (the "Schools"), because of alleged violations of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 ("Title IX").

2.      Over the next days, the Department took a series of additional actions to effectuate the discontinuation of NYCPS' MSAP grants, throwing into chaos and uncertainty the Schools' futures—along with the plans of the approximately 7700 NYCPS students who attend them. The Department's unprecedented actions—undertaken without notice, investigation, hearing, or opportunity to respond, and without a valid substantive basis—represent a blatant attempt to avoid the exacting process required by law before the lives of schoolchildren, parents, teachers, and administrators can be completely upended by the withdrawal of financial support to their schools. The Department's conduct was also a misuse of MSAP's intended grant continuation certification and performance review processes, which should be carried out in service of Congress' clear wish that the funding of magnet schools who are making progress towards the goals set by Congress continue.

3.      The immediate effect of the Department's actions is the complete disruption of the Schools' ability to carry out their specialized programming during the school year, due to the loss of approximately $11 million in carryover MSAP funding previously awarded to the five Projects for the previous fiscal year, FY 2025, but now rendered unavailable in FY 2026 by the

sudden discontinuation of the grant, effective October 1, 2025. It also means the abrupt end to grant funding for the remaining period of the five-year grants. An additional $36 million in federal support had been promised to the Schools under the five-year grant terms, for the period from now through 2028 (the remainder of their 5-year grants). The discontinued MSAP grants provided critical funding necessary for the nineteen magnet Schools to provide curricula in topics like cutting-edge science, technology, engineering, architecture, and math ("STEAM"); multimedia and the arts; performing arts; engineering; journalism; civic activism; and leadership to schools which have historically served isolated, and overwhelmingly low income, Hispanic and Black students.

4.    The discontinuation was purportedly based on a "finding" by OCR—made without notice, investigation or inquiry—that NYCPS' Guidelines to Support Transgender and Gender Expansive Students (the "NYCPS Guidelines") violate Title IX by allowing NYCPS transgender students to use bathroom, changing room and locker room facilities; participate in athletic activities; and be provided with overnight accommodations on school trips, consistent with their gender identity.

5.    However, the NYCPS Guidelines have been in place since 2019—with prior versions dating back to 2014—and NYCPS MSAP Projects have previously been judged by OCR officials in multiple MSAP grant cycles to be operating entirely consistent with Title IX. The abrupt about-face by the Department, seemingly based on the Trump Administration's fixation with upending the Department's previously accepted interpretation of Title IX puts politics before public schools. It is also contrary to law, arbitrary and capricious, and based on a new interpretation of federal law imposed without engaging in notice-and-comment rulemaking.

6.    Moreover, the Department actions are a clear attempted end run around the Congressional directive that school funding not be pulled on a whim: the Department's purported

3

discontinuation of NYCPS' MSAP grants is being carried out unlawfully, without observance of procedures required both by Title IX itself, and by the federal regulations governing the operation of MSAP grants. First, the Department failed to follow Title IX's robust procedural requirements before making a finding that the NYCPS Guidelines violate Title IX and purporting to take action based on that finding to discontinue all MSAP funding to the Schools; those procedures include an opportunity for a hearing, express findings on the record, and filing a report with each Congressional committee with jurisdiction as to the circumstances and grounds for the discontinuance.

7.      Second, where—as here—a decision is made to discontinue a multi-year MSAP grant, the grantee is entitled to notice, and the opportunity to request reconsideration of the decision. 34 CFR § 75.253(g).[1] Here, NYCPS was offered "reconsideration" in name only. The Department conditioned the offer on NYCPS' agreement that it would take all of the remedial steps that OCR demanded—and do so within three business days**.** The remedial steps would require NYCPS to dismantle the NYCPS Guidelines and implement the very determination about which it would seek reconsideration. A failure to agree to the remedial measures would automatically result in a denial of reconsideration.

8.      NYCPS brings this action to restore the Schools to the status they held on September 15, 2025 through an order that the Department's discontinuation of NYCPS' MSAP grants be vacated and set aside as arbitrary and capricious, contrary to law, an abuse of discretion, and as having been undertaken without observance of procedures required by law. It also seeks to preliminarily and permanently enjoin the Department from implementing, maintaining, or reinstating the discontinuation, or otherwise taking any other action to suspend,

---

[1] To the extent the discontinuation could be considered a termination, NYCPS was entitled to an opportunity to object to and provide information and documentation challenging the termination action. 2 C.F.R. §§ 200.340–41

terminate, or refuse to continue the NYCPS' MSAP Projects; and any other appropriate relief required to effectuate the continuation of the NYCPS' MSAP Projects.

## II.    JURISDICTION AND VENUE

9.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 1346. Jurisdiction is also proper under the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. §§ 702, 704. The Court is authorized to issue the relief sought here under the Administrative Procedure Act, 5 U.S.C. §§ 705, 706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.

10.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1) because Defendants are an agency of the United States Government and officers sued in their official capacities. Plaintiff is a resident of this judicial district, and a substantial part of the events or omissions giving rise to the claim occurred and are continuing to occur in this district.

## III.    PARTIES

11.    Plaintiff the Board of Education of the City School District of the City of New York, operating as New York City Public Schools, is the entity responsible for the governance, management, and oversight of New York City's public school district (the "City District"). The City District is a city school district created under the laws of the State of New York which operates more than 1600 schools in New York City. The City District encompasses 32 geography-based community school districts, as well as several specialized districts. Each community school district has a superintendent, and 11 additional superintendents lead groups of high schools. Almost one million students are enrolled in NYCPS, making it the largest school district in the United States.

12.    Defendant United States Department of Education is the agency of the federal government that establishes policy for, administers, and coordinates most federal assistance to

education.  Among other responsibilities, the Department administers MSAP through its Office of Elementary and Secondary Education ("OESE") and enforces Title IX through the Office for Civil Rights.

13.    Linda McMahon is the Secretary of the Department of Education.  Secretary McMahon is named as a defendant in her official capacity.

14.    Craig W. Trainor is the Acting Assistant Secretary for Civil Rights in the United States Department of Education. He is the head of the Department's Office for Civil Rights, which is the office charged with enforcement of Federal civil rights laws that prohibit discrimination in Department programs, or activities that receive Federal funds from the Department, including Title IX. Assistant Secretary Trainor is named as a defendant in his official capacity.

15.    Lindsey M. Burke is the Deputy Chief for Policy and Programs in the United States Department of Education. Upon information and belief, she is the Deciding Official for Reconsideration Requests in the United States Department of Education. Deputy Chief Burke is named as a defendant in her official capacity.

## IV.    FACTUAL BACKGROUND

### A.  New York City Public Schools

16.    NYCPS is an ethnically diverse school district. As of 2023-2024, student enrollment was 42.2% Hispanic, 19.5% Black, 18.7% Asian, 16.2% White, 1.8% multi-racial, and 1.2% Native American/Alaskan. Among our students, more than 180 languages are spoken. Additionally, in the 2023-2024 school year, 73.5% of NYCPS students were considered

"economically disadvantaged," meaning—by reference to the federal poverty line—that they live in poverty, or are served by schools with high concentrations of students living in poverty.[2]

## B. NYCPS Magnet Schools

17.     Supported by federal law and policy, magnet schools developed in the 1970s as a voluntary desegregation tool and an alternative to mandatory busing as a remedy for segregated schools. They are defined under federal law as public elementary or secondary schools that offer "a special curriculum capable of attracting substantial numbers of students of different racial backgrounds." 20 U.S.C. 7231a. "Magnet" refers to the fact that students attending the school come from across normal attendance boundaries.

18.     As contemplated by this federal law and policy, many NYCPS students live in mono-ethnic and -socio-economic neighborhoods and attend NYCPS schools with similar demographics. NYCPS's development and expansion of magnet schools is a powerful tool in combatting this racial and socio-economic segregation in the City District.

19.     NYCPS currently operates over 200 magnet schools, many of which were initially established using federal seed funding provided by the Department through the federal Magnet School Assistance Program, with the expectation that once federal funding expired, the schools would continue to operate as self-sustaining magnet schools offering thematic programming.

## C. Magnet School Assistance Program (MSAP) Grants

### 1. The Purpose and Requirements of MSAP Grants

20.     MSAP is a federal grant program authorized by statute and administered by the Department through the Office of Elementary and Secondary Education. *See* 20 U.S.C. §§ 7231-7231j.  MSAP provides grants to eligible local educational agencies ("LEAs") and groups, or

---

[2] New York City Public Schools, NYCPS Data At A Glance (2025), publicly available at https://www.schools.nyc.gov/about-us/reports/nycps-data-at-a-glance

"consortia" of LEAs to establish and operate magnet schools under mandatory desegregation plans or voluntary efforts designed to bring students from different social, ethnic, and racial backgrounds together. *See* 20 U.S.C. §§ 7231-7231j. In establishing MSAP, Congress made findings as to the significance and multiple educational and societal benefits of magnet schools, and expressly recognized them as being in the best interests of the United States:

> . . .
> (4) It is in the best interests of the United States—
>     (A) to continue the Federal Government's support of local educational agencies that are implementing court-ordered desegregation plans and local educational agencies that are voluntarily seeking to foster meaningful interaction among students of different racial and ethnic backgrounds, beginning at the earliest stage of such students' education;
>     (B) to ensure that all students have equitable access to a high quality education that will prepare all students to function well in a technologically oriented and a highly competitive economy comprised of people from many different racial and ethnic backgrounds; and
>     (C) to continue to desegregate and diversify schools by supporting magnet schools, recognizing that segregation exists between minority and nonminority students as well as among students of different minority groups.
> (5) Desegregation efforts through magnet school programs are a significant part of our Nation's effort to achieve voluntary desegregation in schools and help to ensure equal educational opportunities for all students.

20 U.S.C. § 7231(a).

21.    MSAP grants financially support, *inter alia*, (1) the elimination, reduction, and prevention of minority group isolation in elementary and secondary schools with substantial numbers of minority group students; (2) the development, implementation, and expansion of magnet school programs designed to meet challenging state standards; (3) the development, design, and expansion of innovative educational methods and practices that promote diversity and choice in public school education; (4) courses of instruction that will substantially strengthen students' attainment of tangible and marketable career, technological and professional skills; (5) the capacity of LEAs to continue operating magnet schools at high level after the conclusion of the period of federal funding; and (6) equitable access to high quality education that will enable

students to continue with postsecondary education or employment.  20 U.S.C. § 7231(b); 34 C.F.R. § 280.1.

22.     In its current iteration, MSAP provides for annual awards of up to $3.5 million per LEA or consortium of LEAs, for a project period of up to 5 years. Initially, MSAP grants were provided for 2-year periods, a limit that was later extended to 3 years, before 2015, when the 5-year period was adopted as part of Congress' passage of the Every Student Succeeds Act,[3] providing a longer incubation period for the creation of sustainable magnet programs.

23.     Among other requirements, MSAP projects must "be operated in a manner consistent with discrimination requirements contained in Federal civil rights laws." 87 Fed. Reg. 9591 (Feb. 22, 2022). Thus, as part of the application process for an MSAP grant, an eligible LEA or consortium of LEAs must provide the Department assurances that it will not engage in discrimination based on race, religion, color, national origin, sex, or disability in, *inter alia*, assigning students to schools or course of instruction or designing or operating extracurricular activities for students. 20 U.S.C. § 7231d(b)(2)(C)(ii), (iii). And the authorizing statute for MSAP provides that "[n]o grant shall be awarded under this part unless the Assistant Secretary of Education for Civil Rights determines that the assurances described in subsection (b)(2)(C) will be met." 20 U.S.C. § 7231d(c).

24.     The Assistant Secretary of Education for Civil Rights ("Assistant Secretary") is the head of the Department's Office for Civil Rights, which is the office charged with enforcement of Federal civil rights laws that prohibit discrimination in Department programs, or activities that receive Federal funds from the Department, including Title IX.  *See* 20 U.S.C. § 1681; 34 C.F.R. § 106 *et seq*.; 34 C.F.R. § 100.7.

---

[3] The Every Student Succeeds Act (ESSA), Public Law 114-95 (December 10, 2015) amended 20 U.S.C. § 7231h to extend the maximum length of MSAP grants to 5 years from 3.

### 2. *The Operation of Multi-Year MSAP Grants*

25.     The General Education Provisions Act, 20 U.S.C. §§ 1221 *et seq.* ("GEPA") and the Department's own financial assistance regulatory framework govern the Department's administration of multi-year MSAP funds. The Department's financial assistance regulations, 34 C.F.R. § 75 *et seq.*, address (1) the Department's competitive grantmaking selection process for new grants; and (2) its determination whether to continue a grantee's multi-year project–a process that does not involve competition with other grantees. *Id.* §§ 75.215-227; 75.253. In addition, the MSAP regulations provide that grants are governed by Title 2 of the Code of Federal Regulations. *Id.* § 280.3. GEPA requires that rules affecting the Department's provision of financial assistance go through the APA's notice and comment process. *See* 20 U.S.C. §§ 1221e-4, 1232; 5 U.S.C. § 553.

26.     When the Department announces a competition for new grants, it publishes an application notice ("Notice Inviting Applications") in the Federal Register that explains, among other things, the relevant selection criteria, and whether the Secretary plans to approve multi-year projects and, if so, the project period that will be approved. The Department scores the quality of each application using the selection criteria and competitive priorities, ranks the applications, and selects applications for new grants in rank order. 34 C.F.R. § 75.217; U.S. Department of Education, Discretionary Grantmaking at ED (Oct. 2024) ("Discretionary Grantmaking")[4] at 26-27.

27.     The procedures governing the Department's decision whether to *continue* multi-year grants are quite different. *See Discretionary Grantmaking* at 31–32. When awarding multi-year projects, the Department funds the initial budget period (usually 12-months) and "indicates

---

[4] Publicly available at https://www.ed.gov/media/document/grantmaking-ed-108713.pdf.

[its] intention to make continuation awards to fund the remainder of the project period." 34 C.F.R. § 75.251(a)-(b).

28.     At the end of the annual budget period, when the time comes for a multi-year grant to be continued, the Department reviews information relevant to the grantee's performance for the prior year, including performance reports, performance measures, and financial data. *See* 34 C.F.R. §§ 75.118, 75.253(b); *Discretionary Grantmaking* at 32 ("The program staff uses the information in the performance report in combination with the project's fiscal and management performance data to determine subsequent funding decisions."); 59 Fed. Reg. 30259 (June 10, 1994).

29.     34 C.F.R. § 75.253(a) provides that in order to receive a continuation award after the first budget period of a multi-year grant, the grantee must, *inter alia*, demonstrate substantial progress in achieving the goals and objectives of the project, submit all required performance reports, continue to meet all eligibility requirements of the program, and "receive a determination from the Secretary that continuation of the project is in the best interests of the Federal Government." In making a continuation award, the Secretary "also considers whether the grantee is operating in compliance with the assurances in its approved application, including those applicable to Federal civil rights laws that prohibit discrimination in programs or activities receiving Federal financial assistance from the Department." *See* 87 Fed. Reg. 9595 (Feb. 22, 2022); 88 Fed. Reg. 15705 (March 14, 2023).

30.     The Department has long represented that a cut-off in continuation award funding is "extremely rare in practice." 59 Fed. Reg. 30259 (June 10, 1994). More recently, the Department explained that "In general, we do not deny a large number of non-competing continuation awards and, if that does happen, grantees are often aware of the likelihood of the

decision well in advance and often cite no concerns if they do not receive a continuation award." 89 Fed. Reg. 70,316 (Aug. 29, 2024).

31.     Where the Department decides not to continue a multi-year grant, the Secretary must notify the grantee of that decision, the grounds on which it is based and, "consistent with 2 CFR 200.342,[5] provide the grantee with an opportunity to request reconsideration of the decision." 34 CFR § 75.253(g).[6]

32.     Finally, where a grant is not continued, the Secretary may authorize a no-cost extension of the last budget period in order "to provide for an orderly closeout of the grant." 34 CFR § 75.253(h). A no-cost extension is an extension of the period of performance for a grant that would not require the obligation of additional Federal funds but would permit a grantee to spend available unobligated funds remaining beyond the original grant performance period. *See* 2 CFR § 200.308(f)(10).

**D.  NYCPS's MSAP Grants**

33.     NYCPS has been a recipient of MSAP grants for its magnet schools since at least 2010. Between 2010 and 2022, 63 different NYCPS magnet schools have been funded under MSAP. During the continuation years of each of the MSAP grants awarded to NYCPS during those periods, NYCPS' magnet school projects were found to be in the "best interests of the Federal Government" pursuant to 34 C.F.R. § 75.253(a), and NYCPS MSAP projects'

---

[5] 2 CFR § 200.342 provides that "[u]pon initiating a remedy for noncompliance (for example, disallowed costs, a corrective action plan, or termination), the Federal agency must provide the recipient with an opportunity to object and provide information challenging the action."

[6] To the extent the Department effectuates a termination of an MSAP grant, the requirements of 2 C.F.R. Part 200 governing the whole or partial termination of a federal award for non-compliance would apply, requiring the Department to make a determination that any alleged non-compliance cannot be remedied by imposing additional conditions, as required by 2 C.F.R. § 280.339, and requiring notice and an opportunity to object to and provide information and documentation challenging the termination action. 2 C.F.R. §§ 200.340–42.

assurances of compliance with federal civil rights were routinely certified pursuant to 20 U.S.C. § 7231d(c), *without exception*.[7]

34.    On February 22, 2022, the Department published in the Federal Register a Notice Inviting Applications ("NIA") for FY 2022 ("FY22") from LEAs or consortia of LEA's for MSAP grants of up to $3.5 million per budget year, for a project period of up to 5 years, to create or revise magnet schools. 87 Fed. Reg. 9587 (Feb. 22, 2022). NYCPS applied for MSAP grants in response to the FY22 NIA through three new inter-district magnet school projects, each involving two community school districts ("CSD"): (1) Brooklyn Inter-District (CSD 32 and 16); (2) Brooklyn and Queens Inter-District (CSD 19 and 27); and (3) Queens Inter-District (CSD 28 and 29) (together, the "FY22 MSAP Projects").

35.    The FY22 MSAP Projects involved transforming 13 schools—8 primary schools, and 5 middle or intermediate schools—located in Brooklyn and Queens into new magnet schools serving students from pre-kindergarten and/or kindergarten through 5th grade (for primary schools), and sixth through eighth grades (for middle or intermediate schools). The FY22 MSAP Projects have launched schools with diverse programmatic focuses including journalism and multimedia;[8] innovative leadership and civic activism;[9] multimedia arts and engineering;[10] discovery and applied learning;[11] leadership and exploration;[12] multimedia and the performing arts;[13] and leadership through engineering.[14]

---

[7] Notably, as discussed herein, during part or all of every single one of those past MSAP project periods except the very first one (2010-2013), NYCPS had in place a version of what is currently known as its Guidelines to Support Transgender and Gender Expansive Students.
[8] PS 202, The Magnet School of Journalism and Multimedia
[9] PS 312, The Jamaica Children's Magnet School for Innovative Leadership and Civic Activism
[10] VSCMS, The Magnet School of Multimedia Arts and Engineering
[11] PS 182, The Samantha Smith Magnet School for Discovery and Applied Learning
[12] MS 332, The Redwood Magnet School for Leadership and Exploration
[13] MS 72, The Catherine and Count Basie Magnet School of Multimedia and the Arts
[14] PS 145, The Magnet School of Leadership Through Engineering

36.    On March 14, 2023, the Department published in the Federal Register an NIA for FY 2023 ("FY23") inviting applications from LEAs or consortia of LEAs for MSAP grants of up to $3.5 million per budget year, for a project period of up to 5 years to create or revise magnet schools. 88 Fed. Reg. 15697 (March 14, 2023). NYCPS applied for MSAP grants in response to the FY23 NIA through two new inter-district magnet school projects, each involving three CSDs: (1) Bronx Inter-District (CSD 7, 10, and 11); and (2) Manhattan Inter-District (CSD 4, 2, and 6) (together, the "FY23 MSAP Projects").

37.    The two FY23 MSAP Projects involved transforming six high schools located in Manhattan and the Bronx into new magnet schools serving students in grades 6-12 with programmatic focuses on, among other things, STEAM;[15] early college exploration;[16] career connected learning;[17] aspiring educators;[18] and innovation through visual arts[19].

38.    As part of the MSAP grant applications in both FY22 and FY23, each CSD member of the MSAP Projects provided the Department with a signed assurance of compliance with federal civil rights law, a prerequisite for NYCPS' eligibility to receive this MSAP grant funding.

39.    By the issuance of three Grant Award Notifications in FY22, and two Grant Award Notifications in FY23, the Department awarded MSAP grants of $2,999,999 per year to each of the MSAP Projects on or about September 30, 2022 and September 30, 2023, respectively, for a total award of almost $15 million per Project over each grant's 5-year project performance period. For the FY22 MSAP Projects, the performance period was from October 1,

---

[15] Jacqueline Kennedy Onassis STEAM Magnet School of Business Careers
[16] Esperanza Early College Exploration and Leadership Magnet
[17] Magnet School of Career Connected Learning
[18] Magnet School for Aspiring 21st Century Educators and Leaders
[19] Magnet High School for Innovation through Visual Arts

2022 through September 30, 2027. For the FY23 MSAP Projects, the performance period was from October 1, 2023 through September 30, 2028.

40.    In each case, in awarding MSAP grants, the Department determined that the grants were in the best interests of the Federal Government, and—through OCR—certified the assurances by the NYCPS MSAP applicants that they comply with federal civil rights law. At the time that the Department made those determinations and certifications, the NYCPS Guidelines to support transgender and gender expansive students in NYCPS were in place.

41.    Since the time that the FY22 and FY23 MSAP Projects began on October 1, 2022 and October 1, 2023, respectively, without exception, they each received MSAP funding for an initial budget period, and for continuation budget periods. In connection with each continuation of the MSAP grants, the MSAP Projects submitted the Spring annual performance reports required by 34 C.F.R. § 75.118 to the Department, and the Department determined that the grants were in the best interests of the Federal Government, and—through OCR—certified the assurances by the applicants that they comply with federal civil rights law. At the time that the Department made those determinations and certifications, the NYCPS Guidelines to support transgender and gender expansive students in NYCPS were in place.

42.    Since their initial budget periods in October of 2022 and 2023, respectively, the NYCPS MSAP Projects have made use of the MSAP grant funds to successfully design, develop, and launch the initial phases of innovative magnet school programs at the 19 funded magnet schools, with the expectation that they would be given the full 5 years of funding that Congress intended, in order to position their schools to successfully transition into self-sustaining magnet schools.  Using MSAP funding, FY22 MSAP Project Schools have established a student-led broadcasting station,[20] created specialty learning spaces including a podcasting lab and a

---

[20] PS 86, Bushwick Magnet Multimedia and Arts Academy

STEAM lab,[21] hired full-time engineering/STEM instructors,[22] developed an active student newspaper and morning news station,[23] begun to establish a state-of-the-art fabrication lab and recording studio,[24] and created a puppet-making residency.[25]

43.    Using MSAP funding, FY23 MSAP Project Schools have begun implementing early college courses with a local college,[26] established Advanced Placement classes and a dual enrollment option with a local college,[27] developed a financial technology lab with a financial literacy curriculum,[28] facilitated an entirely student-designed and produced full scale musical production,[29] launched a student-led social media team providing students with hands-on experience in graphic design, digital storytelling, and strategic communication,[30] and developed a design lab.[31]

44.    In only 3 years since the launch of the FY22 MAPS Project, NYCPS' MSAP-funded Schools have already been recognized with a Magnet Schools of America Top Magnet School of Excellence Award,[32] seen students crowned District debate champions,[33] and achieved remarkable improvements in English and math proficiency.[34]

45.    As Congress intended, NYCPS' 5-year plans for the FY22 MSAP Project magnet Schools were focused on using the funding in remaining budget periods to ensure that the

---

[21] PS 116, Leadership Through Multimedia and the Arts Magnet School
[22] PS 145, The Magnet School of Leadership Through Engineering
[23] PS 202, The Magnet School of Journalism and Multimedia
[24] VSCMS, The Magnet School of Multimedia Arts and Engineering
[25] PS 135, The Bellaire Magnet School of Exploration Through the Arts
[26] Esperanza Early College Exploration and Leadership Magnet
[27] Jacqueline Kennedy Onassis STEAM Magnet School for Business Careers
[28] Id.
[29] City College Magnet School of the Arts
[30] Magnet High School for Innovation Through Visual Arts
[31] Id.
[32] MS 35, The Magnet School of Leadership, Exploration, and the Arts
[33] PS 182, The Samantha Smith Magnet School for Discovery and Applied Learning
[34] The percentage of students achieving proficiency in Math and English at the Bushwick Magnet Multimedia and the Arts Academy had improved by 24.7 and 20.6 percentage points, respectively. The Magnet School of Leadership and Innovation improved its math proficiency by 24.9 percentage points, and The Magnet School of Multimedia Arts and Engineering improved its by 29.7 percentage points.

magnet Schools become self-sustaining after September 30, 2027 when the FY22 MSAP

Projects' funding period was scheduled to expire. For example, one of the Schools had planned

to purchase a SmartTable Collaborative Learning Center in budget year 4, and an A+ STEM Law

Robotic Technology Kit in year 5.[35] Another had budgeted to purchase a Phase IV of a

Multimedia Lab Production Package, having purchased Phases I, II, and III during its first 3

years.[36]

46.    NYCPS' 5-year plans for the FY23 MSAP magnet Schools, which are a year less

established, were created to ensure that the Schools become self-sustaining by September 30,

2028 when the FY23 MSAP Projects funding period was scheduled to expire. With only 2

funded years completed, these Projects were only just getting underway and had planned to

invest considerable resources to develop partnerships, and design the experiences, core practices,

systems and structures necessary to ensure sustainability.

47.    Because of the timing of initial MSAP grant approvals, and initial funding, which

operate on the federal fiscal schedule, not the school calendar, it is typical that projects receiving

MSAP grant funding are not able to begin spending the grant funds received during the initial

budget year until well into the school year. This inevitably results in a portion of the first-year

grant amount not being expended during the designated "year 1" budget period. This likelihood

is recognized in the federal program regulations, which provide that unspent amounts from one

budget year become "carryover" which must be spent in the following budget year before any of

the second year's grant funding is spent. Carryover from one budget year to the next often recurs

(and gradually increases in size) during the successive years of the MSAP grant.

---

[35] PS 116, Leadership Through Multimedia and the Arts Magnet School
[36] MS 35, The Magnet School of Leadership, Exploration, and the Arts

48.     As set forth at 34 CFR 75.253(d), "a grantee may expend funds that have not been obligated at the end of a budget period for obligations of the subsequent budget period" and NYCPS MSAP projects have done so in prior years, "if the obligation is for an allowable cost that falls within the scope and objectives of the project." As long as a grant is continued from one budget period to the next, any carryover funds from the prior budget period will be available to the grantee to be spent in the subsequent budget period. As of today, , the combined FY25 unspent funds that available for carryover for use by the five NYCPS MSAP Projects is approximately $11 million. *See also*, 34 CFR § 75.253(e).

49.     In May of 2025, each of the MSAP Projects timely submitted an Spring annual performance report to the Department, in which it documented its progress towards the Project goals, provided a financial update, and submitted the required assurances of compliance with federal civil rights law. Each also documented in the report the amount of unspent funds it was seeking to carryover into the next budget period, and submitted a budget documenting the ways in which the carryover funds would be used in the next budget period for allowable costs falling within the scope and objectives of the Project.

**E.  OCR's Discontinuation of NYCPS's MSAP Grants**

50.     In or around September 2025, the Department's decided to discontinue NYCPS' MSAP grants effective September 30, 2025, and effectuated this decision by four separate actions: (1) OCR's refusal to certify NYCPS' compliance with federal civil rights law pursuant to 20 U.S.C. § 7231d(c), communicated in a letter dated September 16, 2025; (2) the non-continuation decision—communicated both initially, in the September 16, 2025 letter, and upon reconsideration, in a letter dated September 26, 2025—pursuant to 34 CFR 75.253(a)(5); (3) the resetting of the project performance period to September 30, 2025 made effective by the issuance of revised Grant Award Notifications on September 30, 2025; and (4) the election not to

authorize a no-cost extension to facilitate orderly closeout of the grants, which was communicated first in the September 26, 2025 letter, and affirmed in the subsequent Grant Award Notifications (together, the "Discontinuation").

    ***1. The September 16, 2025 Notice of Discontinuation***

    51.    On September 16, 2025, Acting Assistant Secretary Craig W. Trainor sent a letter notifying NYCPS that OCR "has identified a civil rights compliance issue" with NYCPS due to the NYCPS Guidelines (the "OCR Discontinuation Letter"). This notice arrived more than two weeks into the 2025-2026 school year at the 19 covered magnet Schools, where approximately 7700 students are attending school and countless other employees are working to foster and support the students' education, including, for each MSAP Project, a Project Director who is led and supported by NYCPS' Director of Magnet Schools Assistance Program, specialized teachers trained to deliver innovative curriculum, and onsite coaches charged with building the Schools' capacity to continue operating as a magnet school.

    52.    The OCR Discontinuation Letter announced a finding by OCR that the District-wide NYCPS Guidelines discriminate on the basis of sex in violation of Title IX in that (1) NYCPS permits students to use restrooms and locker rooms consistent with their gender identity; (2) students are permitted to participate in all school activities, including sports and overnight field trips, in accordance with their gender identity, with privacy concerns to be addressed on a case-by-case basis; and (3) transgender or gender expansive students may not be required to use an alternative facility, such as a single-occupancy restroom, or a facility that conflicts with their gender identity.

    53.    On the basis of that purported finding, which was made without notice, investigation, hearing, or opportunity to contest, the Acting Assistant Secretary refused to certify for the FY26 grant continuation period, stating that NYCPS cannot meet its civil rights

assurances, as required by 20 U.S.C. § 7231d(c), and that NYCPS's MSAP grant would be non-continued under 34 C.F.R. § 75.253(a)(5) because "it is no longer in the best interest of the Federal Government." (*See* OCR Discontinuation Letter).

54.    In announcing the non-continuation of NYCPS' MSAP grant, the letter did not purport to make any findings, nor identify any concerns, about NYCPS' performance reports, performance measures, or financial data for the prior year. *See* 34 C.F.R. §§ 75.118, 75.253(b); *Discretionary Grantmaking* at 32.

55.    Likewise, the letter did not provide any performance-related explanation as to why the MSAP grants were "no longer in the best interest" of the Federal Government, whether by reference to the purpose of MSAP—including the Congressional findings that continuing to fund MSAP projects is in the best interests of the United States—or by offering any other explanation.

56.    Instead, OCR simply demanded that NYCPS *agree to take* "remedial measures," and indicated that NYCPS could request reconsideration of the decision, but *only* if NYCPS notified OCR in writing by 5 p.m. ET on Friday, September 19, 2025—within three business days—that it would agree to take the following "remedial steps," outlined in the letter, to ensure its compliance with Title IX:

1. Adopt biology-based definitions for the words 'male' and 'female' pursuant to Title IX;
2. Issue a public statement to parents, students, and staff stating that New York City Public Schools will comply with Title IX and specifying that it will not allow males to compete in female athletic programs or occupy intimate facilities designated for females;
3. Specify that New York City Public Schools must provide intimate facilities such as locker rooms and bathrooms accessible to its students strictly separated on the basis of sex and comparably provided to each sex;
4. Specify that New York City Public Schools must provide sleeping arrangements during overnight activities and athletic trips to its

students strictly separated on the basis of sex and comparably provided to each sex;

5. Specify that Title IX forbids schools from allowing boys or men to participate in any athletic program designated for girls or women, ensuring that only female students are eligible to join, participate, or be categorized or counted as a member of Girls' Team(s)/Category(s) and that all male students are ineligible to join, participate, or be categorized or counted as a member of Girls' Team(s)/Category(s); and

6. Rescind any guidance that violates Title IX, remove or revise any internal and public-facing statements or documents that are inconsistent with Title IX, and notify all parents, students, and staff of such rescissions and revisions.

(OCR Discontinuance Letter, pp. 3-4.)

57.    On September 19, 2025, prior to the expiry of OCR's three-day deadline, NYCPS General Counsel Liz Vladeck responded to the OCR Discontinuation Letter on behalf of the NYCPS Chancellor by requesting a 30-day extension of the deadline to consider whether to seek reconsideration of OCR's decision, given that it would be unreasonable to expect NYCPS to evaluate the implications of the OCR Discontinuance Letter and its impact on schools, programs, and students within three business days (the "NYCPS Request for Extension"). The NYCPS Request for Extension also sought responses to a series of questions to assist NYCPS in evaluating its options.

58.    In particular, NYCPS raised the following inquiries:

- Please explain why the Secretary, in summarily concluding that NYCDOE is in violation of Title IX, has deprived the NYCDOE of the procedures and due process required by federal regulations before discontinuing funding based on alleged non-compliance.
- Please explain the nexus between your interpretation of Title IX and the MSAP grant funding that is being discontinued. The policies that you cite are not specific to the MSAP and your letter does not provide a basis for targeting MSAP grants. Nor is it clear how OCR's interpretation of Title IX impacts the goals of the MSAP to expand access and educational opportunities for underserved communities.
- Public statements suggest that only three school districts nationally have been sent letters advising that MSAP grants are being

discontinued. Please explain the basis for selecting these three districts.

- Please confirm that MSAP grant funding already authorized for Fiscal Year 25, but not yet spent, may be used as carryover for expenditures made in Fiscal Year 26 for the five Magnet School Programs.

- Please provide us with a copy of the OCR's written procedures for processing objections, hearings and appeals, as required by 34 C.F.R. 200.342.

(*See* NYCPS Request for Extension pp. 1-2.)

59.    Assistant Secretary Trainor replied to the NYCPS Request for Extension via a short email on September 20, 2025 (the "Trainor Email"). The Trainor Email rejected NYCPS' request for an extension, and refused to provide the requested information, stating that "the authorities cited [in the Discontinuation Letter] speak for themselves." (*Id.*) He granted NYCPS two additional business days—until 5:00 p.m. ET on Tuesday, September 23, 2025—to *seek reconsideration by implementing the remedial measures* outlined in the Discontinuance Letter, threatening that "[f]ailure to do so will result in a denial of reconsideration, and my decision not to certify NYC DOE's grant under 20 U.S.C. § 7231d(c) and non-continue its MSAP grant under 34 C.F.R. § 75.253(a)(5) will stand." (*Id.*)

### 2. *The September 26, 2025 Denial of Reconsideration*

60.    On Friday, September 26, 2025, the Department, through Lindsey Burke, its Deputy Chief of Staff for Policy and Programs, wrote to NYCPS Chancellor Melissa Aviles-Ramos purporting to deny a request for reconsideration of the non-continuation decision that NYCPS never actually made (the "Burke Letter").

61.    First, the Department first sought to portray the OCR Discontinuance Letter and the Trainor Email as offering a credible invitation for NYCPS to "submit a reconsideration request, and the Department would review the submitted material to determine if the request is accepted or denied." *Id*.

62.     In reality, as the Burke Letter then admitted, there were preconditions to the Department's "offer of an opportunity" to seek reconsideration: "the only requirement being that NYC DOE agree to begin to take the remedial steps described in the letter to ensure adequate compliance with federal civil rights law." By reiterating the prerequisite capitulation for reconsideration, the Department continued to deny NYCPS a chance to dispute OCR's findings, and thereby seek meaningful reconsideration of the decision.

63.     Next, the Burke Letter purported to reconsider the determination by OCR, under 34 CFR § 75.253(a)(5), as to whether the NYCPS MSAP grant was in the best interest of the federal government. The Burke Letter concluded that based on the same "ongoing civil rights concerns" upon which the Assistant Secretary refused to certify *NYCPS' compliance* with civil rights laws, reconsideration of the "best interests" determination was denied. *Id.* Similar to the OCR Discontinuation Letter,  in the Burke Letter, the Department again did not consider, let alone make any findings, or identify any concerns, about NYCPS' performance reports, performance measures, or financial data  for  the prior grant year. *See* 34 C.F.R. §§ 75.118, 75.253(b); Discretionary Grantmaking at 32. The Burke Letter also made no reference to the purpose of MSAP—including the Congressional findings that continuing to fund MSAP projects is in the best interests of the United States.

64.     Finally, the Burke Letter informed NYCPS for the first time that "the Department is electing … not to authorize further no-cost extensions for [NYCPS' MSAP] grant awards identified for non-continuation." *Id.*

### 3.   *The Revised Grant Award Notifications*

65.      On Monday, September 29, 2025—three weeks into the current school year—without any prior notice, the Department issued to NYCPS new Grant Award Notifications for

each of the five MSAP Projects, resetting the project performance periods for each MSAP grant to end on September 30, 2025, and revising the authorized funding for each MSAP grant to the amount expended on the Project through September 30, 2025. In so doing, the Department barred NYCPS' MSAP Projects from carrying over into FY26 the unspent funds from FY25. As of today, the previously authorized FY25 funding across all of the 5 MSAP Projects available for carryover is approximately $11 million.

**F.  The NYCPS Guidance Is Mandated by State and Local Law, and Consistent with Federal Law**

*1.  Requirements of State Law*

66.    Like all public school districts in the state of New York, NYCPS is regulated by the New York State Education Department ("NYSED"). NYSED is headed by the Board of Regents, which appoints the State Commissioner of Education to serve as the chief executive officer of "the state system of education," and among other responsibilities, enforce the laws relating to the system, execute the educational policies determined by the Board of Regents, and advise local school districts as to their duties and the general management of their schools. N.Y. Educ. Law § 305(1), (2).

67.    The law in New York is clear: it is unlawful to discriminate against people on the basis of their gender identity or gender expression. New York's Constitution states that "[n]o person shall be denied the equal protection of the laws of this state" and prohibits discrimination because of "sex, including sexual orientation, gender identity, [or] gender expression." N.Y. Const. art. I, § 11(a). The right to equal protection is similarly codified in New York's Human Rights Law. *See* N.Y. Civ. Rights Law § 40-c (subjecting any person to any discrimination in his or her civil rights, or to any harassment based on, *inter alia*, gender identity or expression, is prohibited).

68.     New York law includes the categories of sex, sexual orientation, and gender identity or expression as expressly protected from discrimination in employment, education, places of public accommodation, and other contexts. N.Y. Exec. Law §§ 291, 296. "Gender identity or expression" is defined as "a person's actual or perceived gender-related identity, appearance, behavior, expression, or other gender-related characteristic regardless of the sex assigned to that person at birth, including, but not limited to, the status of being transgender." N.Y. Exec. Law §§ 292(35). *See also* 9 N.Y.C.R.R. § 466.13; 47 R.C.N.Y. § 2-06 (prohibiting discrimination under the New York City Human Rights Law based on gender identity).

69.     In the sphere of education, New York prohibits discrimination or harassment against students on the basis of sexual orientation or gender, and here again, gender means "actual or perceived sex and shall include a person's gender identity or expression." N.Y. Educ. Law §§ 11-12. Moreover, New York law mandates that "the board of education and the trustees or sole trustee of every school district *shall* create policies, procedures and guidelines that shall include, but not be limited to:

> 1. Policies and procedures intended to create a school environment that is free from harassment, bullying and discrimination…."

N.Y. Educ. Law § 13 (emphasis added).

70.     Regulations promulgated by the State Commissioner of Education similarly require schools to implement a written code of conduct prohibiting harassment, bullying, or discrimination against students, including based on sex, sexual orientation, or gender, including gender identity or expression. 8 N.Y.C.R.R. §100.2(l)(2). In 2015, NYSED issued a *Guidance to School Districts for Creating a Safe and Supportive School Environment for Transgender and*

*Gender Nonconforming Students*[37] and in 2023 released, *Creating a Safe, Supportive, and Affirming School Environment for Transgender and Gender Expansive Students: 2023 Legal Update and Best Practices* (together, the "NYSED Guidance").[38] The NYSED Guidance is intended to assist New York school districts in complying with New York state law and federal law, which it interprets as requiring schools to foster an educational environment for all students that is safe and free from discrimination—regardless of sex, gender identity, or gender expression.[39] The NYSED Guidance also highlights the existence of guidance from the U.S. Department of Education ("USDE") and the Department of Justice that Title IX prohibits discrimination on the basis of sex, which has been interpreted to include sexual orientation and gender identity.[40]

71.     Moreover, in 2024, the NYSED Office of Counsel issued a Formal Opinion in response to questions raised about whether New York's recent Gender Expression Non-Discrimination Act (GENDA) "protects students' ability to utilize the 'school restrooms and locker rooms' that align with their gender." NYSED's answer was an emphatic yes:

> GENDA 'reaffirm[ed]' New York State's commitment 'to assure that every individual within this state is afforded an equal opportunity to enjoy a full and productive life …' To that end, it declared discrimination based on 'gender identity or expression' an unlawful practice under the Human Rights Law. GENDA specifically prohibits public schools from 'deny[ing] the use of [their] facilities to any person otherwise qualified, or … permit[ting] the harassment of any student or applicant … by reason of … [a person's] gender identity or expression.

> Restrooms and locker rooms are unquestionably 'facilities.' And denying transgender students access thereto would be due to, or 'by reason of,' their gender identity. The

---

[37] New York State Education Department, Guidance to School Districts for Creating a Safe and Supportive School Environment for Transgender and Gender Nonconforming Students (July 2015), publicly available at https://www.p12.nysed.gov/dignityact/documents/Transg_GNCGuidanceFINAL.pdf

[38] New York State Education Department, Creating a Safe, Supportive, and Affirming School Environment for Transgender and Gender Expansive Students: 2023 Legal Update and Best Practices (2023), publicly available at https://www.nysed.gov/sites/default/files/programs/student-support-services/creating-a-safe-supportive-and-affirming-school-environment-for-transgender-and-gender-expansive-students.pdf

[39] Creating a Safe, Supportive, and Affirming School Environment for Transgender and Gender Expansive Students: 2023 Legal Update and Best Practices at 7.

[40] *Id.* at 9, 33.

ineluctable conclusion, then, is that denying transgender persons access to restrooms or locker rooms violates GENDA.[41]

## 2. *Federal Law – Title IX and the President's Executive Orders*

72.    Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), prohibits discrimination based on sex in federally funded education institutions. In 2021, the Department published interpretive guidance in the Federal Register stating that its Office of Civil Rights would "fully enforce Title IX to prohibit discrimination based on sexual orientation and gender identity." U.S. Department of Education, Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of Bostock v. Clayton County, 2021 (the "Title IX Interpretive Guidance").[42] The Title IX Interpretive Guidance's stated purpose was "to clarify the Department's enforcement authority over discrimination based on sexual orientation and discrimination based on gender identity under Title IX." According to the Guidance, "OCR will fully enforce Title IX to prohibit discrimination based on sexual orientation and gender identity in education programs and activities that receive Federal financial assistance from the Department," such that OCR will read Title IX to protect an individual who is "harassed, disciplined in a discriminatory manner, excluded from, denied equal access to, or subjected to sex stereotyping in academic or extracurricular opportunities and other education programs or activities, denied the benefits of such programs or activities, or otherwise treated differently because of their sexual orientation or gender identity."[43]

---

[41] NYSED, Formal Opinion of Counsel No. 244 (May 14, 2024), publicly available at https://www.counsel.nysed.gov/sites/counsel/files/244.pdf, at 1 (internal citations omitted).
[42] 86 Fed. Reg. 32637 (June 22, 2021).
[43] *Id.* at 32639.

73.     Notwithstanding the Department's published interpretation of Title IX, in January 2025, President Trump issued three Executive Orders rejecting the Department's Title IX Interpretive Guidance, purporting to announce a new federal interpretation of Title IX, and ordering agencies to adopt and enforce it (the "Gender Ideology EOs").[44] [45]

74.     The Gender Ideology EOs impose an interpretation of Title IX that rejects "gender identity-based access to single-sex spaces" including "use of intimate facilities and accommodations such as bathrooms or locker rooms specifically designed for persons of the opposite sex; and participating in school athletic competitions or other extracurricular activities specifically designed for persons of the opposite sex." EO 14168 § 3(f); EO 14190 § 2(e). According to the Gender Ideology EOs, the new interpretation would be enforced by "eliminating Federal funding or support for illegal and discriminatory treatment and indoctrination in K-12 schools, including based on gender ideology," and "prevent[ing] or rescind[ing] Federal funds … from being used by an … elementary school, or secondary school, to directly or indirectly … support or subsidize a violation of Title VI or Title IX." EO 14190 at § 3(iv)(B).

75.     The Gender Ideology EOs also heralded the January 2025 District Court decision in *Tennessee v. Cardona*, 762 F. Supp. 615, 627-628 (E.D. Ky. 2025), in which a District Court in Kentucky vacated a 2024 Final Rule issued after notice and comment by the Department under President Biden[46] that had, *inter alia*, codified the Department's understanding that sex

---

[44] *See* Executive Order ("EO") 14168 – *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025); EO14190 – *Ending Radical Indoctrination in K-12 Schooling*, 90 Fed. Reg. 8853 (Jan. 29, 2025); and EO 14201 – *Keeping Men Out of Women's Sports*, 90 Fed. Reg. 9279 (Feb. 5, 2025).
[45] EO 14168 went so far as to direct Agency heads to "promptly rescind all guidance documents inconsistent with the requirements of this order or the Attorney General's guidance issued pursuant to this order, or rescind such parts of such documents that are inconsistent in such manner," including the Title IX Interpretive Guidance. EO 14168 at § 7(c)
[46] 89 Fed. Reg. 33474(Apr. 29, 2024).

discrimination includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity.

76.    On February 4, 2025, OCR issued a Dear Colleague Letter ("DCL") purporting to announce a pivot in the federal government's enforcement of Title IX, consistent with EO 14168, in which "President Trump ordered all agencies and departments within the Executive Branch to 'enforce all sex-protective laws to promote [the] reality' that there are 'two sexes, male and female,' and that '[t]hese sexes are not changeable….'"[47] The DCL announced: "ED and OCR must enforce Title IX consistent with President Trump's Order."[48]

77.    Notwithstanding the purpose and content of the Gender Ideology EOs and the DCL, the Department has neither revoked the Title IX Interpretive Guidance, nor replaced it by publishing a revised interpretation in the Federal Register.

### 3.  *New York State's Response to the Gender Ideology EOs*

78.    On February 5, 2025, the New York Attorney General and NYSED jointly issued guidance for New York schools, including NYCPS, on their continuing obligations to prohibit discrimination on the basis of gender identity and/or gender expression, as required by New York law, notwithstanding the Gender Ideology EOs issued by President Trump. *See* Joint Statement of the Office of the Attorney General and the State Education Department Regarding Transgender Students' Rights ("Joint Statement").[49]

79.    The Joint Statement informed school districts that Presidential EOs "purporting to restrict K-12 schools from supporting transgender students' social transition and their access to

---

[47] Craig Trainor (Feb. 4, 2025), Dear Colleague Letter, Washington, D.C.: U.S. Department of Education, Office for Civil Rights, publicly available at https://www.ed.gov/media/document/title-ix-enforcement-directive-dcl-109477.pdf.
[48] *Id.*
[49] Letitia James, Betty A. Rosa (Feb. 2025), Joint Statement of the Office of the Attorney General and the State Education Department Regarding Transgender Students' Rights, New York: State of New York Office of the Attorney General; New York State Education Department; publicly available at https://www.nysed.gov/sites/default/files/nysed-oag-joint-statement-regarding-transgender-students.pdf

athletics… do not affect the rights of transgender students and individuals in New York's public schools," and cautioned that "[s]chool districts must continue to follow State law" including the Gender Expression Non-Discrimination Act ("GENDA").[50] The Joint Statement noted that even a federal court decision cited in EO 14201 "explicitly recognized, in enjoining a 2024 regulation, that the injunction did not 'limit[] the ability of any school to … otherwise comply with applicable state or local laws or rules regarding' transgender students."[51]

### 4. *NYCPS Guidelines to Support Transgender and Gender Expansive Students*

80.     In compliance with New York state law, and consistent with existing federal, governmental, and judicial interpretation of Title IX, NYCPS maintains policies for its school-based and central staff that support transgender and gender expansive students. NYCPS' current *Guidelines to Support Transgender and Gender Expansive Students*[52] have been in place since 2019, however prior versions go back as far as 2014. The NYCPS Guidelines set out a protocol and best practices for records, names and pronouns, curriculum, and resources, as well as access to restrooms, locker rooms, sports and physical education, and other circumstances. Consistent with federal and New York state law—and as directed by the New York Attorney General and NYSED —the NYCPS Guidelines state that students must be given access to facilities and permitted to participate in all school activities in accordance with their gender identity asserted at school.

81.     The NYCPS Guidelines also reflect a commitment to ensure a safe learning environment for all students free from discrimination and harassment. They recognize that

---

[50] *Id*. GENDA amended NY Executive Law, Civil Rights Law, and Education Law to prohibit discrimination based on gender identity and expression.
[51] *Id*. (*quoting Kansas v. Dep't of Educ*., 739 F. Supp. 3d 902, 936 (D. Kansas 2024)).
[52] NYCPS, Guidelines to Support Transgender and Gender Expansive Students, publicly available at https://www.schools.nyc.gov/school-life/school-environment/guidelines-on-gender/guidelines-to-support-transgender-and-gender-expansive-students.

transgender and gender expansive students are at high risk for being bullied and marginalized and that schools must foster a culture of respect that values all students. To accomplish that goal, the NYCPS Guidelines require that schools assess the needs of each student individually, and address, on a case-by-case basis, any requests for arrangements to address individual student and family privacy concerns. Under the Guidelines, when families have a concern, they contact their school and they are assisted to find a resolution that will keep their children safe.

**G.  The Department's Discontinuation of the MSAP Grants Violated Governing Statutes and Regulations Failing to Provide NYCPS the Process Required by Title IX**

82.    The Discontinuation of NYCPS' MSAP Projects based on NYCPS' alleged violation of Title IX—without notice, investigation, hearing, or opportunity to respond, and without a valid substantive basis—is both a misuse of MSAP's intended grant continuation certification and performance review processes, as well as a blatant attempt to avoid the exacting process required by law to adjudicate a Title IX violation.

83.    The Department, through the actions taken by the Acting Assistant Secretary, and the Deputy Chief of Staff for Policy and Programs to effectuate the Discontinuation, has plainly tried to sidestep the mandated Title IX process by misusing MSAP's grant continuation review process. OCR, while purporting to refuse to certify compliance with the Projects' assurances required under MSAP, in fact engaged in a wholesale assessment of NYCPS' Guidelines unrelated to MSAP and refused to certify them. Relying on that improper "finding,", the Department then further subverted the process by discontinuing the NYCPS' MSAP grants, abridging the performance period for those grants, and refusing to permit a no-cost extension that would have allowed an orderly wind-down of the Schools' 5-year plans and minimized harm to students using the FY25 carryover funds. As a result, this Discontinuation is not only unlawful,

but is also being carried out in a manner that maximizes the harm to the very students the MSAP grants are designed to support.

84.    First, OCR's refusal to certify the MSAP Projects' compliance with federal civil rights, purportedly pursuant to 20 U.S.C. § 7231d(c), is impermissible Title IX enforcement in circumvention of Congressionally mandated procedural guardrails. Although OCR's refusal to certify is based on NYCPS' operation *writ large*, the statutory provision upon which OCR relies requires the certification of only certain narrow aspects of the Projects' and their Schools' operation. In particular:

> (b) Each application submitted under subsection (a) shall include—
> …
>> (2) assurances that the applicant will—
>> …
>>> (C) not engage in discrimination based on race, religion, color, national origin, sex, or disability in—
>>>> (i) the hiring, promotion, or assignment of employees of the applicant or other personnel for whom the applicant has any administrative responsibility;
>>>> (ii) the assignment of students to schools, or to courses of instruction within the schools, of such applicant, except to carry out the approved plan; and
>>>> (iii) designing or operating extracurricular activities for students;
>> …
> (c) No grant shall be awarded under this part unless the Assistant Secretary of Education for Civil Rights determines that the assurances described in subsection (b)(2)(C) will be met.
> 20 U.S.C. § 7231d(b)-(c).

85.    That OCR has purported to have reviewed not the specific operations about which *the Projects* made assurances, as described in 20 U.S.C. § 7231d(b)(2)(C)[53], but NYCPS' District-wide policy, makes clear that this was not a certification decision tied to the Projects' 20 U.S.C. § 7231d(c) assurances, but rather, an attempt at wholesale Title IX enforcement.

---

[53] For example, 20 U.S.C. § 7231d(b)(2)(C) provides that the "applicants" are required to submit assurances of non-discrimination. Moreover, the statute contemplates—and appears to authorize—and applicant to engage what might be considered "discrimination" based on protected categories in connection with the assignment of students to schools, or to courses of instruction within the schools, "to carry out the approved [desegregation] plan."

86.    Second, the Department purports to discontinue funding the MSAP Projects pursuant to 34 C.F.R. 75.253, which requires that in order to receive a continuation award, recipients must "receive a determination from the Secretary that the continuation of the project is in the best interest of the federal government." 34 C.F.R. 75.253(a)(5).

87.    However, the Department made no mention whatsoever in its notices to NYCPS of the factors specifically prescribed by the MSAP regulations to determine the "best interest" of the federal government: NYCPS' performance reports, performance measures, or financial data for the prior year. *See* 34 C.F.R. §§ 75.118, 75.253(b); *Discretionary Grantmaking* at 32. Nor did the Department reference extensive Congressional findings about the ways in which continued funding of magnet schools through MSAP is in the best interests of the United States. *See* 20 U.S.C. § 7231(a).

88.    Instead, the Department premised the Discontinuation solely on NYCPS' alleged violations of Title IX—skipping to the enforcement stage of a Title IX determination without providing any of the statutorily required procedural protections to get there. The statutory and regulatory provisions effectuating Title IX are clear: actions taken in enforcement of Title IX *may only be undertaken* by following the prescribed procedural protections. The Department's brazen attempt to circumvent this process cannot be reconciled with the best in interests of the United States, nor can it stand under Title IX.

89.    Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefit of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Federal agencies are "authorized and directed" to enforce § 1681 in a number of ways, including "by the termination of or refusal to grant or to continue [financial] assistance…to any

recipient as to whom there has been an express finding on the record, after opportunity for a

hearing, of a failure to comply with such requirement." 20 U.S.C § 1682.

90.     As the Department well knows, before *any decision*[54] can be taken to discontinue,

terminate, or revoke financial assistance as a result of a violation of Title IX, an agency **must**

"advise[] the appropriate person or persons of failure to comply with the requirement and []

determin[e] that compliance cannot be secured by voluntary means," **must** collect evidence and

hold a hearing, and finally, **must** "file with the committees of the House and Senate having

legislative jurisdiction over the program or activity involved a full written report of the

circumstances and the grounds for such action." *Id.* Further, "[n]o such action shall become

effective until thirty days have elapsed after the filing of such report. *Id*. Any such action is then

subject to judicial review in the appropriate federal district court. Here, NYCPS was denied the

process mandated by Title IX at every turn.

91.     Despite cloaking unlawful conduct as a legitimate exercise of the Assistant

Secretary's "unique ability to examine a MSAP grantee's prospective compliance with

applicable federal civil rights law," Burke Letter at 1, the Department has failed to identify any

concern regarding the past or planned programs or policies specific to the operation of the MSAP

School grantees or described in their annual performance reports, as contemplated by the MSAP

or Title IX regulatory schemes.[55]  Instead, the Department points to the existence of the NYCPS

---

[54]"Any decision" includes a Title IX administrative proceeding to terminate or refuse to grant or continue federal financial assistance for an applicant who fails or refuses to furnish assurances of compliance with federal civil rights law. *See* 34 C.F.R. § 100.8(b), (noting that "the Department shall continue assistance during the pendency of such proceedings, where such assistance is due and payable pursuant to an application therefor approved prior to the effective date of this part").
[55] As the FY 22 MSAP NIA provides, a continuation award "considers whether the *grantee* is operating in compliance with the assurances in its approved application…." (87 Fed. Reg. 9595 (Feb. 22, 2022) (emphasis added). In addition, 20 U.S.C. § 1682 provides for refusal to continue financial assistance "to *any recipient* as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement, but such termination or refusal shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made, and shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found…." *Id.* (emphasis added).

Guidelines, protections for transgender and gender expansive students required by law and in effect well before the Schools were approved and recertified multiple times for their MSAP grants.

92.    Moreover, the NYCPS Guidelines have been in place in some form for over a decade, without OCR ever raising concerns about them, despite the Assistant Secretary then in office having had, the entire time, on dozens and dozens of occasions, the same "unique ability to examine [NYCPS MSAP grantees'] prospective compliance with applicable federal civil rights law." With each such opportunity to examine and certify NYCPS Projects' compliance with federal civil rights compliance since the NYCPS Guidelines were issued in 2014, OCR has failed to raise any concern about the Guidelines.

**H.  NYCPS is Harmed by the Discontinuation of NYCPS' MSAP Grants**

93.    The Department's Discontinuation of NYCPS' MSAP grants is already hampering NYCPS' ability to operate its 19 fledgling MSAP-funded magnet schools, cutting them adrift by (1) precluding NYCPS from accessing approximately $11 million in unspent carryover FY25 federal funds to support the current operation of the nineteen magnet schools; and (2) casting ongoing planning for the magnet schools into doubt for the remainder of each Project's 5-year grant period by discontinuing federal funding for the Schools.

94.    In the initial years of their MSAP grants, each of the nineteen schools, all of which received their initial MSAP funding in either FY22 or FY23, made significant investments to develop programmatic and curricular themes like STEAM; college readiness; teaching; journalism; visual, performing, and multimedia arts; and leadership. Discontinuing the grants abruptly, without warning, during the current school year, gave the MSAP Projects no opportunity to plan for prioritization of programming or curtailment of financial commitments. Many of the services and programming that have been developed will be discontinued.

95.     The abrupt cancellation of the MSAP grants imperils every student's 2025-2026 school year and unfairly undermines the availability of the unique educational opportunities they were promised when they enrolled. The Schools' students have applied for and enrolled in these schools in reliance on the promise and expectation of a five-year federal commitment to support the innovative and thematic curricula, purchase of equipment, development of specialized classrooms and partnerships with outside entities designed to provide exceptional learning environments and improved academic outcomes. Students who selected these magnet schools because of the creative nature of the programming will find the core elements of their chosen educational path to have disappeared. This will be a huge loss to the students, staff and parents at these schools.

96.     As a direct result of the Department's unlawful decision to discontinue NYCPS' MSAP grant funds, the educational programs at each of these Schools—and the children enrolled in them—will suffer. The thousands of students that have been benefiting from these programs will see their educational programs transform to much poorer offerings (literally and figuratively) overnight, with the school year well under way. This will undoubtedly impact both their immediate academic performance and achievement, their social emotional development and their overall engagement with school.

97.     Moreover, in connection with establishing these programs, the Schools took on liabilities for ongoing costs such as salaries of magnet school personnel, including magnet school program directors and teachers, and contracts with consultants. If the MSAP grants are not promptly restored to NYCPS, the Schools will have to immediately begin to wind down their programs going forward, ensuring that all current magnet program students in grades K-11 will lose the benefit of these programs which have been designed to continue through the course of

their education, until they graduate. Unknown numbers of future students who would have

pursued these programs will not have those opportunities.

98.    Discontinuing the grants after providing only two or three years of the expected,

Congressionally mandated, 5-years of financial support also severely reduces any hope of long-

term sustainability for these programs because it prevents the schools from being able to fully

develop their capacity to continue as self-sustaining magnet schools.

99.    The Schools face adverse impacts even beyond the losses that will be sustained by

these students and their school communities. Without the planned investment from federal funds,

the Schools will become less appealing to prospective families, who are likely to pursue different

options, decreasing overall enrollment.

### V.    CAUSES OF ACTION
### COUNT I
### (Violation of the Administrative Procedure Act through
### Agency Action Without Observance of Procedure Required by Law (Title IX))

100.    NYCPS incorporates by reference the allegations in the preceding paragraphs.

101.    Section 706 of the APA requires a reviewing court to "hold unlawful and set aside

an agency action, findings, and conclusions found to be … without observance of procedure

required by law." 5 U.S.C. § 706(2)(D).

102.    The Department is an "agency" under the APA, 5 U.S.C. § 551(1), and the

Discontinuation of NYCPS' MSAP grants constituted final agency action subject to review

under the APA.

103.    While Congress authorized federal agencies to enforce compliance with the

requirements of their Title IX rules and regulations, "[n]o order suspending, terminating or

refusing to grant or continue Federal financial assistance shall become effective until … there

has been an express finding on the record, after opportunity for hearing, of a failure by the

37

applicant or recipient to comply with a requirement imposed" by Title IX. 34 CFR § 106.81 (incorporating by reference 34 CFR § 100.8(c)); 20 U.S.C. § 1682.

104.    After completion of those procedures, the Department must also, before taking an action to terminate, or to refuse to grant or continue federal financial assistance, "file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action," and "[n]o such action shall become effective until thirty days have elapsed after the filing of such report." 20 U.S.C § 1682.

105.    Congress expressly declared that any action by a department or agency terminating financial assistance is subject to judicial review, that "any State or political subdivision thereof and any agency of either" may obtain judicial review, and that the federal agency's action "shall not be deemed committed to unreviewable agency discretion." 20 U.S.C. § 1683.

106.    The Discontinuation was effectuated without following the statutory and regulatory requirements of Title IX. There was no investigation; there has been no express finding on the record of a failure by NYCPS to comply with Title IX; and the Department also failed to provide an opportunity for a hearing to NYCPS prior to any such finding.

107.    The Department also took these actions without filing the requisite report with Congress and waiting the required 30-day period after filing the report.

108.    Therefore, pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, NYCPS is entitled to a declaratory order and an order and judgment enjoining the Department's Discontinuation of NYCPS' MSAP grants as in violation of the procedures required by law; and rescinding, vacating and setting aside such Discontinuation; and an order enjoining the Department from implementing, maintaining or reinstating such Discontinuation.

**COUNT II**
**(Violation of the Administrative Procedure Act through Agency**
**Action Without Observance of Procedure Required by Law**
**(MSAP, GEPA, 2 C.F.R. § 200))**

109.    NYCPS incorporates by reference the allegations in the preceding paragraphs.

110.    Section 706 of the APA requires a reviewing court to "hold unlawful and set aside an agency action, findings, and conclusions found to be … without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

111.    The Department is an "agency" under the APA, 5 U.S.C. § 551(1), and the Discontinuation constituted final agency action subject to review under the APA.

112.    The Discontinuation was governed by the MSAP statute and its implementing regulations (20 U.S.C. §§ 7231-7231j; 34 C.F.R. § 280.1-280.41), GEPA and the Education Department General Administrative Regulations ("EDGAR") (20 U.S.C. § 1221 *et seq.*; 34 C.F.R. § 75 *et seq.*), the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (2 C.F.R. § 200 *et seq.*), and the statutes and regulations governing OCR (20 U.S.C. § 1682; 42 U.S.C. § 2000d-1; 34 C.F.R. § 100.1 *et seq.*).

113.    Prior to the Discontinuation, the Department was required to provide notice of the grounds for its decision not to continue the grants, and to provide NYCPS with the opportunity to challenge the decision and request reconsideration. 34 C.F.R. § 75.253(g); 2 C.F.R. § 200.342.

114.    The Department effectuated the Discontinuation without following these statutory and regulatory requirements. By conditioning NYCPS' ability to seek reconsideration on capitulation to the Department's demands that it repudiate the NYCPS Guidelines and take remedial steps, the Department denied NYCPS a meaningful opportunity to seek reconsideration of the finding that the Guidelines violates Title IX.[56]

---

[56] To the extent the Department's agency action actually effectuated a termination of NYCPS' MSAP grants, rather than a discontinuation, OCR failed to comply with the requirements of 2 C.F.R. Part 200 governing the whole or partial termination

115.    Therefore, pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, NYCPS is entitled to a declaratory order and an order and judgment enjoining the Department's Discontinuation of NYCPS' MSAP grants as in violation of the procedures required by law; and rescinding, vacating and setting aside such Discontinuation; and an order enjoining the Department from implementing, maintaining or reinstating such Discontinuation.

## COUNT III
### (Violation of the Administrative Procedure Act through Arbitrary and Capricious Agency Action)

116.    NYCPS incorporates by reference the allegations in the preceding paragraphs.

117.    The APA requires that the Court "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

118.    The Department is an "agency" under the APA, 5 U.S.C. § 551(1), and the Discontinuation constituted final agency action subject to review under the APA.

119.    An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983) (citation modified). Moreover, "[t]he change-in-position doctrine" prevents agencies from "mislead[ing] regulated entities." *FDA v. Wages & White Lion Invs.*, 604 U.S. 542, 567 (2025). "Under that doctrine, '[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change,' 'display

_____

of a federal award for non-compliance. Specifically, the Department discontinued NYCPS's MSAP grants without a determination that any alleged non-compliance cannot be remedied by imposing additional conditions, as required by 2 C.F.R. § 280.339. Moreover, the Part 200 regulations required the Department to provide NYCPS notice and an opportunity to object to and provide information and documentation challenging the termination action. 2 C.F.R. §§ 200.340–41.

awareness that [they are] changing position,' and 'consider serious reliance interests.'" *Id.* at 544

(quoting *Encino Motorcars, LLC v. Navarro,* 579 U.S. 211, 221–22  (2016)).

120.    The decision to discontinue NYCPS' MSAP grants is arbitrary and capricious

because the Department did not articulate a satisfactory explanation for its action including a

"rational connection between the facts found and the choice made."  *See Motor Vehicle Mfrs.*

*Ass'n,* 463 U.S. at 43; *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019). First, the

Department acted irrationally in that it failed entirely to consider the factors specifically

enumerated in the MSAP regulations to determine whether to make a continuation award,

including on the basis of the "best interest" of the federal government: NYCPS' performance

reports, performance measures, or financial data for the prior year. *See* 34 C.F.R. §§ 75.118,

75.253(b).

121.    Second, the non-continuation "best interests" determination was seemingly made

without reference to the express Congressional findings about the ways in which continued

funding of magnet schools through MSAP is in the best interests of the United States. *See* 20

U.S.C. § 7231(a)(4) (finding that it is in the best interests of the United states "to continue the

Federal Government's support of … local educational agencies that are voluntarily seeking to

foster meaningful interaction among students of different racial and ethnic backgrounds,

beginning at the earliest stage of such students' education," "to ensure that all students have

equitable access to a high quality education that will prepare all students to function well in a

technologically oriented and a highly competitive economy comprised of people from many

different racial and ethnic backgrounds," and "to continue to desegregate and diversify schools

by supporting magnet schools, recognizing that segregation exists between minority and

nonminority students as well as among students of different minority groups").

122.    Third, the Department's Discontinuation referenced a novel interpretation of Title

IX that is not supported by any law, is contrary to the determinations of multiple federal circuit

courts and is contrary to the New York State Constitution and statute. In support of their contention,

the Department references only *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791 (11th Cir. 2022)

and *Tennessee v. Cardona*, 762 F. Supp. 3d 615 (E.D. Tenn. 2025), both of which examined the

exact opposite issue: whether Title IX in fact *requires that schools allow* equal access by

transgender students to facilities consistent with their gender identity. These court did not rule, and

no court has held, that Title IX *requires that schools restrict* equal access by transgender students,

and the Department has not offered any reasoned explanation of its new interpretation.

123.    The Discontinuation is also arbitrary and capricious because the Department

violated the "[t]he change-in-position doctrine," by failing to provide a reasoned explanation for

the change,' [and] failing to 'display awareness that [they are] changing position.' *Wages & White

Lion Invs.*, 604 U.S. at 567 (quoting *Encino Motorcars, LLC*, 579 U.S. at 221–22).  The

Department's Discontinuation fails entirely to recognize that the NYCPS Guidelines, the

substance of which has been in place in various iterations since 2014, has never before been

adjudged by the Department to violate Title IX. The notices of Discontinuation also fail to

acknowledge that their decision here to the contrary represents a change in position by the

Department, without a reasoned explanation.

124.    The Discontinuation also violates the change-in-position doctrine because the

Department failed to account for the serious reliance interests of NYCPS. *Id*. NYCPS has

structured its budget with the understanding and expectation that the Department would make

annual continuation awards through the remainder of the project performance period based on

the MSAP Projects' performance, consistent with the Department's expressed priorities at the

time of the application, as expressed in the Notice of Invitation to Apply. Discretionary

Grantmaking at 31–32. NYCPS has also structured its budget with the understanding that, consistent with Congressional intent in creating MSAP, and in extending the grant period to 5 years, it would have the benefit of several more years to generate performance results and identify and build relationships with new sources of funding that would allow it to continue its projects in a self-sustaining fashion following the end of the federally funded performance period.

125.    NYCPS's reliance is based on, among other things, clear Congressional intent that MSAP projects be funded for 5 years, and the Department's past history and practice under MSAP, and MSAP's governing regulations, all of which reflect an "intention to make continuation awards to fund the remainder of the project period" for 5 years upon approval of multi-year grants, 34 C.F.R. § 75.251(b)(2). *See also, e.g.*, 59 Fed. Reg. 30259 (June 10, 1994) (explaining that a cut-off in continuation award funding is "extremely rare in practice"); 89 Fed. Reg. 33474 (Aug. 29, 2024) (explaining that, "[i]n general, we do not deny a large number of non-competing continuation awards and, if that does happen, grantees are often aware of the likelihood of the decision well in advance"). Believing that discontinuances would be based on criteria within its control—i.e. its performance—NYCPS invested time and resources to develop magnet schools that will have the full benefit of the five-year term to develop, which allows for the programs to be sustaining even after grant funding has ended. Instead, all of the planning, training and development will now be lost due to discontinuances based on improper criteria outside the NYCPS MSAP Projects' control. 34 C.F.R. § 75.253(b).

126.    The Department also failed to account for the reliance interests of the MSAP Program's participants and beneficiaries: students—with the support of their parents—have chosen to enroll in the MSAP-funded Schools with the expectation that the magnet school funding by the Department will continue through the 5-year project term, consistent with federal

law, to allow the realization of all of the benefits of the carefully-designed and planned magnet program. Students enrolled in the Schools expecting to have access to project-based learning, dedicated spaces (such as media rooms, laboratories, podcast studios, gardens), and partnerships with outside entities like the Columbia University Division of Technology and School Change, Carnegie Hall, and the Metropolitan Museum of Art. High School Students at the Jacqueline Kennedy Onassis STEAM Magnet School of Business Careers, and Esperanza Early College Exploration and Leadership Magnet School have been planning to pursue the early completion of college credits, and receive college and career readiness support, financial literacy training, and paid internship opportunities. Middle schoolers attending the Magnet School of Leadership, Exploration and the Arts in Brooklyn are expecting access to coursework associated with an international baccalaureate program. Others chose to attend the Schools to have opportunities to learn from full-time, specialized engineering/STEM instructors, or to develop an active student newspaper and morning news station, or to train in a state-of-the-art fabrication lab or recording studio. To abruptly discontinue the grants funding the magnet Schools, mid-stream, fails to take into account the reliance of these students and their families.

127.    Therefore, pursuant to 5 U.S.C. §§ 705, 706 and 28 U.S.C. § 2201, NYCPS is entitled to a declaratory order and an order and judgment enjoining the Department's Discontinuation of NYCPS' MSAP grants as contrary to law, arbitrary and capricious and an abuse of discretion; rescinding, vacating and setting aside such Discontinuation; and enjoining the Department from implementing, maintaining or reinstating such Discontinuation.

### COUNT IV
**(Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(D) through Agency Action without Notice and Comment Rulemaking)**

128.    NYCPS incorporates by reference the allegations in the preceding paragraphs.

129.    The APA requires that a reviewing court "hold unlawful and set aside agency action, findings, and conclusions found to be … without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

130.    "The APA generally requires that before a federal agency adopts a rule it must first publish the proposed rule in the Federal Register and provide interested parties with an opportunity to submit comments and information concerning the proposal." *N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018) (citing 5 U.S.C. § 553). "Failure to abide by these requirements renders a rule procedurally invalid." *Id.*

131.    Under GEPA, the Department is required to follow the APA's notice-and-comment rulemaking procedure when changing rules guiding its enforcement of Title IX. *See* 20 U.S.C. §§ 1221e-4, 1232.

132.    The Department cannot purport to adopt and act upon a new interpretation of Title IX which guides the enforcement of Title IX with respect to discrimination based on gender identity without following the proper procedures.

133.    Without having proceeded through notice-and-comment rulemaking, the Department has purported to adopt and act upon an interpretation of Title IX with respect to discrimination based on gender identity to effectuate its Discontinuation of NYCPS' MSAP grants and its actions are procedurally invalid under the APA.

134.    Therefore, pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, NYCPS is entitled to a declaratory order and an order and judgment enjoining the Department's Discontinuation of NYCPS' MSAP grants as in violation of the procedures required by law; and rescinding, vacating and setting aside such Discontinuation; and an order enjoining the Department from implementing, maintaining or reinstating such Discontinuation.

## COUNT V
## (Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(D) through Agency Action Contrary to Law)

135.    NYCPS incorporates by reference the allegations in the preceding paragraphs.

136.    The APA requires that the Court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

137.    The Department is an "agency" under the APA, 5 U.S.C. § 551(1), and the Discontinuation constituted final agency action subject to review under the APA.

138.    An agency's action is contrary to law in the absence of statutory authorization for its act. *Hikvision USA, Inc. v. FCC*, 97 F.4th 938 (D.C. Cir. 2024). It may not rewrite clear statutory terms to suit its own sense of how the statute should operate. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014).

139.    The Department's Discontinuation of the NYCPS's MSAP grants is contrary to law because it is based on a novel interpretation of Title IX, is entirely unsupported by any law, and contravenes the findings of several federal circuit courts that Title IX at the very least allows schools to permit transgender students to use facilities consistent with their gender, and in some cases actually requires such. *See, e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.,* 972 F.3d 586 (4th Cir. 2020), *as amended* (Aug. 28, 2020), *reh'g en banc denied*, 976 F.3d 399 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 2878 (June 28, 2021) (affirming a grant of summary judgment that a school district policy that prohibited a transgender boy from using the boy's bathroom violated Title IX); *A.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760 (7th Cir. 2023) (affirming a preliminary injunction preventing the application of a policy denying a transgender student access to the bathroom consistent with their gender identity).

140.    In matters of statutory interpretation, courts are required to exercise independent judgment rather than deference to administrative agencies' interpretations. *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 391, 412-13 (2024).

141.    The Department's determination that the NYCPS Guidelines violate Title IX is contrary to the decisions from multiple Circuit Courts that gender-inclusive policies for restrooms and other facilities are, at the very least, permitted, if not required. conforming facilities is required by Title IX's prohibition of sex discrimination. *See Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518 (3d Cir. 2018) (affirming denial of preliminary injunction to plaintiff students who challenged policy permitting transgender students' access to gender-conforming bathrooms, in decision issued from the bench); *Parents for Privacy v. Barr*, 949 F.3d 1210 (9th Cir. 2020) (affirming the dismissal of similar claims).

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff NYCPS prays that the Court:

a.  Declare and order that the Department's Discontinuation of NYCPS' MSAP grants be rescinded, vacated and set aside as arbitrary and capricious, contrary to law, and an abuse of discretion, and as having been undertaken without observance of procedures required by law;

b.  Preliminarily and permanently enjoin the Department from implementing, maintaining, or reinstating the Discontinuation, or otherwise taking any other action to suspend, terminate, or refuse to continue the NYCPS' MSAP grants for the FY25 and FY26 periods;

c.  Declare and order that the Department deem NYCPS' MSAP grants to be a) certified as complying with federal civil rights laws pursuant to 20 U.S.C. § 7231d(c); b) continued pursuant to 34 C.F.R. § 75.253(a); c) allowed a no-cost extension pursuant to 34 C.F.R. § 75.253(h);

d.  Declare and enjoin the Department from freezing, terminating or otherwise interfering with any NYCPS' MSAP grant funding based on Department findings of alleged Title IX violations without complying with required procedures under Title IX and Department procedures;

e.  Issue other appropriate declaratory and injunctive relief as required to effectuate paragraphs a-d above;

f.  Retain jurisdiction of this case for the purpose of supervising the Department's full compliance with the Court's Order;

g.  Award NYCPS reasonable attorney's fees and costs in bringing this litigation; and

h.  Grant such other and further relief as this Court may deem proper.

Dated: October 15, 2025

MURIEL GOODE-TRUFANT
Corporation Counsel of the City of
    New York
100 Church Street
New York, NY 10007
(212) 356-2276
mash@law.nyc.gov

By: Melanie C. T. Ash
June Buch
Bianca Isaias
Gavin Mackie *
Emeline Kong

**Attorneys for Plaintiff The Board of Education of the City School District of the City of New York**

*Admission pending

48