UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

THE BOARD OF EDUCATION OF THE CITY SCHOOL
DISTRICT OF THE CITY OF NEW YORK,

Plaintiff,

v.

UNITED STATES DEPARTMENT OF EDUCATION,
LINDA MCMAHON, in her capacity as Secretary of the
United States Department of Education, CRAIG W.
TRAINOR, in his capacity as Acting Assistant Secretary
for Civil Rights, and LINDSEY M. BURKE, in her
capacity as Deputy Chief of Staff for Policy and Programs,

Defendants.

------------------------------------------------------------------------x

No. 25-cv-8547 (AS)

**PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

Dated: New York, New York
     October 16, 2025

MURIEL GOODE-TRUFANT
Corporation Counsel of
 the City of New York
100 Church Street
New York, New York 10007
(212) 356-1000

*Attorney for Plaintiff*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ III

PRELIMINARY STATEMENT ........................................................................... 1

FACTS ................................................................................................................ 4

    The MSAP Grants ...................................................................................... 4

    The Department's Discontinuation of MSAP Grants ................................. 5

    The NYCPS Guidelines .............................................................................. 7

    Irreparable Harm ........................................................................................ 8

ARGUMENT

    I.    PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS ................................................................................. 9

        A.  The D6.5    epartment Acted Without Observance of Procedure Required by Law, 5 U.S.C. § 706(2)(D): Title IX 10

        B.  The Department Acted Without Observance of Procedure Required by Law, 5 U.S.C. § 706(2)(D): MSAP, GEPA, 2 C.F.R. § 200    12

        C.  The Department 's Actions were Arbitrary and Capricious, 5 U.S.C. § 706(2)(A)    13

        D.  The Department's Actions Were Without Observance of Procedure Required by Law Because It Failed to Implement Required Rulemaking Procedures, 5 U.S.C. § 706(2)(D)    16

        E.  The Department's Actions Were Contrary to Law, 5 U.S.C. § 706(2)(A, C) 17

            1.  The Determinations Were Unsupported by Statute, Regulation, or Precedent ........................... 17

            2.  The NYCPS Policy is Well-Supported by Relevant Authorities. ......................................... 19

**Page**

II.    NYCPS WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF INJUNCTIVE RELIEF.................................. 21

III.   THE BALANCE OF THE EQUITIES FAVORS PRELIMINARY INJUNCTIVE RELIEF ....................................... 23

CONCLUSION.................................................................................... 25

CERTIFICATE OF COMPLIANCE WITH LOCAL RULE....................................... 27

# TABLE OF AUTHORITIES

**Cases** **Pages**

*A.C. v. Metro. Sch. Dist. of Martinsville*,
   75 F.4th 760 (7th Cir. 2023),
   *cert. denied,* 2024 US LEXIS 440 (Jan. 16, 2024) ...............................................19

*Adams v. Sch. Bd. of St. Johns Cnty.*,
   57 F.4th 791 (11th Cir. 2022) ...............................................................................18

*American Association of University Professors v. Rubio*,
   No. 1:25-cv-10685 (D. Mass. Sept. 30, 2025) ......................................................13

*Dep't of Commerce v. New York*,
   588 U.S. 752 (2019).................................................................................................13

*Doe v. Boyertown Area Sch. Dist.*,
   897 F.3d 518 (3d Cir. 2018).....................................................................................19

*Encino Motorcars, LLC v. Navarro*,
   579 U.S. 211 (2016).................................................................................................14

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021).................................................................................................13

*FDA v. Wages & White Lion Invs.*,
   145 S. Ct. 898 (2025)...............................................................................................14

*Grimm v. Gloucester Cnty. Sch. Bd.*,
   972 F.3d 586 (4th Cir. 2020),
   *as amended* (Aug. 28, 2020),
   *reh'g en banc denied*, 976 F.3d 399 (4th Cir. 2020),
   *cert. denied*, 141 S. Ct. 2878 (June 28, 2021).......................................................19

*Loper Bright Enterprises v. Raimondo*,
   603 U.S. 369 (2024)................................................................................................17

*Maine v. United States Dep't of Agric.*,
   778 F. Supp. 3d 200 (D. Maine April 11, 2025).....................................................11

*Maryland v. United Stated Dep't of Agric.*,
   770 F.Supp. 3d 779 (D. Md. 2025) .........................................................................25

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983)..............................................................................................13, 14

**Cases**                                                                **Page**

*N.H. Hosp. Ass'n v. Azar*,
   887 F.3d 62 (1st Cir. 2018) .................................................................................16

*New York v. U.S. Dep't of Homeland Sec.*,
   969 F. 3d 42 (2d Cir. 2020) ............................................................................9, 21

*Nken v. Holder*,
   556 U.S. 418 (2009) .......................................................................................9, 23

*Pacito v. Trump*,
   772 F.Supp. 3d 1204 (W.D. Wash. 2025) .........................................................25

*Parents for Privacy v. Barr*,
   949 F.3d 1210 (9th Cir. 2020) ..........................................................................20

*Rodriguez v. Noem*,
   No. 3:25-cv-616 (SRU), 2025 U.S. Dist. LEXIS 83349
   (D. Conn. May 1, 2025) ....................................................................................25

*New York ex rel. Schneiderman v. Actavis PLC*,
   787 F.3d 638 (2d Cir. 2015) .............................................................................22

*Tennessee v. Cardona*,
   762 F. Supp. 3d 615 (E.D. Ky. 2025) ..............................................................18

*West Virginia v. B.P.J.*,
   98 F.4th 542 (4th Cir. 2024) (*cert. granted*, U.S. Dkt.
   No. 24-43, argument pending) ..........................................................................20

*Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Education*,
   858 F.3d 1034 (7th Cir. 2017) .........................................................................19

*Winter v. NRDC, Inc.*,
   555 U.S. 7 (2008) ...............................................................................................9

**Statutes**

2 C.F.R. § 200 ..........................................................................................................12

2 C.F.R. § 200 *et seq.* ..............................................................................................12

2 C.F.R. § 200.342 ...................................................................................................12

34 C.F.R. 75.253(b) .................................................................................................16

34 C.F.R. § 75 *et seq.* ..............................................................................................12

**Statutes**                                                                                              **Pages**

34 C.F.R. § 75.251(b)(2)...............................................................................................15

34 C.F.R. § 75.253(a)(5).................................................................................................6

34 C.F.R. § 75.253(b) (2024).......................................................................................15

34 C.F.R. § 75.253(d)...............................................................................................3, 23

34 C.F.R. § 75.253(g).................................................................................................12

34 C.F.R. § 75.253(h).................................................................................................24

34 C.F.R. § 100.1 *et seq.*...........................................................................................12

34 C.F.R. § 106.31(a).................................................................................................17

34 C.F.R. § 106.31(b)(2)—(4).....................................................................................17

34 C.F.R. § 280.1-280.41...........................................................................................12

8 NYCRR § 100.2.......................................................................................................20

5 U.S.C. § 553..............................................................................................................16

5 U.S.C. § 553(a)(2)....................................................................................................16

5 U.S.C. § 701 *et seq.*...............................................................................................10

5 U.S.C. § 706......................................................................................................10, 17

5 U.S.C. § 706(2)(A)......................................................................................10, 13, 17

5 U.S.C. § 706(2)(C)..................................................................................................17

5 U.S.C. § 706(2)(D)......................................................................................10, 12, 16

20 U.S.C. § 1221 *et seq.*.........................................................................................12

20 U.S.C. § 1232(a)....................................................................................................16

20 U.S.C. § 1232(d)....................................................................................................16

20 U.S.C. § 1682.................................................................................................11, 12

20 U.S.C. § 1683.........................................................................................................11

20 U.S.C. §§ 7231-7231j...........................................................................................12

**<u>Statutes</u>**                                                                                           **<u>Pages</u>**

20 U.S.C. § 7231d(c) ............................................................................................6

42 U.S.C. § 2000d-1 .............................................................................................12

Fed. R. Civ. P. 56(c) ...........................................................................................25

N.Y. Exec. L. § 290 *et seq.* ..............................................................................20

NY Educ. L. § 3201-a ..........................................................................................20

NYC Admin. Code § 8-102(23)...........................................................................20

**<u>Other Authorities</u>**

NYS Consti. Art. I, § 11 .......................................................................................20

## PRELIMINARY STATEMENT

Plaintiff the Board of Education of the City School District of the City of New York, operating as New York City Public Schools ("NYCPS"), moves for preliminary injunctive relief pending the resolution of this action to prevent immediate irreparable harm to 19 of its magnet schools from the precipitous, unjustified and erroneous determination of the United States Department of Education (the "Department"), after the current school year had already begun, to discontinue grants for those schools under the Magnet School Assistance Program ("MSAP"). NYCPS satisfies all required elements for a preliminary injunction.

First, NYCPS has a strong likelihood of success on the merits of its claims. The Department failed to follow required procedures in discontinuing the magnet school funding. Its actions are based on a purported finding that longstanding NYCPS policies allowing students to use restrooms and other facilities and participate in sports consistent with their gender identity constitutes discrimination based on sex in violation of Title IX of the Civil Rights Act. But Title IX makes clear that, among other strict procedural requirements, NYCPS must be afforded a hearing before such a finding may be made in connection with any reduction of education funding. Here, the Department's surprise "finding" came without notice, after the school year had already begun, and certainly did not provide for a hearing.

Additionally, the MSAP regulations entitle NYCPS to an opportunity to seek reconsideration of the Department's decision, and here the NYCPS was offered "reconsideration" in name only. In the Discontinuation Letter, the Department conditioned the offer on NYCPS' agreement, to be submitted within three business days, *that it would take all of the remedial steps OCR demanded*. Those steps would require NYCPS to dismantle its policies and implement the very determination as to which it would be seeking reconsideration. The Department made clear that a failure to agree would automatically result in a denial of reconsideration. Thus, the

Department expressly conditioned NYCPS's ability to seek reconsideration on NYCPS's agreement to submit to its demands to reverse the policies in question—the opposite of a genuine opportunity for reconsideration.

Beyond those procedural failings, the Department's determinations also misconstrue the meaning of Title IX's antidiscrimination provisions and their application to NYCPS policy, reflected in the NYCPS Guidelines to Support Transgender and Gender Expansive Students ("Guidelines"). Indeed, to our knowledge, no court has ever held that allowing transgender students equal access to facilities and full participation in sports teams constitutes unlawful discrimination on the basis of sex. Thus, NYCPS is likely to succeed on the merits of its challenges under the Administrative Procedure Act.

Second, NYCPS will suffer imminent irreparable harm in the absence of a preliminary injunction. The Department's abrupt and unjustified actions are causing immediate and irreparable disruption to the 19 Schools' 2025-2026 school years, and consequently students, families, teachers, and staff are being irreparably harmed as well. The MSAP grants were all for a five-year performance period; three of them had been awarded in 2022, the other two in 2023. The Department's abrupt discontinuation of the grants, which it first communicated to NYCPS on September 16, 2025, *after the current school year had already begun*, is already causing disruption to the educational programs at the 19 magnet schools ("the Schools"), and will continue to severely interfere with the Schools' educational programs. These grants support specialized curricula in cutting-edge science, technology, engineering, arts, and math ("STEAM"); multimedia and the arts; leadership; and other themes as well. The immediate harm to the Schools, teachers, students, parents and caregivers from completely disrupting these programs midstream is irreparable.

2

In addition to the actions discontinuing the grants – which have caused NYCPS to face immediate harm due to the loss of $36 million in funding for the remainder of each five-year grant period extending through FY 2027 and 2028, disrupting its ongoing planning for the Schools -- the Department's improper actions have caused NYCPS to face the loss of an additional approximately $11 million in unspent carryover MSAP funding that NYCPS had received for the previous fiscal year, FY 2025, which pursuant to federal regulations can be used to fund the program in the current fiscal year.  34 C.F.R. § 75.253(d).  NYCPS had expected to use those funds to support current Magnet School operations, until the Department suddenly and unjustifiably made them unavailable.  This harm – throwing the current school year into chaos -- will continue unless and until NYCPS receives carryover funds for immediate use.  NYCPS therefore brings this motion for a preliminary injunction to obtain access to those funds pending the resolution of this litigation.

Third, the balance of equities and public interest also support the grant of a preliminary injunction directing the Department to make the carryover funds immediately available. The Department has no compelling claim to equitable consideration.  The Department failed to make its non-continuation decision on the timetable contemplated by the MSAP statute, and instead announced its determination more than two weeks after NYCPS's school year had begun and only days before the conclusion of the federal fiscal year. It flouted multiple requirement of fair process in doing so.  Moreover, the Department took this precipitous action without providing any factual basis to believe that NYCPS's policies regarding gender identity were impairing the magnet schools' performance or causing any concern at all at those schools.

On the other hand, NYCPS has powerful equitable interests that are decidedly in accord with the public interest. The affected magnet schools in question—and students, families, teachers

and others—have strong reliance interests, where the school year had already begun, where NYCPS's policies were known to the Department when it approved these grants and continued them in past years, and where non-continuance decisions have been only rarely seen as a matter of practice, and never for the reasons given here. Moreover, both New York State and New York City law prohibit NYCPS from discriminating on the basis of gender identity, so it has no ability to change its policies on a dime in response to the Department's novel and unsupported re-interpretation of Title IX. For all of these reasons and others, the court should grant the requested preliminary injunction.

## FACTS

The relevant facts are set forth in the accompanying Declaration of Melissa Aviles-Ramos, Chancellor of the Board of Education ("Aviles-Ramos Decl."), and exhibits thereto, and the Declaration of Seritta Scott, Chief Financial Officer of the Board of Education ("Scott Decl."), and exhibits thereto.

### The MSAP Grants

NYCPS has five MSAP grant projects in progress at this time – three groups of schools (consortia) received grants starting in October, 2022; and two groups of schools starting in October, 2023, serving a total of over 7700 students ("the Projects"). They have all completed either two or three years of planning and programming. The Projects support the operation of 19 magnet schools in 12 of the 32 Community School Districts (CSD), across four boroughs of New York City. Aviles-Ramos Decl. ¶¶ 3-4, 19. Each Project provides students in multiple grade levels with a theme-based curriculum that the students pursue through successive grades, including some high schools, and combines multiple CSDs in order to create a broader applicant pool capable of achieving the many goals of magnet schools. *Id.* ¶ 5, 33-35. Those goals include reducing minority group isolation and segregation; allowing the development, design and expansion of innovative

educational methods, programs, and practices that promote diversity and increase school choice; and ensuring that all students enrolled in the school have equitable access to high quality education that will enable them to succeed academically and continue with post-secondary education or employment. *See* 87 FR 35 (February 22, 2022). MSAP grant funds are used for planning and development, hiring and professional development of teachers and other specialists, the creation of spaces such as media rooms and labs, and partnerships with outside entities, among other things. Aviles-Ramos Decl. ¶¶ 29-30. The Congressionally approved five-year duration of MSAP grants is essential to ensuring the long-term sustainability of the Schools after the grant term's conclusion. *Id.* ¶ 27.

### The Department's Discontinuation of MSAP Grants

On September 16, 2025, NYCPS received a letter from Acting Assistant Secretary Craig Trainor of the Department's Office for Civil Rights ("OCR"), notifying NYCPS that he declined to certify that NYCPS' MSAP grants are in compliance with federal civil rights law and that the grant would be "non-continued . . . because it is no longer in the best interest of the Federal Government."(the "Discontinuation Letter"). Aviles-Ramos Decl. ¶ 6 and Ex. 1. The Discontinuation Letter stated, as the sole basis for this decision, that NYCPS was in violation of Title IX because its Guidelines allowed transgender students to use bathrooms, changing room and locker room facilities, participate in athletic activities, and be provided with overnight accommodations on school trips, consistent with their gender identity. The Discontinuation Letter expressed no concerns about the MSAP Schools' performance or financial reports for the previous year, and provided no explanation as to why the NYCPS' MSAP grants were no longer in the best interest of the United States. It demanded that NYCPS take specified "remedial measures" to "ensure" that it is in compliance with Title IX, i.e., to fully adopt OCR's interpretation of Title IX. NYCPS could seek reconsideration of the decision, but it would have to do so by September 19,

2025 at 5 p.m., three business days later, and it would have to agree to amend the Guidelines and to take other specified "remedial" steps as a condition of reconsideration.  *Id*.

NYCPS timely responded to the Discontinuation Letter on Friday, September 19, 2025, seeking 30 days to consider whether to request reconsideration, and asked OCR to respond to a set of clarifying questions about the basis for the determination and its impact on schools, programs, and students (the "NYCPS Request for Extension").  Aviles-Ramos Decl. ¶ 7 and Ex. 2.  Mr. Trainor replied with a short email on Saturday night, September 20, 2025 (the "Trainor Email"). He denied the requests for clarification, stating that "the authorities cited [in the Discontinuance Letter] speak for themselves."  He allowed NYCPS an additional two business days to seek reconsideration, which again was conditioned on NYCPS agreeing to implement the remedial steps listed in the Discontinuance Letter.  "Failure to do so will result in a denial of reconsideration, and my decision not to certify [the MSAP grant] under 20 U.S.C. § 7231d(c) and non-continue its MSAP grant under 34 C.F.R. § 75.253(a)(5) will stand."  *Id*. ¶ 8 and Ex. 3.

On September 26, 2025, NYCPS received a letter from Deputy Chief of Staff for Policy and Programs Lindsey M. Burke (the "Burke Letter"), which purported to formally deny NYCPS' request for reconsideration (which NYCPS had not made) while also reiterating the requirement "that NYC DOE agree to begin to take the remedial steps described in the [Discontinuance Letter"] in order to obtain reconsideration.  The Burke Letter also notified NYCPS that the Department "is electing … not to authorize further no-cost extensions for [NYCPS's MSAP] grant awards identified for non-continuation."  Aviles-Ramos Decl. ¶ 9 and Ex. 4.

On September 29, 2025, NYCPS received amended Grant Award Notifications ("GANs") for all five MSAP grants that reset the end of their respective performance periods from September 30, 2027 or September 30, 2028, to September 30, 2025.  Scott Dec. ¶¶ 23-24 and Exhibit 2.  The

normal procedure at the end of an annual grant period is that the balance of the funding not spent during a fiscal year would be carried over to the next year and thereby remain available to reimburse eligible expenses in the following year. Aviles-Ramos Decl. ¶ 11. NYCPS understood that as a result of the issuance of new GANs, the remaining carryover funds from the FY25 grants would not be available for use in the current fiscal year. Due to the non-continuance of the grants for FY26, as stated in the prior communications from Assistant Secretary Trainor and Deputy Chief of Staff Burke, NYCPS understood that all remaining funds awarded for the rest of the 5-year project period were also terminated as of September 30, 2025. Scott Decl. ¶ 24.

**The NYCPS Guidelines**

The Guidelines set out protocols and best practices for supporting transgender and gender expansive students in NYCPS. Aviles-Ramos Decl. ¶ 45. They are critical to implementing NYCPS's nondiscrimination policy – as required by New York state law – to provide equal educational opportunities in accordance with applicable laws and regulations and without regard to actual or perceived race, color, religion, age, creed, ethnicity, national origin, alienage, citizenship status, disability, sexual orientation, gender (including actual or perceived gender identity, gender expression, pregnancy/conditions related to pregnancy or childbirth), or weight, and to maintain an environment free of harassment on the basis of any of these classifications. Under the Guidelines, students may not be denied access to restrooms, changing rooms, locker rooms, field trips or participation in sports and physical education classes consistent with their gender identity. Aviles-Ramos Decl. ¶ 47 and Exhibit 5.

While the current Guidelines were issued in 2019, NYCPS has had guidelines that provide direction for schools to support transgender students since 2014. Their goal has consistently been to ensure a safe learning environment free from discrimination and harassment to all students and

to ensure that the needs of each student are assessed on a case-by-case basis while ensuring the safety of all students. *Id*. ¶¶ 43-47.

**Irreparable Harm**

Months after the Schools' budgets were set, and weeks after the school year started, the Department precipitously acted to cut off the funding for all 19 magnet schools for the current year, both the FY 2026 grants and the carryover funding from FY 2025, creating a chaotic situation that threatens the imminent end of the MSAP-funded programs at these schools. Without the immediate restoration of access to the FY25 carryover funds, the magnet programs in these schools, with approximately 7,700 students, will face immediate and irreparable negative consequences as the funding supporting these developing programs is cut off. The effect of the abrupt termination of MSAP grant funding mid-stream is immediate and concrete, with devastating consequences to the affected programs, the student already attending them, and the staff and parents at the schools. Aviles-Ramos Decl. ¶¶ 12-17, 52-58.

This harm will be particularly disruptive because of the Department's choice to cut off the MSAP funds without any advance notice and after the school year had already begun. *Id.* ¶ 10. Schools have abruptly lost a source of anticipated funding to support their activities this school year, and it is likely that neither they, nor their impacted students, will have any way to salvage their year. NYCPS had no opportunity to plan alternative options for students already enrolled and attending. *Id*. ¶¶ 12-17, 58. A student who misses out on special magnet school programming in one grade cannot recapture that year when he or she moves on to the next grade. *Id*. That loss is indeed irreparable.

The Department's actions have already had a serious and negative impact on transgender students and their families, in the MSAP Schools and in other public schools. Numerous parents have expressed fears about their children's vulnerability to bullying and cruelty, and the disregard

for the basic humanity of their children reflected in the Department's demand that the Guidelines be revoked.  As the Guidelines recognize, transgender and gender expansive students are at high risk for being bullied and marginalized.  *Id.* ¶ 46.

Disregarding this risk, and without specifying any supporting facts, investigations, reports of complaints, or other basis, and without any opportunity for NYCPS to be heard, OCR discontinued the MSAP funding, stating that it was "predictable" that the Guidelines cause or will cause non-transgender students to experience a hostile educational environment or deny them equal access.  Trainor Letter, *id*. Ex. 1.  The Discontinuation was a decision based on speculation, not based on actual experience.

## ARGUMENT

To obtain a preliminary injunction, the movant must demonstrate (1) a likelihood of success on the merits; (2) that the movant will suffer irreparable harm in the absence of preliminary injunctive relief; (3) a balance of the equities in the movant's favor; and (4) a public interest served by issuance of a preliminary injunction. *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008); *New York v. U.S. Dep't of Homeland Sec.*, 969 F. 3d 42, 58-59 (2d Cir. 2020).  The final two factors—the balance of equities and the public interest —"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## I.    PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS

The Discontinuation of NYCPS' MSAP Projects based on NYCPS' alleged violation of Title IX—without notice, investigation, hearing, or opportunity to respond, and without a valid substantive basis—was a misuse of MSAP's intended grant continuation certification and performance review processes, as well as an obvious attempt to avoid the exacting process required by law to adjudicate a Title IX violation and reduce education funding on that basis.

Through the actions of the Acting Assistant Secretary and the Deputy Chief of Staff for Policy and Programs, the Department has plainly tried to sidestep the mandated Title IX process by misusing MSAP's process for grant continuation review.  First, OCR purported to make a Title IX "finding" based on speculation, in an attempt to support the refusal to certify compliance with the assurances required under MSAP, in violation of the rules and procedures governing Title IX and the rules and procedures governing MSAP.  Relying on that improper "finding," the Department then further subverted the process by discontinuing NYCPS' MSAP grants, abridging the performance period for those grants, and refusing to permit a no-cost extension that would have allowed the magnet programs to continue this year by using the FY25 carryover funds, pursuant to the usual Department processes.  As a result, the Discontinuation was not only unlawful, but was also carried out in a manner that maximizes the harm to the very students the MSAP grants are designed to support.

NYCPS asserts five claims for relief under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* ("APA").  Complaint, ¶¶ 100-141 (Doc. 1).  As to each of these claims, it has a very substantial likelihood of success:  The Department acted "without observance of procedure required by law," *id.* § 706(2)(D), in multiple respects.  Its actions also were "arbitrary and capricious" and "otherwise not in accordance with law," *id.* §706(2)(A).  Its determinations to discontinue the FY 2026 grants and to revoke NYCPS's access to the FY 2025 carryover amount fail on all of these grounds.

A.    **The Department Acted Without Observance of Procedure Required by Law, 5 U.S.C. § 706(2)(D):  Title IX**

Section 706 of the APA requires a reviewing court to "hold unlawful and set aside an agency action, findings, and conclusions found to be … without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

Compliance with Title IX may only be enforced by, *inter alia*, "the termination of or refusal to grant or to continue [financial] assistance ... to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement." 20 U.S.C. § 1682.

In this case, the Department invoked Title IX as the only basis for refusing to continue NYCPS's MSAP grants for FY26. In connection with the discontinuance, it also reset the project performance period to September 30, 2025 and thereby revoked access to NYCPS's FY25 carryover funds. However, the Department took these actions without first following Title IX's statutory procedures: conducting an investigation, providing NYCPS an opportunity for a hearing, making an express finding on the record of a failure to comply with Title IX, filing "a full written report of the circumstances and the grounds for such action" with Congress and waiting 30 days thereafter. "No such action shall become effective" until that time period elapses. *Id.* The Department complied with none of these requirements, precipitously cutting off funding for the MSAP programs.[1]

After a similar attempt by the federal government to bypass lawful procedure and immediately terminate funding without justification, the State of Maine was granted a temporary restraining order against the termination of United States Department of Agriculture funding, where the termination was based in part on the State's asserted violations of Title IX and federal agency had failed to follow statutory procedures before revoking the funds. *See Maine v. United States Dep't of Agric.*, 778 F. Supp. 3d 200, 228-230 (D. Maine April 11, 2025). As in that case,

---

[1] Title IX provides specifically for judicial review of agency action that terminates financial assistance. "[A]ny State or political subdivision thereof and any agency of either …may obtain judicial review of such action …, and such action shall not be deemed committed to unreviewable agency discretion." *Id.* § 1683.

NYCPS is likely to succeed on its claim that the Department's failure to follow Title IX's procedures before discontinuing the MSAP grants was contrary to law, and that the court should vacate and set aside those decisions.

**B.      The Department Acted Without Observance of Procedure Required by Law, 5 U.S.C. § 706(2)(D):  MSAP, GEPA, 2 C.F.R. § 200**

The Department's decision to discontinue NYCPS' MSAP grants, and in connection with such to revise the project performance period, was agency action governed by the MSAP statute and its implementing regulations, 20 U.S.C. §§ 7231-7231j; 34 C.F.R. § 280.1-280.41; by the General Education Procedures Act ("GEPA"), 20 U.S.C. § 1221 *et seq.* and the Education Department General Administrative Regulations ("EDGAR"), 34 C.F.R. § 75 *et seq.*; by the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 2 C.F.R. § 200 *et seq.*; and by the statutes and regulations governing the Office for Civil Rights (20 U.S.C. § 1682; 42 U.S.C. § 2000d-1; 34 C.F.R. § 100.1 *et seq.*).

Prior to discontinuing the MSAP grants, the Department was required to give notice to NYCPS of the grounds for its decision and to provide an opportunity to challenge the decision and request reconsideration. 34 C.F.R. § 75.253(g); 2 C.F.R. § 200.342 (before initiating a remedy for noncompliance, the agency must provide the recipient an opportunity to object and to provide information to challenge the action, and "comply with any requirements for hearings, appeals, or other administrative proceedings to which the recipient … is entitled under any statute or regulation applicable to the action involved").

The Department failed to follow these requirements.  Its notice of an opportunity to request reconsideration allowed NYCPS only three business days to submit the request, and in any event was conditioned on NYCPS' immediate capitulation to a host of demands - that NYCPS repudiate its Guidelines and agree to take all of the remedial steps that the Department demanded.  When

NYCPS sought additional time and a further explanation of NYCDOE's sudden new position, it was flatly rebuffed: "the letter and the authorities cited therein speak for themselves."  Aviles-Ramos Decl. ¶ 8 and Exhibit 3.  In short, the Department did not provide a meaningful opportunity for NYCPS' MSAP grantees to object to the decision not to continue, or to provide information and seek reconsideration, and thereby failed to comply with lawful procedure.

These deficiencies were not cured by the September 26, 2025 letter, which offered no means to challenge the determinations.  On the contrary, the September 29, 2025 amended GANs made clear that the MSAP funding was not only *not* continued going forward for FY 2026 (*i.e.,* the current school year, which was already underway), but that the Department had further determined not to allow a no-cost grant extension to allow for use in FY26 of the carried-over funding that remained available at the end of the FY25 budget period.

C.    **The Department 's Actions were Arbitrary and Capricious, 5 U.S.C. §**
**706(2)(A)**

An agency action is arbitrary and capricious under the APA where it is not "reasonable and reasonably explained."  *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  The explanation must show "a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation modified). The purpose of this requirement is to ensure that agencies "offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce v. New York*, 588 U.S. 752, 758 (2019).  The requirement that agency action be reasonable and reasonably explained applies in particular where agency action is an abrupt change from prior policy.  *See, e.g., American Association of University Professors v. Rubio*, No. 1:25-cv-10685 (D. Mass. Sept. 30, 2025) (holding that defendants' reversal of prior enforcement policy under the Immigration and Naturalization Act was arbitrary and capricious).

13

Agency action "must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, 50.

Under the "change-in-position doctrine," agencies seeking to change their existing policies must provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests. *FDA v. Wages & White Lion Invs.*, 145 S. Ct. 898, 917 (2025) (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016), explaining "change-in-position doctrine").

The Department's decision to discontinue NYCPS's MSAP grants was arbitrary and capricious on multiple grounds. First, it offered no genuine, reasonable and reasonably explained justification for its decision. It said only that it had "identified a civil rights compliance issue" with NYCPS's Guidelines, which it summarily concluded "authorizes discrimination on the basis of sex in violation of Title IX of the Education Amendments of 1972 … and its implementing regulation, 34 C.F.R. Part 106." Aviles-Ramos Decl., Exhibits 1, 4. The Department failed to acknowledge the requirements of New York law, which are binding on NYCPS, or the considerable body of federal case law in this area, including precedent holding that the rights of transgender students are protected by Title IX, and the fact that policies such as those in the NYCPS Guidelines have been upheld as consistent with Title IX.

Second, the Department did not explain at all – let alone with a reasoned explanation - why it deviated from its prior determinations that the NYCPS Guidelines did not preclude certification of the MSAP grant recipients' assurances of compliance with federal civil rights law and that the MSAP grants were in the best interests of the United States. *Id.* ¶¶ 6, 8-9 and Ex. 1, 3-4.

Third, the Department failed to consider NYCPS's serious reliance interests. That reliance is based on, among other things, Congressional intent, the Department 's own history and practice

under MSAP, and its governing regulations, reflecting an "intention to make continuation awards to fund the remainder of the project period" upon approval of multi-year grants, 34 C.F.R. § 75.251(b)(2). See also, e.g., 59 Fed. Reg. 30,259 (June 10, 1994) (explaining that a cut-off in continuation award funding is "extremely rare in practice"); 89 Fed. Reg. 70,316 (Aug. 29, 2024) (explaining that, "[i]n general, we do not deny a large number of non-competing continuation awards and, if that does happen, grantees are often aware of the likelihood of the decision well in advance"). Relying on these regulations and past practice, NYCPS invested time and resources to develop magnet schools that will have the full benefit of the five-year term to develop, which allows for the programs to be self-sustaining even after grant funding has ended. Instead, the planning, training and development will now be lost due to discontinuances based on improper criteria outside the MSAP Projects' control. 34 C.F.R. § 75.253(b) (2024).

Students and their families also have reliance interests. Students have chosen to enroll, and parents and caregivers have chosen to enroll the children, in the MSAP-funded Schools with the expectation that the magnet school funding will be provided for the full 5-year project term, consistent with federal law, to allow the benefits of the carefully designed and planned magnet program to be realized. Some examples of these benefits are the early completion of college credits at two high schools, the Jacqueline Kennedy Onassis STEAM Magnet School of Business Careers and the Esperanza Early College Exploration and Leadership Magnet School, and the ability to pursue coursework associated with an international baccalaureate program at the Magnet School of Leadership, Exploration and the Arts in Brooklyn. To abruptly discontinue the magnet program mid-stream fails to take into account the reliance interests of these students and their families. Aviles-Ramos Decl. ¶ 10-16, 56-57

Fourth, the Department 's decision was arbitrary and capricious because, as noted above, it failed to even consider the expressly listed criteria when making its decision. See 34 C.F.R. 75.253(b) (limiting "Information considered in making a continuation award" to "information regarding grantee performance"). The Secretary made no findings as to NYCPS's performance with respect to the MSAP grants. Disregarding relevant factors is also arbitrary and capricious.

### D.    The Department's Actions Were Without Observance of Procedure Required by Law Because It  Failed to Implement Required Rulemaking Procedures, 5 U.S.C. § 706(2)(D)

"The APA generally requires that before a federal agency adopts a rule it must first publish the proposed rule in the Federal Register and provide interested parties with an opportunity to submit comments and information concerning the proposal." *N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018) (citing 5 U.S.C. § 553). "Failure to abide by these requirements renders a rule procedurally invalid." *Id.*

Under GEPA, the Department is required to follow the APA's notice-and-comment rulemaking procedure when changing rules guiding its enforcement of Title IX. *See* 20 U.S.C. § 1232(a) (defining "regulation" to include any "interpretation or other requirement that … has legally binding effect in connection with, or affecting, the provision of financial assistance under any applicable program").

Although the APA generally excludes "a matter relating to … grants, benefits, or contracts," 5 U.S.C. § 553(a)(2), under GEPA such exception "shall only apply to regulations … that govern the first grant competition under a new or substantially revised program authority as determined by the secretary." 20 U.S.C. § 1232(d). The continuation grants at issue here plainly are not a "first grant competition" such that they would be excluded from the notice-and-comment requirement.

The Department cannot purport to adopt and to condition the renewal of pre-existing grant programs on a novel interpretation of Title IX with respect to discrimination based on gender identity without at the very least adhering to the procedures required by its own governing statutes and regulations.

### E.    The Department's Actions Were Contrary to Law, 5 U.S.C. § 706(2)(A, C)

Agency action that is "otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" *id.* § 706(2)(C), is unlawful and must be set aside. "Section 706 makes clear that agency interpretations of statutes – like agency interpretations of the Constitution – are *not* entitled to deference." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 392 (2024) (emphasis in original).

### 1.    The Determinations Were Unsupported by Statute, Regulation, or Precedent.

Title IX requires that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance"; *see also* 34 C.F.R. § 106.31(a).  Recipients of federal funds are prohibited from, *inter alia*: (1) providing different aid, benefits, or services; (2) denying aid, benefits, or services; and (3) subjecting any person to separate or different rules, sanctions, or treatment on the basis of sex. *See* 34 C.F.R. § 106.31(b)(2)—(4).

Beyond its bald statement interpreting the meaning of "discrimination on the basis of sex" under Title IX, the Trainor Letter is silent as to any relevant facts or law.  OCR's determination that the NYCPS Guidelines violate Title IX and its implementing regulation relies on no statutory or regulatory language that would invalidate NYCPS' Guidelines.  It merely states, without authority:  "Title IX's commitment to sex-separated intimate facilities and athletics is based on immutable biological differences, well-established privacy interests, and ensuring the safety of all

students when in enclosed and vulnerable spaces and engaged in the competitive, physical activity of sport."

The Trainor Letter, Aviles-Ramos Decl. Ex. 1, cites but two cases: *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791 (11th Cir. 2022), and *Tennessee v. Cardona*, 762 F. Supp. 3d 615 (E.D. Ky. 2025). Neither supports its position. In *Adams* the school board's policy was the opposite of NYCPS's Guidelines: the school barred the plaintiff transgender boy from using the boys' bathroom. The 11th Circuit concluded, in a divided *en banc* decision, that the board's policy did not violate the Equal Protection Clause or Title IX. In other words, a policy that excludes transgender students from gender-conforming restrooms is permitted. The court, however, had no occasion to address the issue before this court – whether a contrary policy, which accommodates transgender children in bathrooms that match their gender identity, is also permitted under Title IX.

The second case the Department cited, *Cardona*, 762 F. Supp. 3d 615, held that a 2024 Final Rule that defined the term "sex" in Title IX to include gender identity, exceeded the agency's authority and vacated it. The result is similar to the *Adams* decision: the Department could not *require* that a school adopt a policy that transgender students be allowed in gender-conforming school bathrooms and other facilities. The decision does not address the issue before this Court: whether such a local school policy is *permitted* under Title IX. [2] Thus, the Department has abruptly cut off the magnet schools' funding, mid-school year, based on a novel and unprecedented

---

[2] Other than *Adams* and *Tennessee*, the Department cited only an op-ed piece by the future Justice Ginsburg, published in the Washington Post in 1975 when she was a law professor. *Id*. n. 5. The views expressed in that article, that sex-segregated facilities may be permitted or even required by a regard for individual privacy, also are irrelevant. It does not get to the question of whether transgender individuals may be permitted by their schools to use facilities that match their gender identity.

interpretation of Title IX that, to our knowledge, no court has ever accepted.  It has not provided, and cannot provide, any support for its interpretation of Title IX.

### 2.   The NYCPS Policy is Well-Supported by Relevant Authorities.

The Department's misguided interpretation of Title IX is contrary to abundant authority finding that Title IX permits the policies set out in the Guidelines, and may well require such policies.  In the Trainor Letter, the Department failed to acknowledge the case law interpreting Title IX directly opposite to the Department's interpretation.

Plaintiffs who have challenged school policies barring transgender students from using facilities consistent with their gender identity as violating Title IX have been successful.  *See, e.g., Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020), *as amended* (Aug. 28, 2020), *reh'g en banc denied*, 976 F.3d 399 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 2878 (June 28, 2021) (affirming grant of summary judgment for plaintiffs enjoining a school district policy that prohibited a transgender boy from using the boy's bathroom violated Title IX); *A.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760 (7th Cir. 2023) (rejecting reasoning of 11th Circuit in *Adams*, noting a circuit split, adopting the position of the 4th Circuit, and affirming a preliminary injunction on all grounds), *cert. denied,* 2024 US LEXIS 440 (Jan. 16, 2024); *Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Education*, 858 F.3d 1034 (7th Cir. 2017) (affirming injunction against unwritten policy denying equal access).

Further, plaintiffs that have challenged local policies that permit transgender students to access facilities consistent with their gender identity, arguing that such laws violate Title IX, have failed at the circuit level.  *See Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518 (3d Cir. 2018) (affirming denial of preliminary injunction to plaintiff students who challenged policy *permitting* transgender students' access to gender-conforming bathrooms, in decision issued from the bench);

*Parents for Privacy v. Barr*, 949 F.3d 1210 (9th Cir. 2020) (affirming the dismissal of similar claims).

The Second Circuit has not yet ruled on this issue. However, this Court need not determine that Title IX actually *requires* that transgender students have access to facilities consistent with their gender identity. It is clear from consistent decisions in other Circuits that Title IX does not *prohibit* states from allowing students such access, and therefore that the NYCPS Guidelines are fully consistent with Title IX.[3]

NYCPS's policy is also in accordance with New York State's Constitution, as amended in 2024, Art. I, § 11; New York Education Law § 3201-a (the Dignity for All Students Act); 8 NYCRR 100.2; New York State Human Rights Law (N.Y. Exec. L. § 290 *et seq.*); and the New York City Human Rights Law, Admin. Code § 8-102(23). It is also in accord with the State Education Department's ("NYSED") guidance for school districts for creating a safe and supportive school environment for transgender students, issued in 2015 and updated in 2023.[4] In

---

[3] The Supreme Court is scheduled to hear arguments this term in an appeal from the 4th Circuit's decision in *West Virginia v. B.P.J.*, 98 F.4[th] 542, (4th Cir. 2024) (*cert. granted*, U.S. Dkt. No. 24-43, argument pending), which found that a West Virginia statute could not be applied to prevent a transgender girl from participating in her school's girls' cross-country and track teams, in part because such an application would violate Title IX. One of the questions before the Court in that case is whether Title IX *prevents* states from discriminating against students on the basis of gender identity. As in the other matters cited above with regard to the use of restrooms and other intimate facilities, even a finding reversing the 4th Circuit would not suggest that Title IX in fact *requires* schools to discriminate against transgender students.

[4] New York State Education Department, Guidance to School Districts for Creating a Safe and Supportive School Environment for Transgender and Gender Nonconforming Students (July 2015), publicly available at https://www.p12.nysed.gov/dignityact/documents/Transg_GNCGuidanceFINAL.pdf; New York State Education Department, Creating a Safe, Supportive, and Affirming School Environment for Transgender and Gender Expansive Students: 2023 Legal Update and Best Practices (2023), publicly available at https://www.nysed.gov/sites/default/files/programs/student-support-services/creating-a-safe-supportive-and-affirming-school-environment-for-transgender-and-gender-expansive-students.pdf

February 2025, the New York Attorney General and NYSED issued a joint statement to school districts regarding two presidential Executive Orders purporting to restrict K-12 schools from supporting transgender students' social transition and their access to athletics.[5]  The joint statement made clear that the executive orders do not affect the rights of transgender students and individuals in New York's public schools:  the President cannot restrict the meaning of "sex" in Title IX to exclude gender identity "unilaterally" and the presidential statements of policy are therefore "legally ineffective."[6]  It remains the case that no statute or regulation supports the Department's interpretation of Title IX, and no court has adopted it.

The Department's determination is contrary to this abundant authority, unsupported by statute or regulation, contrary to law, arbitrary and capricious, and such a departure would require action by Congress or formal rulemaking to be implemented.  Plaintiff is likely to succeed on the merits of this case.

## II.    NYCPS WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF INJUNCTIVE RELIEF

NYCPS will suffer imminent irreparable harm absent injunctive relief.  Irreparable harm exists where it involves an "injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages."  *New York v. U.S. Dep't of*

---

[5] EO 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025); EO 14190, 90 Fed. Reg. 8853 (Jan. 29, 2025).

[6] Letitia James, Betty A. Rosa (Feb. 2025), Joint Statement of the Office of the Attorney General and the State Education Department Regarding Transgender Students' Rights, New York: State of New York Office of the Attorney General; New York State Education Department; publicly available at https://www.nysed.gov/sites/default/files/nysed-oag-joint-statement-regarding-transgender-students.pdf.

*Homeland Sec.*, 969 F.3d 42, 86 (2d Cir. 2020) (*citing New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 660 (2d Cir. 2015)).

The Department is bringing irreparable chaos to the staff, students, and families of 19 schools, with no justification and without any warning.  These schools were all in the midst of grants for a five-year performance period, implementing a great variety of innovative specialized curricula and programming, ranging from cutting-edge science and technology to multimedia and the arts, leadership, and other innovative themes.  Aviles-Ramos Decl. ¶¶ 4; 26-27.  When the Department discontinued the grants midstream, planning and budgets were already in place, students had enrolled, the school year had already started, and the schools' teachers, students, and staff were engaged in their educational programs.  Aviles-Ramos Decl. ¶¶ 29-33.

The immediate consequences of this unjustified action are irreparable.  NYCPS had expected to use approximately $11 million in unspent carryover MSAP funding that it had been granted  for the previous fiscal year, FY 2025, which can be used to fund the program in the new fiscal year. Scott Decl. ¶¶ 12-13.  The Department has now suddenly made the entire amount unavailable.  Scott Decl. ¶¶ 22-24.  This action threatens the imminent end to the MSAP-funded programs at the schools.  Without that carryover funding, NYCPS will have to immediately dismantle the programs.  Aviles-Ramos Decl. ¶¶ 52-58; Scott Decl. ¶¶ 26-28. Schools will have to not only put on hold or cancel their planning for future years of their magnet programs, but will have no way to salvage the current year.  *Id.*

That harm flows to the students who enrolled in the schools in reliance on the magnet programming, and to their parents and the staff and teachers at the schools.  The magnet schools offer their students, ranging from kindergarten through high school, expansive opportunities  to learn from specialized teachers and facilities such as labs and studios. Aviles-Ramos Decl.

¶ 30.  For the students in magnet high schools, the loss extends to access to Advanced Placement courses, and dual enrollment in CUNY programs that enable these students to earn college credit or even an associate's degree, at no cost.  *Id*. ¶ 57.

Even if the expected MSAP funds are ultimately forthcoming, the delay itself is irreparable in a school setting.  The students whose school year now lacks magnet school resources will not regain the benefit of those experiences.  Even if funding is later restored, and they are fortunate enough to be in a new magnet class,  it will not be for the grade they are in this school year.   Aviles-Ramos Decl. ¶¶ 12-17, 52-58.

The immediate irreparable harm that the Discontinuance is causing will continue unless and until NYCPS is allowed to utilize carryover funds for immediate use, pursuant to 34 C.F.R. § 75.253(d) and the Department's usual procedures.

## III.    THE BALANCE OF THE EQUITIES FAVORS PRELIMINARY INJUNCTIVE RELIEF

The equities and the public interest, which merge in a case involving federal government action, *Nken v. Holder*, 556 U.S. 418, 435 (2009), both strongly favor the issuance of a preliminary injunction.

The Department has little claim to equitable consideration.  The MSAP program has regular timetables for school districts to submit performance reports and for the Department  to review them and approve continuation grants.  Scott Decl. ¶ 13  Instead of acting timely and responsibly, the Department first notified NYCPS that the MSAP funding for FY26 was not approved in a September 16, 2025 letter  – weeks after the beginning of the school year, and four months after the MSAP Schools submitted their annual performance reports.  The Department compounded its utter disregard for NYCPS and its students and families by a letter sent ten days later, on September 26, 2025, that denied NYCPS access to the carryover funds that remained from the FY25 grants:

"Please note that the Department is electing, consistent with 34 C.F.R. § 75.253(h), to not authorize further no-cost extensions for grant awards identified for non-continuation." Aviles-Ramos Decl. Ex. 4. These decisions were unprecedented and shocking. Aviles-Ramos Decl. ¶ 11.

The Department has acted so as to deprive NYCPS of funds that it very reasonably relied on up to and past the beginning of the current school year. There is no apparent legitimate explanation for its timing and the gratuitous additional harm that it caused not only to NYCPS but to all the students, families, staff and other participants in the MSAP magnet schools.

Moreover, as is apparent from the facts of this case, the Department appears to have relied on mere speculation about the impact of the Guidelines, hypothesizing about a supposed hostile environment for students, with no evidence that it had any basis for such a claim. The Department has no claim to equitable consideration by this Court.

NYCPS, on the other hand, has no fault at all here. It successfully completed its planning and preparations for the MSAP grants, timely submitted its reports, and acted in reasonable reliance on receiving approval of continued funding. It hired MSAP teaching staff, purchased MSAP-related equipment, notified families and students of the opportunity to apply, accepted applications, and went forward with the MSAP program in the new school year. Moreover, as described above, the Guidelines follow New York State and City laws, which prohibit discrimination on the basis of gender identity, and abundant precedent holds that Title IX does likewise. In these circumstances, NYCPS should be able to retain its MSAP carryover funding while this case is litigated.

Public interest considerations also favor NYCPS. First, the NYCPS community is overwhelmingly supportive of the policies as they are implemented. The Department's actions, on the other hand, have caused confusion and fear among NYCPS' transgender students and their

families.  Second, NYCPS is acting in the public interest by meeting the expectations of the schools, parents, caregivers, and students who expected to be attending magnet schools this year and did not anticipate that the programs' existence would be threatened.  Magnet schools plan years in advance, and students apply to these schools based on their expectation that they will receive the programming that the school offers. Aviles-Ramos Decl. ¶ 17; 28-32.  The students who attend these schools deserve to receive the full programing they were promised, which will not be possible absent NYCPS' ability, at the very least, to use the carry-over funds to maintain programming during the course of this litigation.

The balance of the equities and the public interest lie with NYCPS and support the issuance of a preliminary injunction to allow the use of carryover funding.

## **CONCLUSION**

For all the reasons set forth above, this Court should grant this motion and issue a preliminary injunction requiring that Defendants rescind their denial of no-cost grant extensions and rescind the September 29, 2025 amended GANs, and  take such other steps as are necessary to enable NYCPS to access and use the carryover funds from the FY 2025 MSAP grants, pending the determination of this action.[7]

---

[7] Pursuant to Fed. R. Civ. P. 56(c), the Court may, but is not required to, order security in the form of a bond upon issuing a preliminary injunction. *See Rodriguez v. Noem*, No. 3:25-cv-616 (SRU), 2025 U.S. Dist. LEXIS 83349, at *35 (D. Conn. May 1, 2025) (stating that "[t]he Second Circuit reject[s] the argument that a bond is always required when a preliminary injunction is granted" and waiving the bond requirement) (internal citations omitted). Courts addressing this issue in recent matters in which plaintiffs have sought funds already appropriated have determined that no security bond is necessary, or that a nominal amount is appropriate. *See, e.g., Pacito v. Trump*, 772 F.Supp. 3d 1204, 1227 (W.D. Wash. 2025) (concluding that no bond is necessary where the government is only required to spend appropriated funds); *Maryland v. United Stated Dep't of Agric.*, 770 F.Supp. 3d 779, 820 (D. Md. 2025) (concluding that even where "the risk of harm to the Government is not remote … it would be prohibitive to require plaintiffs to bear up front the total cost of the alleged governmental wrongdoing," and setting a nominal bond of $100.  This motion seeks only the restoration of NYCPS' ability to spend funds carried over from the previous

Dated: October 16, 2025
     New York, NY

Respectfully submitted,

MURIEL GOODE-TRUFANT
Corporation Counsel of the City of
   New York
100 Church Street
New York, NY 10007
(212) 356-2276
mash@law.nyc.gov

By: Melanie C. T. Ash (*Lead Trial
Attorney*)
June Buch
Bianca Isaias
Gavin Mackie*
Emeline Kong

*SDNY Admission Pending

**Attorneys for Plaintiff The Board of Education of the City School
District of the City of New York**

---

fiscal year budget cycle, posing little to no risk of harm to USDOE, such that either no or nominal
security is warranted.

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE</u>

As required by Local Civil Rule 7.1(c), I certify that the document contains 8,027 words,

excluding the parts of the document that are exempted by Local Civil Rule 7.1(c) ("These limits

do not include the caption, any index, table of contents, table of authorities, signature blocks, or

any required certificates, but do include material contained in footnotes or endnotes.").


_____

Melanie C.T. Ash