UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

THE BOARD OF EDUCATION OF THE CITY SCHOOL
DISTRICT OF THE CITY OF NEW YORK,

                              Plaintiff,

              v.                                                    No. 25-cv-08547 (AS)

UNITED STATES DEPARTMENT OF EDUCATION and
LINDA MCMAHON, in her official capacity as Secretary
of the United States Department of Education, KIMBERLY
M. RICHEY, in her capacity as Assistant Secretary for
Civil Rights, and LINDSEY M. BURKE, in her capacity as
Deputy Chief of Staff for Policy and Programs,

                              Defendants.

------------------------------------------------------------------------x


**PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**


Dated: New York, New York                    MURIEL GOODE-TRUFANT
       December 16, 2025                      Corporation Counsel of
                                              the City of New York
                                              100 Church Street
                                              New York, New York 10007
                                              (212) 356-1000


                                              *Attorney for Plaintiff*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................... 1

FACTS ..................................................................................................................... 2

ARGUMENT ........................................................................................................... 9

    I.     THE DISCONTINUATION OF NYCPS' MSAP GRANTS
    CONSTITUTED A TITLE IX ENFORCEMENT ACTION .............................. 10

        A.   Chenery Compels the Discontinuation
        Decision to be Analyzed as a Title IX Enforcement
        Action........................................................................................... 10

        B.   Congress Intended That Title IX Actions be
        Governed by the Exacting Statutory Process it
        Designed ...................................................................................... 14

        C.   Discontinuation on Title IX grounds is
        unlawful as a matter of law ......................................................... 15

    II.    NYCPS IS ENTITLED TO SUMMARY JUDGMENT .......................... 16

        A.   This Court has Jurisdiction Over the Dispute
        and Relief Sought......................................................................... 16

        (a)  This Court Has Jurisdiction to Vacate and Set
            Aside the Department's Discontinuation of the
            MSAP Grants........................................................................ 16

        (b)  This Court Has Jurisdiction to Grant
            Declaratory and Injunctive Relief to Ensure the
            Department Makes Continuation
            Determinations Consistent with Law................................... 19

        B.   NYCPS is Entitled to Judgment as a Matter of
        Law on Each of its Five Causes of Action................................... 20

        C.   The Discontinuation of NYCPS' MSAP Grants
        Based on Purported Violations of Title IX Is
        Unlawful Action Taken Without Observance of
        Procedure Required by Law.......................................................... 20

        D.   This Court Should Grant Judgment to NYCPS
        on the Remaining Counts.............................................................. 22

(a) In Failing to Provide NYCPS with Notice and an Opportunity to Challenge the Discontinuation of its MSAP Grants and in Conditioning the Availability of Reconsideration on NYCPS' Capitulation to the Department's Determination, the Department Acted Without Observance of Procedure Required by Law .................................................. 22

(b) The Department's Actions were Arbitrary and Capricious, 5 U.S.C. § 706(2)(A) ...................................... 23

(c) In Implementing and Enforcing a New Rule Concerning Title IX Without Revoking the Prior Rule and Engaging in Notice-and-Comment Rulemaking, the Department Acted Without Observance of Procedure Required by Law .............................................................................. 28

(d) The Department's Interpretation of Title IX and Enforcement Thereof Are Contrary to Law, 5 U.S.C. § 706(2)(A, C) ............................................................ 29

III.    NYCPS IS ENTITLED TO VACATUR, DECLARATORY RELIEF, AND A PERMANENT INJUNCTION ................................................. 31

CONCLUSION ................................................................................................. 33

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A.C. v. Metro. Sch. Dist. of Martinsville*,
75 F.4th 760 (7th Cir. 2023) *cert. denied,* 2024 US LEXIS 440 (Jan. 16, 2024) ...................30

*Am. Ass'n of Univ. Professors v. Trump*,
2025 U.S. Dist. LEXIS 224922 (N.D. Ca. Nov. 14, 2025) ........................................... *passim*

*Am. Pub. Health Ass'n v. Nat'l Insts of Health*,
145 F.4th 39 (1st Cir. 2025)........................................................................................20

*Amer. Assoc. of University Profs. v. Rubio*,
No. 1:25-cv-10685, 2025 U.S. Dist. LEXIS 193069 (D. Mass. Sept. 30, 2025)....................24

*Ass'n of Amer. Univers. v. Dep't of Def.*,
No. 25-cv-11740-BEM, 2025 U.S. Dist. LEXIS 201095 (D. Mass. Oct. 10,
2025) ........................................................................................................................9, 17, 20

*Bilbrey v. Brown*,
738 F.2d 1462 (9th Cir. 1984) ...............................................................................19

*Bostock v. Clayton County*,
590 U.S. 644 (2020)................................................................................................30

*Burlington Truck Lines, Inc. v. United States*,
371 U.S. 156 (1962).................................................................................................11

*Canonsburg Gen. Hosp. v. Burwell*,
807 F.3d 295 (D.C. Cir. 2015) ................................................................................11

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
603 U.S. 799 (2024) (Kavanaugh, J., concurring) ................................................18

*Dep't of Commerce v. New York*,
588 U.S. 752 (2019)...........................................................................................14, 24

*Dep't of Educ. v. California*,
604 U.S. 650 (2025), 145 S. Ct. 966......................................................................16

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020).............................................................................................25, 27

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006)................................................................................................32

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021)..................................................................................23

*FDA v. Wages & White Lion Invs.*,
    604 U.S. 542, 145 S. Ct. 898 (2025)........................................................24

*Griffin v. HM Fla.-ORL, LLC*,
    144 S. Ct. 1 (2023) (Kavanaugh, J., respecting denial of stay, quotations
    omitted)......................................................................................................18

*Grimm v. Gloucester Cnty. Sch. Bd.*,
    972 F.3d 586 (4th Cir. 2020), *as amended* (Aug. 28, 2020), *reh'g en banc
    denied*, 976 F.3d 399 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 2878 (June 28,
    2021) .........................................................................................................30

*Humane Soc'y of the United States v. United States Dep't of Agric.*,
    41 F.4th 564 (D.C. Cir. 2022)...................................................................28

*Kakar v. USCIS*,
    29 F.4th 129 (2d Cir. 2022) ......................................................................23

*Kansas v. Dep't of Educ.*,
    739 F. Supp. 3d 902 (D. Kansas 2024)......................................................31

*Adams ex rel. Kasper v. Sch. Bd. Of St John's Cnty.*,
    57 F.4th 791 (11th Cir. 2022)....................................................................30

*Maine v. United States Dep't of Agric.*,
    778 F. Supp. 3d 200 (D. Me Apr. 11, 2025)..............................................16

*Megapulse, Inc. v. Lewis*,
    672 F.2d 959 (D.C. Cir. 1982)...................................................................18

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983).....................................................................................23

*N.H. Hosp. Ass'n v. Azar*,
    887 F.3d 62 (1st Cir. 2018)........................................................................28

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
    545 U.S. 967 (2005)...................................................................................26

*Nat'l Insts. of Health v. Am. Pub. Health Ass'n*,
    145 S. Ct. 2658 (2025).................................................................16, 17, 20

*National Mining Ass'n v. U.S. Army Corps of Eng'rs*,
    145 F.3d 1399 (D.C. Cir. 1998).................................................................18

*Parents for Priv. v. Barr*,
    949 F.3d 1210 (9th Cir. 2020) ...................................................................................31

*President & Fellows of Harv. Coll. v. United States HHS*,
    Nos. 25-cv-11048-ADB, 25-cv-10910-ADB, 2025 U.S. Dist. LEXIS 171326
    (D. Mass. Sept. 3, 2025) ................................................................................... *passim*

*Robaid v. Mayorkas*,
    No. 23-cv-485-EK, 2025 U.S. Dist. LEXIS 192155 (E.D.N.Y. Sept. 29, 2025)....................23

*Rosati v. Mayorkas*,
    691 F.Supp.3d 597 (N.D.N.Y., 2023) ...................................................................23

*SEC v. Chenery Corp.*,
    332 U.S. 194 (1947).............................................................................................11

*Thakur v. Trump*,
    787 F.Supp.3d 955 (N.D. Cal. 2025) ....................................................................24

*Washington v. U.S. Dep't of Educ.*,
    No., 2025 U.S. Dist. LEXIS 207342 (W.D. Wash. Oct. 21, 2025) ...................17, 23

*Washington v. U.S. Dep't of Health and Human Servs., et al.*,
    No. 6:25-cv-01748-AA, U.S. Dist. LEXIS 211013 (D. Or. Oct. 27, 2025) ...........26

**Statutes**

5 U.S.C. § 702.............................................................................................................16

5 U.S.C. § 706............................................................................................................ *passim*

20 U.S.C. § 1232(a) .....................................................................................................28

20 U.S.C. § 1681(a) .....................................................................................................29

20 U.S.C. § 1682...................................................................................................... *passim*

20 U.S.C. §§ 7231 .................................................................................................... *passim*

42 U.S.C. § 2000d-1 ....................................................................................................15

20 U.S.C. § 1221 *et seq.*..........................................................................................22, 28

N.Y. Educ. Law §§ 11-12 ..............................................................................................8

N.Y. Educ. Law § 13 ......................................................................................................9

## Other Authorities

2 C.F.R. § 200.339 ..........................................................................................................15

2 C.F.R. § 200.340 ..........................................................................................................15

34 C.F.R. 75.253 ...........................................................................................................2, 4

34 C.F.R. 75.253(g) .........................................................................................................22

34 C.F.R. Part 6 ................................................................................................................6

34 C.F.R. Part 106 ..........................................................................................................25

34 C.F.R. § 75 *et seq.* .................................................................................................14, 22

34 C.F.R. §§75.118 .......................................................................................................4, 24

34 C.F.R. § 75.251(b)(2) ................................................................................................27

34 C.F.R. § 75.253(a)(5) ..................................................................................3, 7, 10, 13

34 C.F.R. § 106.31(a) ......................................................................................................29

34 C.F.R. § 106.31(b)(2)—(4) .........................................................................................29

2 C.F.R § 200.342 .........................................................................................................5, 6

34 C.F.R 75.118 ................................................................................................................4

34 C.F.R § 75.253 ...........................................................................................................14

34 C.F.R 75.253(g) .......................................................................................................6, 22

45 Fed. Reg. 22548 (Apr. 3, 1980) ................................................................................14

59 Fed. Reg. 30259 ....................................................................................................*passim*

86 Fed. Reg. 117 .............................................................................................................12

87 Fed. Reg. 9587 .............................................................................................................2

87 Fed. Reg. 9595 .............................................................................................................5

88 Fed. Reg. 15705 .......................................................................................................4, 5

89 Fed. Reg. 70,316 .....................................................................................................4, 27

90 Fed. Reg. 8853 (Jan. 29, 2025) .................................................................................12

EO 14168 ....................................................................................................................12, 13

EO 14190 ....................................................................................................................12, 13

EO 14201 ..........................................................................................................................12

## PRELIMINARY STATEMENT

Since 2022 and 2023, New York City Public Schools ("NYCPS") has been operating 19 magnet schools with the support of five multi-year Magnet School Assistance Program ("MSAP") grants awarded by the United States Department of Education (the "Department"), with each school using an innovative and challenging curriculum to powerfully transform learning opportunities for overwhelmingly low income, primarily Black and Hispanic students in 12 school districts across the City. Every spring since 2023, the consortia operating the schools have submitted annual performance reports ("APRs") documenting progress towards MSAP's Congressionally-mandated desegregation and academic achievement goals, and based on the Department's review of those APRs, NYCPS' grants have routinely been continued from one budget year to the next, without exception.

Two weeks into the 2025-2026 school year, without considering the latest round of APRs submitted by the schools, the Department suddenly discontinued $36 million in funding based on a purported "finding" that NYCPS's longstanding guidelines to support transgender students violate Title IX.[1] But it did so without following any of Title IX's statutory procedures—which require notice and an opportunity to be heard, findings on the record after a hearing, and the submission of reports about the finding to Congress 30 days before any refusal of funding.

While the Department's discontinuation decision purported to be an exercise of its discretion under the MSAP statute and what is in the "best interests" of the federal government, its communications with NYCPS confirm that the decision hinged solely on the government's new approach to Title IX, as reflected in three Presidential Executive Orders that upend existing

---

[1] Less than two weeks later, with three days left in the federal fiscal year, the Department also shortened the performance period for the magnet school grants, immediately restricting NYCPS' use of approximately $11 million in unspent funds—a decision the Department has now agreed to temporarily reverse.

interpretations of federal civil rights law. That move violated the APA, because Title IX does not allow for the discontinuation of funding without process and the MSAP statute also requires the Department to base continuation decisions entirely on a review of the APRs. The Department did not review the APRs submitted by the consortia, and its decision did not even purport to consider the indicia of performance which the MSAP regulations mandate be considered, yet it purported to make a determination under 34 C.F.R. 75.253. This Court should reject the Department's pretextual decision out of hand, vacate its unlawful Title IX determination, and, while directing that lawful continuation determinations be issued forthwith, enjoin any further attempt by the Department to engage in pretextual Title IX enforcement unless and until complying with the requirements of Title IX.

## FACTS

The relevant facts are set forth in the accompanying October 15, 2025 Declaration of Melissa Aviles-Ramos, Chancellor of the Board of Education ("Aviles-Ramos Decl.") and exhibits thereto (Dkt 6), and the October 15, 2025] Declaration of Seritta Scott, Chief Financial Officer of the Board of Education ("Scott Decl.") and exhibits thereto (Dkt 32), and in the December 16, 2025 Supplemental Declaration of Seritta Scott and exhibits thereto ("Supp. Scott Decl.")

**The NYCPS MSAP Grants**

In 2022 and 2023, five NYCPS groups (consortia) of schools applied for and were awarded multi-year federal MSAP grants by the Department to serve a total of over 7700 students at 19 magnet schools in 12 of NYCPS' 32 Community School Districts (CSD) located across New York City (the "Projects"). Three of the Projects applied for and were awarded 5-year grants in response to the Notice of Invitation to Apply (NIA) issued by the Department in 2022 (87 Fed. Reg. 9587 (Feb. 22, 2022)) and two Projects applied for and were awarded 5-year grants in

response to the NIA issued in 2023 (88 Fed. Reg. 15697 (March 14, 2023)). Aviles-Ramos Decl. ¶¶ 3-4, 19. As part of the application process, each of the Projects submitted assurances that they would not engage in discrimination in, *inter alia*, assigning students to schools or courses of instruction or designing or operating extracurricular activities for students. 20 U.S.C. § 7231d (b)(2)(C)(ii), (iii).

MSAP grant funds are used by the Projects for planning and development of programming for theme-based curricula, the hiring and professional development of teachers and other specialists, the creation of spaces such as media rooms and labs, and partnerships with outside entities, among other things, to create a broader applicant pool capable of achieving the many goals of magnet schools Aviles-Ramos Decl. ¶¶ 5, 29-30, 33-35.

Those goals, as noted in the NIAs, include reducing minority group isolation and segregation; allowing the development, design and expansion of innovative educational methods, programs, and practices that promote diversity and increase school choice; and ensuring that all students enrolled in the school have equitable access to high quality education that will enable them to succeed academically and continue with post-secondary education or employment. *See*, *i.e.,* 87 Fed. Reg. 9587 (February 22, 2022).

At the end of the federal fiscal year ("FY") 2025 budget year, each Project had completed either two or three years of the expected 5-year duration of their MSAP grants, and engaged in planning and programming with an eye to ensuring the long-term sustainability of the schools after the Projects' conclusion. Aviles-Ramos Decl. ¶ 27.

**The Grant Continuation Process**

Each year after the first year of a multi-year MSAP grant, the Department must determine whether to continue the grant, which includes considering whether continuation is in

the best interests of the Federal Government. 34 C.F.R. § 75.253(a)(5). Since 1994, when the Department adopted "an entirely new paradigm" streamlining the award continuation process, including by eliminating the requirement to submit an application for a continuation award, the Department's regulations have required that grant continuation determinations—including whether "continuation of the project is in the best interest of the Federal Government"—"be based *entirely* on the submission of [performance] reports," and the schedule for submitting such reports was adjusted so that the Department would be able to assess the reports as "evidence that the grantee has met the standards for continuation contained in 34 C.F.R. 75.253." 59 Fed. Reg. 30,259 (emphasis added).[2] *See* 34 C.F.R. §§ 75.118, 75.253(b); U.S. Department of Education, Discretionary Grantmaking at ED (Oct. 2024), *publicly available at* https://www.ed.gov.media.document/grantmaking-ed-108713.pdf ("Discretionary Grantmaking") at 32 ("The program staff uses the information in the performance report in combination with the project's fiscal and management performance data to determine subsequent funding decisions."); 88 Fed. Reg. 15705 (March 14, 2023) ("If you receive a multiyear award, you must submit an annual performance report that provides the most current performance and financial expenditure information as directed by the Secretary under 34 CFR 75.118."). The Department's stated expectation is that continuation determinations will only "extremely rarely" result in a discontinuation of funding, 59 Fed. Reg. 30,259 (June 10, 1994), and that where such a cut off occurs, "grantees are often aware of the likelihood of the decision well in advance." 89 Fed. Reg. 70,316 (Aug. 29, 2024).

---

[2] This contrasts with the requirements for initial grant applications, which are governed by 20 U.S.C. § 7231d and, *inter alia*, 34 C.F.R. §§ 75.215-217.

The grant continuation process was further streamlined in 1994 by removing any grantee obligation to annually resubmit the assurances required as part of their initial applications. 59 Fed. Reg. 30259 ("Since recipients will no longer submit an application to receive continuation funding, they will no longer be required to resubmit these assurances annually for the life of the project."). To that end, the language in both the 2022 and 2023 MSAP NIAs contemplate a backward looking assessment by the Department's Office for Civil Rights ("OCR") of prior civil rights assurances: "in making a continuation award, the Secretary also considers whether the grantee is operating in compliance with the assurances in its approved application, including those applicable to Federal civil rights laws…." 87 Fed. Reg. 9595 (Feb. 22, 2022) (found in the Administrative Record ("AR") at USDOE003108); 88 Fed. Reg. 15705 (March 14, 2023) (AR at USDOE003118). And as made clear by the 1994 Final Rule, consideration of a grantee's compliance with assurances is also to be undertaken *entirely* by reference to the grant recipient's submitted performance reports. 59 Fed. Reg. 30259 (June 10, 1994).[3] *See also,* U.S. Department of Education, Office for Civil Rights, FY 2023 MSAP Pre-Application Webinar Series (March 30, 2023), p. 9, *publicly available at* https://www.ed.gov/sites/ed/files/2023/04/FY2023-MSAP-TA-PRESENTATION-OCR-3.24.23.pdf. ("OCR reviews applications (and in continuation years, annual performance reports) for language that may raise civil rights concerns.").

Where the Department decides not to continue a multi-year grant, the Secretary must notify the grantee of that decision, the grounds on which it is based and, "consistent with 2

---

[3] The requirement to review the performance report and "consider" whether a grantee is operating in compliance with its assurances as part of a grant continuation decision is notably different from the requirement, in connection with an initial grant application, to "determine" whether the grantee's assurances will be met.

CFR 200.342[4], provide the grantee with an opportunity to request reconsideration of the decision."
34 CFR § 75.253(g).

**The Discontinuation of the MSAP Grants**

In a letter dated September 16, 2025 (the "Discontinuation Letter"), then-Acting
Assistant Secretary of OCR, Craig Trainor, informed NYCPS that its five multi-year MSAP grants
were being "non-continued" based on OCR's "findings" that NYCPS' Guidelines to Support
Transgender and Gender Expansive Students (the "NYCPS Guidelines") violate Title IX of the
Education Amendments of 1972 (Title IX), 20 U.S.C. § 1682 *et seq*., because they allow
transgender students to use bathrooms, changing room and locker room facilities, participate in
athletic activities, and be provided with overnight accommodations on school trips, consistent with
their gender identity (the "Discontinuation"). Aviles-Ramos Decl. ¶ 6 and Ex. 1 (AR at
USDOE000022, USDOE000001-4):

> Here, *the Guidelines violate Title IX* of the Education Amendments of 1972 (Title IX), 20
> U.S.C. § 1682 et seq., and its implementing regulation, 34 C.F.R. Part 6, in its provision,
> or lack thereof, regarding sex-segregated facilities, athletic opportunities, and overnight
> sleeping accommodations as part of extracurricular activities."
> …
> Simply put, allowing males in girls' sports, intimate facilities, or private spaces, such as
> with overnight sleeping accommodations, *violates Title IX* by creating a hostile
> educational environment or by denying females equal access to benefits of education or
> activities.

*Id*., pp. 1, 2, 3 (emphasis added).

Notably, the Discontinuation Letter contained *10 references* to Title IX but did not
identify any other basis for the Discontinuation. *Id*. In particular, it made no reference to the APRs
that each Project had been required to submit in May 2025 as part of the grant continuation process,

---

[4] 2 CFR 200.342 provides that "[u]pon initiating a remedy for noncompliance (for example, disallowed
costs, a corrective action plan, or termination), the Federal agency must provide the recipient with an
opportunity to object and provide information challenging the action."

as instructed by the Department. *See* Supplemental Declaration of Seritta Scott ("Supp. Scott Decl."), ¶¶ 5-7 and Ex. 2. Notwithstanding the APRs submitted by NYCPS, the only basis provided in the Discontinuation Letter for the Department's decision not to "certify," and to refuse to continue the NYCPS MSAP grants, were its "findings" that NYCPS' Guidelines violate Title IX:

> *As a result of these findings*, I will not certify NYC DOE's grant under 20 U.S.C. §7231d(c). Likewise, NYC DOE's MSAP grant will be non-continued under 34 C.F.R. §75.253(a)(5) because it is no longer in the best interests of the Federal Government.

Aviles-Ramos Decl. ¶ 6 and Ex. 1 (AR at USDOE000022, USDOE000001-4), at p. 3 (emphasis added).

The Discontinuation Letter then listed remedial actions that NYCPS must take to cure the asserted Title IX violations—and conditioned any reconsideration of the Department's decision to discontinue the MSAP grants on implementation of those steps. *Id*., pp. 2-3.

Shortly thereafter, in response to NYCPS' September 19, 2025 letter asking why the Department had "deprived [NYCPS] of the procedures and due process required by federal regulations before discontinuing funding based on alleged non-compliance [with Title IX]," the Department appeared to try to distance itself from its Title IX finding. *Id*. ¶ 7 and Ex. 2, p. 1 (AR at USDOE000005-6, USDOE000019-21). In a September 26, 2025 letter sent to NYCPS by Deputy Chief of Staff for Policy and Programs Lindsey M. Burke (the "Burke Letter") the Department purported to formally deny reconsideration of the its decision—even though NYCPS had not sought reconsideration given the Department's demand that it "implement the remedial measures articulated" in the Discontinuation Letter within 2 business days, *Id*., ¶ 8 and Ex. 3 (AR at USDOE000007-8). The Burke Letter glaringly avoided making even a single reference to Title IX. Instead, it described the Discontinuation as having been based on "specific concerns with [NYCPS'] compliance with applicable federal civil rights laws," which led the Acting Assistant Secretary to be "unable to certify that the civil rights assurances [NYCPS] made as part of its

MSAP grant would be met." *Id.* ¶ 9 and Ex. 4, p. 1 (AR at USDOE000009-18). Attempting to pivot from what was until then exclusively a Title IX -based decision, the Burke Letter premised its denial of "reconsideration" on those same "ongoing civil rights concerns … recognized by the Acting Assistant Secretary…." *Id.*

Finally, on September 29, 2025, the Department issued amended Grant Award Notifications ("GANs") for each of the five Projects, which effectuated the Discontinuation of the grants and reset the end of their respective grant performance periods from September 30, 2027 or September 30, 2028, to September 30, 2025, eliminating all of the remaining funds awarded and anticipated for the remainder of each grant's 5-year Project period, effective as of that date. Scott Decl. ¶¶ 23-24 and Ex. 2 (AR at USDOE002720-2725, 2843-2848, 2905-2910, 2967-2972, 3090-3095).

As described in the Aviles-Ramos Declaration, the Discontinuation has caused, and continues to pose, serious harm to NYCPS, its students, their families, and the schools themselves. Aviles-Ramos Decl. ¶¶ 52-58.

**The NYCPS Guidelines**

The NYCPS Guidelines referenced in the Discontinuation Letter set out NYCPS' protocols and best practices for supporting its transgender and gender expansive students. Aviles-Ramos Decl. ¶ 45. They are critical to implementing NYCPS's nondiscrimination policy—as required by New York state law.[5] Under the NYCPS Guidelines, students may not be denied access

---

[5] For example, the New York State Constitution prohibits discrimination because of sex, including sexual orientation, gender identity, or gender expression. N.Y. Const. art. 1, § 11(a). In the sphere of education, New York law prohibits discrimination or harassment against students on the basis of sexual orientation or gender, and here again, gender means "actual or perceived sex and shall include a person's gender identity or expression." N.Y. Educ. Law §§ 11-12. Moreover, New York law mandates that "the board of education and the trustees or sole trustee of every school district shall create policies, procedures and guidelines that

to restrooms, changing rooms, locker rooms, field trips or participation in sports and physical education classes consistent with their gender identity. *Id*. ¶ 47 and Ex. 5 (AR at USDOE003120-3126).

While the current NYCPS Guidelines were issued in 2019, NYCPS has had similar Guidelines in place since 2014 to provide direction for schools to support transgender and gender expansive students—who are at high risk for being bullied and marginalized—to ensure a safe learning environment free from discrimination and harassment to all students, and enable that the needs of students to be assessed on a case-by-case basis while ensuring the safety of all students. *Id*. ¶¶ 43-47.

## **ARGUMENT**

NYCPS brought this action asserting five separate causes of action, each seeking among other declaratory and injunctive relief, to vacate and set aside the Discontinuation. NYCPS is entitled to summary judgment on each of its claims: this Court has jurisdiction to consider the claims, and to grant the relief sought. In deciding a summary judgment motion in an lawsuit challenging agency action, the Court reviews the agency action "'not to determine whether a dispute of fact remains but, rather, to determine whether the agency action was arbitrary and capricious' or otherwise unlawful," *Ass'n of Amer. Univers. v. Dep't of Def.*, No. 25-cv-11740-BEM, 2025 U.S. Dist. LEXIS 201095 at *8 (D. Mass. Oct. 10, 2025) (*quoting Bos. Redevelopment v. Nat'l Park Serv.*, 838 F.3d 42, 47(1st Cir. 2016)).

---

shall include, but not be limited to…[p]olicies and procedures intended to create a school environment that is free from harassment, bullying and discrimination…." N.Y. Educ. Law § 13 (emphasis added).

## I.    THE DISCONTINUATION OF NYCPS' MSAP GRANTS CONSTITUTED A TITLE IX ENFORCEMENT ACTION

Put simply, NYCPS' Complaint alleges that the Department sought to coerce compliance with the Trump Administration's new interpretation of Title IX by refusing to continue five MSAP grant awards based on purported "findings" that the longstanding NYCPS Guidelines violate Title IX. *See* Complaint ¶¶50, 51-65. Those "findings," were in no way linked to the Congressional goals of MSAP, the operation of the MSAP Projects, or the performance of the magnet schools they were working to develop, nor did the Discontinuation comply with Title IX the statutory and regulatory requirements. Apparently recognizing that it had fatally tethered its action to Title IX without following any required process, the Department attempted to recast the basis for the Discontinuation after the fact. But the Department cannot rewrite the record—it must be held to the express language and reasoning of its decision. And the Department's stated justification—a perceived violation of Title IX—simply does not allow the discontinuation of an MSAP grant before following Title IX's statutory procedures. Consequently, the discontinuation decision is unlawful as a matter of law and must be vacated.

### A.  Chenery Compels the Discontinuation Decision to be Analyzed as a Title IX Enforcement Action

To avoid the exacting obligations of Title IX, the Department has sought to recast the discontinuation decision as having been based not on a finding that NYCPS' Guidelines violate Title IX, but rather on a determination that the continuation of the grants was not in the "best interest" of the Federal Government. 34 C.F.R. § 75.253(a)(5). However, cloaking its actions in "best interest" language cannot help the Department avoid the overwhelming record that the Discontinuation—the "final agency action" challenged here—was entirely based on three express "findings" that NYCPS' Guidelines violate Title IX. Aviles-Ramos Decl. ¶ 6 and Ex. 1 (AR at USDOE000022, USDOE000001-4).

It is well settled law under *SEC v. Chenery* that a *post hoc* rationalization cannot save an agency's unlawful action, which "must be upheld, if at all, on the same basis articulated in the order by the agency itself." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 169 (1962) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (if the grounds provided by the agency "are inadequate or improper, the court is powerless to affirm the administrative action")).[6] Here, the Department's attempted after-the-fact rationalization in a Burke Letter scrubbed clean of references to Title IX—coming only after the unlawfulness of its original justification had been brought to the Department's attention by NYCPS—is no different from the *post hoc* rationalization that was before the court in *Burlington*, or the 11th hour pivot by the federal government in *President & Fellows of Harv. Coll. v. United States HHS,* Nos. 25-cv-11048-ADB, 25-cv-10910-ADB, 2025 U.S. Dist. LEXIS 171326 (D. Mass. Sept. 3, 2025) ("*Harvard*"), to put forward an alternative justification, and should be rejected for the same reasons as in those cases: "'the *post hoc* rationalizations of the agency … cannot serve as a predicate for agency action.'" *Harvard*, *id.*, at *91 (quoting *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 539 (1981)).

Moreover, the Department's assertion that the Discontinuation is a proper exercise of its regulatory authority over grant continuations rather than a Title IX enforcement action is entirely pretextual. The Discontinuation was plainly a means to effectuate the current administration's policy of targeting and defunding schools that recognize what it terms "gender ideology."

---

[6] The legal question of whether or not the discontinuation decision constitutes a Title IX enforcement action or a decision under the MSAP regulation falls to this Court to decide, and there is no need or requirement for this Court to defer to the Department under *Chenery*. *See, e.g., Canonsburg Gen. Hosp. v. Burwell*, 807 F.3d 295, 304 (D.C. Cir. 2015).

In January 2025, President Trump issued three Executive Orders purporting to announce a new federal interpretation of Title IX, and ordering agencies to adopt and enforce it (the "Gender Ideology EOs").[7] One of the Gender Ideology EOs directed Agency heads to "promptly rescind all guidance documents inconsistent with the requirements of this order." EO 14168, *Id.* at 3. That would include a 2021 interpretive guidance published by the Department in the Federal Register under the prior administration, which had announced that "OCR will fully enforce Title IX to prohibit discrimination based on sexual orientation and gender identity in education programs and activities that receive Federal financial assistance from the Department." (the "Title IX Interpretive Guidance").[8]

In direct contradiction to the Title IX Interpretive Guidance, the Gender Ideology EOs purport to impose an interpretation of Title IX that rejects "gender identity-based access to single-sex spaces" including "use of intimate facilities and accommodations such as bathrooms or locker rooms specifically designed for persons of the opposite sex; and participating in school athletic competitions or other extracurricular activities specifically designed for persons of the opposite sex." EO 14168 at 2; EO 14190 at 2. EO 14190 directed the enforcement of the President's new interpretation by "eliminating Federal funding or support for illegal and discriminatory treatment and indoctrination in K-12 schools, including based on gender ideology," and "prevent[ing] or rescind[ing] Federal funds … from being used by an … elementary school,

---

[7] *See* Executive Order ("EO") 14168 – *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* 90 Fed. Reg. 8615 (Jan. 20, 2025); EO 14190 – *Ending Radical Indoctrination in K-12 Schooling*; 90 Fed. Reg. 8853 (Jan. 29, 2025); and EO 14201 – *Keeping Men Out of Women's Sports* 90 Fed. Reg. 9279 (Feb. 5, 2025).

[8] 86 Fed. Reg. 117 (June 22, 2021).

or secondary school, to directly or indirectly … support or subsidize a violation of Title VI or Title IX." EO 14190 at 2-3.

On February 4, 2025, OCR issued a Dear Colleague Letter ("DCL") announcing a pivot in the Department's enforcement of Title IX, consistent with EO 14168, in which "President Trump ordered all agencies and departments within the Executive Branch to 'enforce all sex-protective laws to promote [the] reality' that there are 'two sexes, male and female,' and that '[t]hese sexes are not changeable….'"[9] The DCL announced: "ED and OCR must enforce Title IX consistent with President Trump's Order."[10]

Just seven months later, on September 16, 2025, that the Department issued its determination not to continue NYCPS' MSAP grants, because to do so would not be "in the best interest of the Federal Government" based on "findings" that NYCPS' Guidelines to protect transgender students from discrimination in the schools violate Title IX.

Based on the record before the Court, the Department's invocation of the "best interests" instead of Title IX is a red herring: the Discontinuation Letter makes clear that the supposed "best interests" decision was driven entirely by the finding that the NYCPS Guidelines violated Title IX. While the Burke Letter makes a vague reference to "civil rights concerns" instead of expressly relying on Title IX, it provides no new basis whatsoever for the decision:

> Here, the determination under 34 C.F.R. § 75.253(a)(5) was whether NYC DOE's MSAP grant continues to be in the best interest of the federal government. Given the ongoing civil rights concerns impacting MSAP students recognized by the Acting Assistant Secretary through his refusal to certify NYC DOE's compliance with applicable civil rights laws, I cannot make such a determination.

Aviles-Ramos Decl. ¶ 9, Ex. 4.

---

[9] U.S. Department of Education, Dear Colleague Letter, Feb. 4, 2025, *publicly available at* https://www.ed.gov/media/document/title-ix-enforcement-directive-dcl-109477.pdf

[10] *Id.*

Despite the Department's 1994 Final Rule requiring that MSAP grant continuation determinations—*including the "best interests of the Federal Government" decision*—be based *entirely* on performance reports submitted by the grantee, 59 Fed. Reg. 30,259 (June 10, 1994), NYCPS' May 2025 performance reports are not even included in the Administrative Record that the Department claims to have relied upon in making its determinations. Moreover, the Discontinuation Letter demanded that NYCPS remedy the purported Title IX violation, an action seemingly grounded in the enforcement provisions of Title IX. *See* 20 U.S.C. § 1682 (requiring the Department first to seek compliance with Title IX by voluntary means). By contrast, 34 CFR § 75.253 provides no authority to seek any remedy for a project that is no longer in the best interest of the federal government—or for a purported Title IX violation. The predecessor Department acknowledged as much when it adopted an early version of the Education Department General Administrative Regulations ("EDGAR") (*see* 34 C.F.R. § 75 *et seq*.), including the "best interest" requirement for continuation awards, noting that such regulations do not set authority "to determine compliance with civil rights requirements" and "do not duplicate Federal and State civil rights compliance requirements." 45 Fed. Reg. 22548 (Apr. 3, 1980). It is clear here that the Department invoked Title IX, made findings of violations, and acted upon them, regardless of how they now seek to recharacterize the decision. Any suggestion to the contrary is "incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019).

### B. Congress Intended That Title IX Actions be Governed by the Exacting Statutory Process it Designed

Defendants have argued in the alternative that it is within their discretion to address violations of Title IX through the MSAP certification and "best interests" requirements rather than through Title IX's exacting statutory process. But even if that is so, the existence of regulations

requiring certification and/or annual continuation of grants "do not give Defendants a blank check to ignore the Tile VI and Title IX processes and limits. [11] Such an interpretation would nullify the safeguards imposed by 42 U.S.C. § 2000d-1. Agencies would never need to go through the onerous process of terminating funds under Title VI and Title IX if they could take the very same actions simply by citing 2 C.F.R. §§ 200.339-40. Nothing permits an agency to "'regulate away' the statutory commands imposed by Congress in … Title IX in that manner." *Amer. Assoc. of University Profs., et al., v. Trump, et al.,* Case No. 25-cv-07864-RFL, 2025 U.S. Dist. LEXIS 224922 at *98-99 (N.D.Cal. Nov. 14, 2025) ("*AAUP*") (*citing Nat'l Treasury Emps. Union v. Cornelius*, 617 F. Supp. 365, 371 (D.D.C. 1985)) (rejecting the government's argument that they need not comply with statutory requirements for Title VI and IX because 2 C.F.R. § 200.339 and 2 C.F.R. § 200.340 provide an alternative process for suspending funds). Here, the Department is simply attempting to wrap its unlawful actions in a vague standard to avoid statutory commands and judicial review. That result may be in the best interest of this agenda-driven Department, but not the federal government as a whole.

## C. Discontinuation on Title IX grounds is unlawful as a matter of law

This Court can dispose of this suit based on the Department's unlawful Title IX enforcement action, as explained in more detail below. Title IX's statutory procedures require the federal government to conduct an investigation, provide an opportunity for a hearing, make an express finding of a failure to comply with Title IX, and file a report with Congress 30 days before cutting local education funding. 20 U.S.C. § 1682. There is no dispute that none of that happened here. NYCPS is accordingly entitled to an order vacating and setting aside the Discontinuation in

---

[11] The procedural requirements under Title IX are materially the same as Title VI. *Am. Ass'n of Univ. Professors v. Trump*, 2025 U.S. Dist. LEXIS 224922, *93 n.18 (N.D. Ca. Nov. 14, 2025) ("*AAUP*").

its entirety and prohibiting the Department from taking any Title IX enforcement actions without following the procedures set out in 20 U.S.C. § 1682. *See Maine v. United States Dep't of Agric.*, 778 F. Supp. 3d 200, 228-230 (D. Me Apr. 11, 2025) (barring interference with Maine's federal funding based on the State's asserted violations of Title IX without compliance with statutory procedures); *Harvard*, 2025 U.S. Dist. LEXIS 171326, at *88-95 (granting summary judgment to Harvard in part, and vacating and setting aside the federal government's termination of Harvard's funding under Title VI without the required procedures); *AAUP*, at *133-37 (N.D. CA Nov. 14, 2025) (preliminarily enjoining the government's suspension of funding under Title VI and Title IX violations without the statutorily mandated process). This Court needs to go no further to vacate the Department's unlawful action and direct the Department not to enforce Title IX unless and until it follows the procedures set out in 20 U.S.C. § 1682.

## II.    **NYCPS IS ENTITLED TO SUMMARY JUDGMENT**

### A.    **This Court has Jurisdiction Over the Dispute and Relief Sought**

### (a) **This Court Has Jurisdiction to Vacate and Set Aside the Department's Discontinuation of the MSAP Grants.**

This Court has jurisdiction to decide this action under the APA, which waives federal sovereign immunity for suits alleging injury by agency action. 5 U.S.C. § 706. The waiver does not apply if the suit seeks "money damages," 5 U.S.C. § 702, or if "any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought," *id.,* 704, such as the Tucker Act, which requires claims sounding in contract be heard by the Court of Federal Claims; however, neither exception applies here.

Even after the Supreme Court's recent emergency stay decisions *Dep't of Educ. v. California*, 604 U.S. 650 (2025), 145 S. Ct. 966 ("*California")* and *Nat'l Insts. of Health v. Am. Pub. Health Ass'n,* 145 S. Ct. 2658 (2025) ("*NIH*"), district courts retain jurisdiction to adjudicate

unlawful agency actions and require compliance with statutory or regulatory procedures. Such actions are appropriately within the district court's jurisdiction because they seek "a process correction, not a payment direction." *Washington v. U.S. Dep't of Educ.*, No., 2025 U.S. Dist. LEXIS 207342 at *32 (W.D. Wash. Oct. 21, 2025) (rejecting a motion to dismiss on jurisdictional grounds a challenge to the discontinuation of discretionary multi-year education grants without complying with the applicable statutes and Education Department regulations).

The court's decision in *Harvard*, 2025 U.S. Dist. LEXIS 171326 at *45-46 is particularly instructive. The district court rejected the government's argument that the Tucker Act mandated Federal Court of Claims' jurisdiction over the dispute regarding Title VI claims on the basis that the claims "will merely determine whether statutory procedural requirements were satisfied" and "[r]egardless of how these claims are resolved, the government will not necessarily be obligated to disburse any additional funds nor will any contract terms need to be considered as part of the analysis") (distinguishing *NIH* and *California*).

Further, district courts remain the appropriate forum to litigate the lawfulness of policies or internal agency guidance underlying grant determinations and have jurisdiction to grant relief vacating and setting aside an unlawful determination based on adoption and imposition of new priorities, or policies. *Ass'n of Amer. Univs.*, 2025 U.S. Dist. LEXIS 201095, at *5-6 (citing *NIH*, 145 S. Ct. at 2661 (Barrett J., concurring). NYCPS' challenges to the Department's policies and guidance on Title IX fit comfortably within these parameters.

The source of NYCPS' claims here are the statutes and regulations which constrain the Department's actions and the policies and internal guidance by which it attempts to impose the government's new priorities on "gender ideology," *not* the "contractual" terms of the MSAP grants themselves: NYCPS asserts claims that the Discontinuation, based on a Title IX finding, was

unlawful because it failed to comply with the procedures under Title IX and its implementing regulations (Count I); the Discontinuation was unlawful because it failed to comply with the MSAP statute and its implementing regulations (Count II); the Discontinuation was unlawful as arbitrary and capricious (Count III); the Title IX finding underlying the Discontinuation was unlawful in that it purported to impose a novel interpretation of Title IX without having promulgated that interpretation through notice-and-comment rulemaking (Count IV); and finally, the Title IX finding on which the Discontinuation was based was contrary to law because it was based on an erroneous and unsupported interpretation of Title IX (Count V). All of these claims are properly before this Court. *Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982).

This Court likewise has jurisdiction to award the relief necessary to remedy the harms established by the evidence before the Court. In an action under the APA, a Court may "hold unlawful and set aside 'agency action,' findings, and conclusions found to be—arbitrary, capricious … or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). Cmpl, ¶¶ 100-141 (Doc. 1). It has long been understood that § 706(2) authorizes vacatur of an unlawful agency action. *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 826-27 (2024) (Kavanaugh, J., concurring). "When a federal court sets aside an agency action, the vacated "agency action is treated as though it had never happened." *Griffin v. HM Fla.-ORL, LLC,* 144 S. Ct. 1, 2 n.1 (2023) (Kavanaugh, J., respecting denial of stay, quotations omitted). This means the parts of the agency action held unlawful are vacated as a whole. *National Mining Ass'n v. U.S. Army Corps of Eng'rs,* 145 F.3d 1399, 1409 (D.C. Cir. 1998).

NYCPS seeks an order under the APA vacating and setting aside the Discontinuation, which the Department undertook based on a finding of Title IX violations,

without complying with the procedural protections set out in Title IX. Such an order is within the jurisdiction of this Court. *See Harvard*, 2025 U.S. Dist. LEXIS 171326 (on summary judgment, vacating grant termination letters as violative of Title VI). Likewise, NYCPS seeks, and the court may order, that the Discontinuation be vacated and set aside because the Department failed to provide NYCPS with the procedural protections afforded by, and/or failed to consider the relevant factors mandated by, the MSAP statute and regulations. *See Washington v. Dep't of Educ.ation*, No. 25-cv-1228-KKE, 2025 U.S. Dist. LEXIS 211521 (W.D. Wash. Oct. 27, 2025) (stay den., 2025 U.S. App . LEXIS 31650 (9th Cir. Dec. 4, 2025). A vacatur order is clearly within the jurisdiction of this Court.

### (b) This Court Has Jurisdiction to Grant Declaratory and Injunctive Relief to Ensure the Department Makes Continuation Determinations Consistent with Law

In addition to vacatur, given that NYCPS' five MSAP grants are each multi-year grants with either two or three years remaining, and given that for each such grant year, the Department will be required to make a grant continuation determination, this Court has jurisdiction to grant declaratory relief to clarify and guide the relationship between NYCPS and the Department with regard to continuation determinations for the lifetime of the MSAP grants, and thereby afford relief "from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Bilbrey v. Brown*, 738 F.2d 1462, 1470 (9th Cir. 1984).

The Department made its unlawful discontinuation determination days before the end of the federal funding year—and after the school year had already begun—which profoundly disrupted the ability of the affected schools to operate on an ongoing basis. The schools are now wrapping up their first semester, and the end of the school year is rapidly approaching. Meanwhile, the interim funding provided by the consent order issued on November 20, 2025 will soon run out for several of the affected schools. Supp. Scott Decl. ¶ 9. Upon vacatur, this Court should direct

the Department to make a continuation determination that complies with governing statutes and regulations for this school year within ten (10) days. Such relief is appropriate under the circumstances and within this Court's authority. Indeed, in *NIH*, the Supreme Court left undisturbed the First Circuit's determination that "the district court clearly had jurisdiction to grant 'prospective relief' that [would] govern 'the rather complex ongoing relationships' between the Department and grant recipients." *Am. Pub. Health Ass'n v. Nat'l Insts of Health*, 145 F.4th 39, 50 (1st Cir. 2025) (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 905 (1988)). *See also, Ass'n of Amer. Univs.*, 2025 U.S. Dist. LEXIS 201095 at *9-11 (*quoting* Barrett, J. and Roberts, C.J. in *NIH*).

### B. NYCPS is Entitled to Judgment as a Matter of Law on Each of its Five Causes of Action

NYCPS is entitled to judgment on each of its five causes of action under the APA as a matter of law: the Department acted "without observance of procedure required by law," *id.* § 706(2)(D), in multiple respects (Counts I, II, and IV); the actions of the Department in discontinuing NYCPS' MSAP funding were "arbitrary [and] capricious," (Count III); and the Department's actions were "otherwise not in accordance with law," *id.* §706(2)(A) (Count V). On all of these bases, the Discontinuation of NYCPS' MSAP grants is void, illegal, and of no force or effect, and should be vacated and set aside, and declaratory and injunctive relief should issue to govern prospective continuation decisions.

### C. The Discontinuation of NYCPS' MSAP Grants Based on Purported Violations of Title IX Is Unlawful Action Taken Without Observance of Procedure Required by Law

This Court could vacate the discontinuation decision and issue a judgment in favor of NYCPS based on Count I alone. As described, *supra*, the overwhelming evidence establishes that the Department's actions were, in every sense, Title IX enforcement actions: the

Discontinuation Letter invoked Title IX—making three specific Title IX findings and containing 10 separate references to Title IX—as the *sole basis* for refusing to continue NYCPS' MSAP grants for FY26 and demanded that NYCPS bring itself into compliance with Title IX through a series of remedial measures; the Burke Letter upheld the Discontinuation by purporting to deny reconsideration; and the Department effectuated the decision by issuance of amended GANs discontinuing each grant and resetting the performance period for each Project to end on September 30, 2025, which had the effect of foreclosing any further performance or payment under the grants. Moreover, the Department acted precipitously, without following Title IX's statutory procedures—without conducting an investigation; providing NYCPS an opportunity for a hearing; making an express finding on the record of a failure to comply with Title IX; and filing "a full written report of the circumstances and the grounds for such action" with Congress and waiting 30 days thereafter. 20 U.S.C. § 1682. These actions constituted unlawful agency action without observance of procedure required by law, contrary to the APA, and NYCPS is accordingly entitled to an order vacating and setting aside the Discontinuation in its entirety, including vacatur and setting aside of the Discontinuation Letter, the Burke Letter, and the Amended GANs which effectuated the Discontinuation.

This Court can and should also grant declaratory and permanent injunctive relief enjoining the Department from issuing discontinuation decisions on the NYCPS MSAP grants in a manner not consistent with the law. Discontinuation based on the same or similar reasons, including Title IX or "civil rights violations," or otherwise taking a Title IX enforcement action with respect to NYCPS' MSAP grants, unless and until they follow the required Title IX procedures set out in 20 U.S.C. § 1682.

21

### D. This Court Should Grant Judgment to NYCPS on the Remaining Counts

This Court needs to go no further to grant NYCPS's the full relief requested because the Department's action was an unlawful Title IX action. In any event, NYCPS is also right about its other claims, because the Department failed to follow the procedures that govern continuation decisions under the MSAP statute.

### (a) In Failing to Provide NYCPS with Notice and an Opportunity to Challenge the Discontinuation of its MSAP Grants and in Conditioning the Availability of Reconsideration on NYCPS' Capitulation to the Department's Determination, the Department Acted Without Observance of Procedure Required by Law

NYCPS is also entitled to judgment as a matter of law on its claim for relief under the APA for the Department's failure to act in accordance with the statutes and regulations governing MSAP. 20 U.S.C. §§ 7231-7231j; the General Education Procedures Act ("GEPA"), 20 U.S.C. § 1221 *et seq.;* and EDGAR, 34 C.F.R. § 75 *et seq.* Prior to taking steps to effectuate the Discontinuation, 34 C.F.R. 75.253(g) required the Department to provide NYCPS with notice of the grounds for its decision not to continue the grants, and consistent with 2 C.F.R. 200.342[12], to provide NYCPS with the opportunity to challenge the decision and request reconsideration. Cmpl. ¶ 113. The Department failed to meet those requirements.

Equally flawed was Defendants purported "reconsideration" of the decision not to continue the MSAP grants. The Discontinuation Letter demanded that NYCPS take the listed remedial measures, including agreeing to fully adopt the Department's interpretation of Title IX, "in order for this decision to be reconsidered…." Aviles-Ramos Decl. ¶ 6 and Ex. 1 (AR at

---

[12] 34 C.F.R. § 75.253(g) clearly contemplates that NYCPS will be provided with a three-tiered process of "objections, hearings, and appeals" to contest any discontinuation. *In re: University of St. Thomas, Grantee/Petitioner,* 2025 EOHA LEXIS 115 at *28-29 (U.S. Dep't of Ed. Offices of Hearings and Appeals, July 10, 2025). No such process was disclosed or provided to NYCPS.

USDOE000022, USDOE000001-4). By conditioning NYCPS' ability to seek reconsideration on capitulation to the Department's demands that it repudiate the NYCPS Guidelines, and by failing to provide NYCPS with access to the written procedures and a list of any information that should accompany a request for reconsideration, the Department denied NYCPS a meaningful opportunity to seek reconsideration, as required by the MSAP statute and regulations. *Washington,* 2025 U.S. Dist. LEXIS 211521 at *25, n.6 (lack of necessary information "precludes a meaningful opportunity to seek reconsideration"). The Department's failure to provide NYCPS with the required procedural protections, and/or a meaningful opportunity to seek reconsideration, violated the APA.

### (b) The Department's Actions were Arbitrary and Capricious, 5 U.S.C. § 706(2)(A)

On a motion for summary judgment, a district court decides whether an agency's action was arbitrary and capricious "by reviewing the administrative record compiled by the agency when it made its decision," *Rosati v. Mayorkas*, 691 F.Supp.3d 597, 602 (N.D.N.Y., 2023) (*citing Saleh v. Blinken*, 596 F.Supp.3d 405, 413 (E.D.N.Y. 2022)) "to determine whether the agency decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Kakar v. USCIS*, 29 F.4th 129, 132 (2d Cir. 2022) (internal citations omitted). See *Robaid v. Mayorkas*, No. 23-cv-485-EK, 2025 U.S. Dist. LEXIS 192155 at *1 (E.D.N.Y. Sept. 29, 2025).

An agency action is arbitrary and capricious under the APA where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021), or does not show "a rational connection between the facts found and the choice made," *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation modified), or "offer genuine justifications for important decisions, reasons that can be

scrutinized by courts and the interested public." *Dep't of Commerce*, 588 U.S. at 758. This is particularly the case where agency action is an abrupt change from prior policy. *See, e.g., Amer. Assoc. of University Profs. v. Rubio*, No. 1:25-cv-10685, 2025 U.S. Dist. LEXIS 193069 at * 155-157 (D. Mass. Sept. 30, 2025). Under the "change-in-position doctrine," agencies seeking to change their existing policies must provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests. *FDA v. Wages & White Lion Invs.*, 604 U.S. 542, 145 S. Ct. 898, 917 (2025) (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016) (explaining "change-in-position doctrine")); *Thakur v. Trump*, 787 F.Supp.3d 955, 1106 (N.D. Cal. 2025).

The Department's decision to discontinue NYCPS' MSAP grants was arbitrary and capricious on multiple grounds. *First*, it failed to even consider the criteria expressly listed in the MSAP regulations when making its decision. If an agency "has … entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency" then it is arbitrary and capricious. *AAUP*, at *113-114, *quoting Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. MSAP continuation decisions are required to be based on a review of "any relevant information *regarding grantee performance,*" including performance reports, performance measures, and financial data. 34 C.F.R. §§75.118; 75.253(b) (emphasis added); Discretionary Grantmaking at 31-32, ("The program staff uses the information in the performance report in combination with the project's fiscal and management performance data to determine subsequent funding decisions.").

Here, not only did the Secretary fail to make any findings as to NYCPS' performance with respect to the MSAP Projects, but the complete absence in the Administrative Record of any of the five NYCPS APRs submitted to the Department in May 2025, and of any

grant-related fiscal or performance data makes clear that the Department failed to consider grantee performance at all in making the continuation decision. Administrative Record, generally; *See Harvard*, *supra* at *99-103; *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020).

Instead, the Department purported to rely on a decision by OCR not to "certify" NYCPS' grant assurances pursuant to 20 U.S.C. § 7231d(c). *See* Aviles-Ramos Decl., ¶ 6 and Ex. 1 (AR at USDOE000022, USDOE000001-4). OCR, however, "certifies" assurances made only as part of an "application" for MSAP funding.[13] *See generally* 20 U.S.C. § 7231d. That is, OCR certification is a pre-award clearance process, not roving authority for OCR to "certify" and "de-certify" at will during the pendency of a multi-year award. As noted above, a continuation decision is not based on an application, but rather on review of the APRs. 59 Fed. Reg. 30259. Here, NYCPS made such assurances in its 2022 and 2023 applications for MSAP funding, and thereafter OCR certified those assurances and the Department granted the applications and made the awards to NYCPS. Thus, OCR has no basis now to claim any certification authority with respect to the Projects.

*Second*, the Department offered no genuine, reasonable and reasonably explained justification for its decision. OCR said only that it had "identified a civil rights compliance issue" with the NYCPS Guidelines, which it summarily concluded "authorizes discrimination on the basis of sex in violation of Title IX of the Education Amendments of 1972 … and its implementing regulation, 34 C.F.R. Part 106." Aviles-Ramos Decl. ¶ 6 and Ex. 1, (AR at USDOE000022, USDOE000001-4). Similarly, the Burke Letter only reported "concerns" about NYCPS'

---

[13] The text of the relevant statute actually describes the process as "determining" that the assurances will be met, rather than "certifying," as described by the Department. 20 U.S.C § 7231d(c).

compliance with civil rights laws. However, without factual support and a reasoned basis for the decision, "[b]aldly asserting that longstanding funding is being terminated to comply with an agency's statutory mandate does not constitute a reasoned explanation under the APA." , *Washington v. U.S. Dep't of Health and Human Servs., et al.*, No. 6:25-cv-01748-AA, U.S. Dist. LEXIS 211013 at *53 (D. Or. Oct. 27, 2025) ("*Washington v. HHS*"), *quoting Thakur*, 787 F. Supp. 3d 955, 982 (N.D. Cal. 2025)(internal quotations omitted); *see also Harvard,* 2025 U.S. Dist. LEXIS 171326 at *99-100.

   *Third*, the Department did not provide any explanation—let alone a reasoned one— why it deviated from its prior determinations that the MSAP grant recipients' assurances of compliance with federal civil rights law and that the MSAP grants were in the best interest of the Federal Government. Aviles-Ramos Decl. ¶¶ 6, 8 and Exs. 1, 3, (AR at USDOE000022, USDOE000001-4, USDOE000007-8). The five MSAP grants at issue were awarded in 2022 and 2023 and were continued annually thereafter, even though the NYCPS Guidelines have been in place for over a decade. AR at USDOE002613-2719, 2726-2842, 2849-2904, 2911-2966, 2973-3089, 3096-3099 "Unexplained inconsistency between agency actions is a reason for holding an interpretation to be an arbitrary and capricious change." *Washington v. HHS, supra* at *56 *quoting Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) and *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005). An agency that changes its view of what is in the public interest, "must do so in accordance with the law and must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored." *AAUP v. Trump*, at *117, *quoting Nw. Env't Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 687 (9th Cir. 2007).

*Fourth*, before discontinuing the MSAP grants, the Department failed to consider NYCPS' serious reliance interests, based, among other things, on Congressional intent, the Department's own history and practice under MSAP, and MSAP's governing regulations, which reflect, upon approval of multi-year grants, an "intention to make continuation awards to fund the remainder of the project period." 34 C.F.R. § 75.251(b)(2). *See Regents of the Univ. of Cal.*, 591 U.S. at 30 ("When an agency changes course, … it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account … It would be arbitrary and capricious to ignore such matters.") (internal quotations omitted); *AAUP, supra,* at *114-116; *Harvard, supra,* at *105-106. *See also, e.g.*, 59 Fed. Reg. 30,259 (June 10, 1994) (explaining that a cut-off in continuation award funding is "extremely rare in practice"); 89 Fed. Reg. 70,316 (Aug. 29, 2024) (explaining that, "[i]n general, we do not deny a large number of non-competing continuation awards and, if that does happen, grantees are often aware of the likelihood of the decision well in advance"). Relying on these regulations and past practice, NYCPS invested time and resources to develop magnet schools that would have the full benefit of the five-year term to develop, with the intent that the programs would become self-sustaining after grant funding concluded. The Administrative Record provides absolutely no indication that they considered NYCPS' investment in staffing, curricula development, contracted programming, partnerships with community-based organizations, and materials and infrastructure.

The thousands of students enrolled in these magnet schools and their families also have reliance interests, which the Department failed to consider. Students have chosen to enroll, and parents and caregivers have chosen to enroll their children, in the MSAP-funded schools with the expectation that funding will be provided for the full 5-year Project term, consistent with

Congressional intent, to allow the benefits of the carefully designed and planned magnet program to be realized.

### (c) In Implementing and Enforcing a New Rule Concerning Title IX Without Revoking the Prior Rule and Engaging in Notice-and-Comment Rulemaking, the Department Acted Without Observance of Procedure Required by Law

NYCPS is entitled to judgment as a matter of law on its claim that in implementing and enforcing a new interpretation of Title IX without engaging in notice-and-comment rulemaking, the Department has acted without observance of procedure required by law. "The APA generally requires that before a federal agency adopts a rule it must first publish the proposed rule in the Federal Register and provide interested parties with an opportunity to submit comments and information concerning the proposal." *N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018) (citing 5 U.S.C. § 553); *see also, Humane Soc'y of the United States v. United States Dep't of Agric.,* 41 F.4th 564, 569 (D.C. Cir. 2022). "Failure to abide by these requirements renders a rule procedurally invalid." *Azar, id.* Moreover, under GEPA, the Department is required to follow the APA's notice-and-comment rulemaking procedure when changing rules guiding its enforcement of Title IX. *See* 20 U.S.C. § 1232(a) (defining "regulation" to include any "interpretation or other requirement that … has legally binding effect in connection with, or affecting, the provision of financial assistance under any applicable program").

The Discontinuation Letter, issued only seven months after the issuance of the Gender Ideology EOs and the DCL, plainly constituted an attempt to carry out the Trump Administration's new interpretation of Title IX, without engaging in notice-and-comment rulemaking to revoke and/or replace the existing Title IX Interpretive Guidance. Notably, despite President Trump's issuance of the Gender Ideology EOs, and the Department expression in the DCL of intent to enforce them, the Department neither revoked the Guidance, nor replaced it by

publishing a revised interpretation in the Federal Register. The Department cannot purport to adopt and to condition the renewal of pre-existing grant programs on a novel interpretation of Title IX without at the very least adhering to the procedures required by its own governing statutes and regulations. It has failed entirely to do so, and accordingly, the Discontinuation, which is based on that novel interpretation, should be vacated and set aside.

> **(d) The Department's Interpretation of Title IX and Enforcement Thereof Are Contrary to Law, 5 U.S.C. § 706(2)(A, C)**

Finally, although this Court need not resolve this ultimate issue, which should be deferred until the Department follows Title IX's statutory procedures for finding a violation, NYCPS is entitled to judgment as a matter of law on its fifth claim under the APA because the Department based the Discontinuation on an interpretation of Title IX that is at odds with existing case law and agency guidance.[14] Agency action that is "otherwise not in accordance with law," 5 U.S.C. §706(2)(A), or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C), is unlawful and must be set aside.

The Department's determination to discontinue NYCPS' MSAP grants based on its finding that NYCPS' Guidelines violate Title IX, is entirely unsupported by any controlling law, and contravenes the findings of two Circuit Courts that have found that transgender-inclusive policies are at least permitted, if not required.

---

[14] Title IX requires that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance...." 20 U.S.C. § 1681(a); *see also* 34 C.F.R. § 106.31(a). Recipients of federal monies are prohibited from, *inter alia*, (1) providing different aid, benefits, or services; (2) denying aid, benefits, or services; and (3) subjecting any person to separate or different rules, sanctions, or treatment on the basis of sex. *See* 34 C.F.R. § 106.31(b)(2)—(4).

In *Bostock v. Clayton County*, 590 U.S. 644 (2020), the Supreme Court held that the prohibition against sex discrimination codified in Title VII prevents even private parties from discriminating against transgender people, stating that "it is impossible to discriminate against a person for being … transgender without discriminating against that individual based on sex." *Id* at 660. Beginning in 2021, the Department adopted an interpretation of Title IX as prohibiting discrimination on the grounds of sexual orientation and gender identity, consistent with *Bostock*. The Department has since purported to adopt an entirely contrary interpretation of Title IX, asserting that, far from protecting the rights of trans students, Title IX actually *requires* that schools discriminate against trans students or risk losing their funding. This interpretation does not withstand scrutiny.

No authority binding on this Court has considered the question of whether Title IX protects transgender students; however, the 4th and 7th Circuits have adopted the Supreme Court's decision in *Bostock*, finding that, since the relevant statutory language in Title VII and Title IX is essentially identical, the same reasoning must apply. *See, Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020), *as amended* (Aug. 28, 2020), *reh'g en banc denied*, 976 F.3d 399 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 2878 (June 28, 2021) (affirming a grant of summary judgment for plaintiffs enjoining a school district policy that prohibited a transgender boy from using the boy's bathroom as violating Title IX); *A.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760 (7th Cir. 2023) *cert. denied,* 2024 US LEXIS 440 (Jan. 16, 2024) (Title IX requires the school district to allow three trans boys to use a restroom and locker room consistent with their gender identity).

The 9th and 11th Circuits have determined that while Title IX does not necessarily *require* that schools allow students to use the facilities consistent with their gender identities, *see Adams ex rel. Kasper v. Sch. Bd. Of St John's Cnty.*, 57 F.4th 791 (11th Cir. 2022) (finding that

Title IX allows schools to segregate on the grounds of "biological sex"), nor does it *prevent* school districts from treating trans students equally to their peers. *See Parents for Priv. v. Barr*, 949 F.3d 1210, 1227 (9th Cir. 2020) (*quoted in AAUP*, *supra*, 2025 U.S. District LEXIS 224922 at \*87-88 (finding it likely that a grant condition that would have *required* UCLA "to adopt novel interpretations of the law, favored by Defendants but not yet imposed by Congress or the courts," violated the Tenth Amendment/Spending Clause)). As the 9th Circuit stated in *Barr*, "just because Title IX authorizes sex-segregated [locker and bathroom] facilities does not mean that they are required, let alone that they must be segregated based only on biological sex and cannot accommodate gender identity"; "[n]owhere does the [Title IX] statute explicitly state, or even suggest, that schools may not allow transgender students to use the facilities that are most consistent with their gender identity." 949 F.3d at 1227.

This Court need not determine that Title IX actually *requires* that trans students have access to facilities consistent with their gender identity, as it is clear that Title IX does not *prohibit* states from allowing students such access.[15] Accordingly, the Department's "findings" that NYCPS' Guidelines violate Title IX, which represent an attempt to enforce its preferred—and legally unsupported—reading of Title IX, are contrary to law, and should be vacated.

### III.   NYCPS is Entitled to Vacatur, Declaratory Relief, and a Permanent Injunction

NYCPS has convincingly demonstrated entitlement to summary judgment on each count of the Complaint. Accordingly, NYCPS is entitled to vacatur of the Discontinuation; an order directing the Department to, within 10 days of entry of the order, make a continuation

---

[15] On the other hand, New York state and City law *does* protect the rights of trans students to access facilities consistent with their gender identity, *see, supra*, n4, and courts have upheld the ability of schools to comply with applicable state and local laws protecting transgender students. *Kansas v. Dep't of Educ.*, 739 F. Supp. 3d 902, 936 (D. Kansas 2024).

determination with respect to each of the NYCPS MSAP grants, in adherence to the judgment and direction of this court, and consistent with the requirements of the MSAP statute; and is entitled to permanent injunctive relief.

To obtain permanent injunctive relief, a party must demonstrate (1) irreparable injury; (2) that remedies available at law, such as damages, are inadequate, (3) that, on the balance of hardships between the parties, a remedy in equity is warranted; and (4) that the public interest will not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 390 (2006) The criteria for permanent injunctive relief mirror those for preliminary injunctions, except that a plaintiff must prevail on the merits. *Id.* at 391. Having proven our entitlement to prevail on the merits, the record before this Court also demonstrates that NYCPS has met the remaining four elements to establish entitlement to a permanent injunction.

*First*, there is substantial evidence before this Court in the Aviles-Ramos and Scott Declarations that NYCPS, its students, parents, and magnet schools will suffer irreparable harm in the absence of permanent injunctive relief, just like the harm it suffered beginning mid-September, when the Department unlawfully effectuated the Discontinuation of the five MSAP grants, which the schools are completely reliant upon. Aviles-Ramos Decl. ¶¶ 52-58.

*Second*, NYCPS has demonstrated that a damages remedy will not and cannot address the prospective risk of harm here because each of the grants will require additional continuation decisions between now and the end of their grant performance periods in 2027 and 2028. In particular the evidence demonstrates that absent a permanent injunction, there is no way to ensure that the Department, while purporting to undertake a continuation determination, would not simply once again take the opportunity to engage in an unlawful, pretextual, Title IX enforcement action under the guise of a continuation determination, subverting the statutory

protections that Congress has mandated be followed to protect school funding to the fullest extent possible.

*Third*, the facts of this case demonstrate that the balance of hardships weighs entirely in favor NYCPS and the magnet schools, who, absent injunctive relief, will face the annual threat of loss of their grants. On the other hand, there is no hardship that the Department can claim in being required to follow the law.

*Fourth*, NYCPS easily meets the final prong of the test—that of the public interest being served by issuance of a permanent injunction. The public interest is best expressed through the will of Congress here, that the "best interest" of the United States supports the continued funding of magnet schools. Cmpl, ¶ 20; 20 U.S.C. § 7231(a), and any disruption of school funding pursuant to Title IX should occur only after following an exacting process which expressly intends that the non-continuation of funding for violation of Title IX should be an action of last resort, not an opening salvo. Accordingly, a permanent injunction should issue.

## **CONCLUSION**

For the foregoing reasons, this Court should grant summary junction and (1) hold unlawful, vacate, and set aside in all respects the Discontinuation of the five MSAP grants, including as effectuated through the September 29, 2025 amended GANs; (2) grant declaratory and injunctive relief to ensure that the Department issues a lawful continuation determination for FY2026 as to each MSAP grant, to be issued within ten (10) days of entry of this Court's order; and (3) permanently enjoin Defendants from discontinuing the MSAP grants based on Title IX findings, or "civil rights violations" relating to Title IX, unless and until complying with the procedures required by 20 U.S.C. § 1682.

Dated: December 16, 2025

Respectfully submitted,

MURIEL GOODE-TRUFANT
Corporation Counsel of the City of
    New York
100 Church Street
New York, NY 10007
(212) 356-2276
mash@law.nyc.gov

---

By: Melanie C. T. Ash
June Buch
Bianca Isaias
Gavin Mackie

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE</u>

As required by Local Civil Rule 7.1(c), I certify that the document contains 10,355 words, excluding the parts of the document that are exempted by Local Civil Rule 7.1(c) ("These limits do not include the caption, any index, table of contents, table of authorities, signature blocks, or any required certificates, but do include material contained in footnotes or endnotes.").

_____

Melanie C.T. Ash