# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

THE BOARD OF EDUCATION OF THE CITY
SCHOOL DISTRICT OF THE CITY OF NEW YORK,

Plaintiff,

v.

No. 25-cv-08547 (AS)

UNITED STATES DEPARTMENT OF EDUCATION,
*et al.*,

Defendants.

## BRIEF OF AMICI CURIAE STATE OF OKLAHOMA
## AND 17 OTHER STATES IN SUPPORT OF DEFENDANTS
## AND IN OPPOSITION TO PLAINTIFF'S
## MOTION FOR SUMMARY JUDGMENT

GARRY M. GASKINS, II*
*Solicitor General*
ZACH WEST*
*Director of Special Litigation*
ELLEN CARR*
*Assistant Solicitor General*

OFFICE OF THE OKLAHOMA
ATTORNEY GENERAL
313 NE 21st Street
Oklahoma City, OK 73105
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
Ellen.Carr@oag.ok.gov

*Counsel for State of Oklahoma*
**pro hac vice pending*

# TABLE OF CONTENTS

**PAGE**

INTEREST OF AMICI CURIAE ...................................................................................1

INTRODUCTION ..........................................................................................................2

ARGUMENT ..................................................................................................................4

    I.   Title IX Does Not Mandate the NYCPS Policies Here. ...................................4

        A.  Title IX Clearly Does Not Match NYCPS's Policies. ...............................4

        B.  *Grimm* Was an As-Applied Decision with a Narrow Factual Predicate That Bears No Resemblance to NYCPS's Categorical Policies. .......5

        C.  *Bostock* Does Not Extend to Title IX. ...................................................7

        D.  The Spending Clause's Clear-Notice Requirement Forecloses NYCPS's Claim of Legal Compulsion. ..................................................8

        E.  The Second Circuit's Own Precedent Does Not Require NYCPS's Policies. .......................................................................................10

    II.  The Supreme Court's Recent Decision in *Skrmetti* Counsels for the Department. ....................................................................................................11

        A.  Per *Skrmetti*, *Bostock* Does Not Automatically Extend Beyond Title VII. .......................................................................................11

        B.  *Skrmetti* Confirmed That "Sex" in Federal Law Refers to Biological Sex. ...........................................................................................11

    III. Amici States' Experience Demonstrates That the Secretary's Concerns About NYCPS's Guidelines Are Well-Founded. .........................................12

        A.  Sex-Separated Facilities Reflect a Longstanding Historical Practice Rooted in Privacy and Safety. ...............................................12

        B.  Amici States Have Heard Directly from Families Harmed by Policies Like NYCPS's Guidelines. .....................................................14

        C.  Title IX Recognizes That Biological Sex Remains Relevant in Certain Contexts. .........................................................................................15

        D.  Amici States Have Significant Reliance Interests at Stake. ...............16

CONCLUSION..............................................................................................................16

## TABLE OF AUTHORITIES

PAGE(S)

<u>Cases</u>

*Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*,
  57 F.4th 791 (11th Cir. 2022) ........................................................................3, 5, 9, 12

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
  548 U.S. 291 (2006)............................................................................................8

*Bostock v. Clayton Cnty.*,
  590 U.S. 644 (2020)..........................................................................4, 7, 8, 9, 11

*Brannum v. Overton Cnty. Sch. Bd.*,
  516 F.3d 489 (6th Cir. 2008) ........................................................................13

*Doe v. Luzerne Cnty.*,
  660 F.3d 169 (3d Cir. 2011) ..........................................................................13

*Fowler v. Stitt*,
  104 F.4th 770 (10th Cir. 2024) ........................................................................8

*Grimm v. Gloucester Cnty. Sch. Bd.*,
  972 F.3d 586 (4th Cir. 2020)..........................................................4, 5, 6, 11

*Jackson v. Birmingham Bd. of Educ.*,
  544 U.S. 167 (2005)............................................................................................7

*Lee v. Downs*,
  641 F.2d 1117 (4th Cir. 1981) ........................................................................13

*McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*,
  370 F.3d 275 (2d Cir. 2004)............................................................................3

*Pelcha v. MW Bancorp*,
  988 F.3d 318 (6th Cir. 2021) ..........................................................................7

*Pennhurst State Sch. & Hosp. v. Halderman*,
  451 U.S. 1 (1981) .......................................................................................... 8, 10

*Poe v. Drummond*,
  149 F.4th 1107 (10th Cir. 2025) ........................................................................7

*Roe v. Critchfield*,
  137 F.4th 912 (9th Cir. 2025) ..........................................................................9

*Department of Education v. Louisiana*,
  603 U.S. 866 (2024)............................................................................................9

*Sepulveda v. Ramirez*,
  967 F.2d 1413 (9th Cir. 1992) ........................................................................13

*Soule v. Connecticut Ass'n of Schs.*,
  90 F.4th 34 (2d Cir. 2023)..............................................................................10

*Stitt v. Fowler*,
  145 S. Ct. 2840 (2025) ......................................................................................8

*Tennessee v. U.S. Dep't of Educ.*,
  615 F. Supp. 3d 807 (E.D. Tenn. 2022) ............................................................7

*Texas v. EEOC*,
  633 F. Supp. 3d 824 (N.D. Tex. 2022) ..........................................................7—8

*United States v. Skrmetti*,
  605 U.S. 495 (2025) ..................................................................................7, 11, 12

**Statutes**

20 U.S.C. § 1686 ..................................................................................3, 4, 15

34 C.F.R. § 106.33 ....................................................................................5, 8

34 C.F.R. § 106.41(b) ....................................................................................5

Idaho Code Ann. § 33-6701(4) ....................................................................14

**Other Authorities**

118 Cong. Rec. 5,807 (1972) ........................................................................13

*Implementing Title IX: The HEW Regulations*,
  124 U. Pa. L. Rev. 806 (1976) ......................................................................4

Jonathan H. Adler, *Auer Evasions*,
  16 Geo. J.L. & Pub. Pol'y 1 (2018) ..............................................................4

Julia Silverman, *Tualatin High student sues school district for $3.7M after alleged rape at school*,
  THE OREGONIAN (August 9, 2024, 10:00 a.m.) ..........................................15

N.Y.C. Dep't of Educ., *Guidelines to Support Transgender and Gender Expansive Students*, § Restrooms and
  Locker Rooms ..........................................................................................2, 6

Okla. Senate, *Bullard's Bill Signed to Protect Boys' and Girls' Bathrooms in Public Schools*
  (May 27, 2022) ............................................................................................14

Ruth Bader Ginsburg, *Sexual Equality Under the Fourteenth and Equal Rights Amendments*,
  1979 WASH. U. L.Q. 161 ............................................................................12

Ruth Bader Ginsburg, *The Fear of the Equal Rights Amendment*,
  WASH. POST, Apr. 7, 1975 ..........................................................................13

## INTEREST OF AMICI CURIAE

*Amici curiae* are the States of Oklahoma, Alabama, Alaska, Arkansas, Georgia, Indiana, Iowa, Kansas, Louisiana, Mississippi, Montana, Nebraska, South Carolina, South Dakota, Tennessee, Texas, Utah, and Wyoming (collectively, the "amici States"). Amici States have long maintained and are considering enacting additional laws and policies recognizing the fundamental biological differences between males and females, including laws commonsensically separating intimate facilities, athletic opportunities, and overnight accommodations in public schools. These measures reflect the considered judgment of numerous state legislatures and the citizens they represent that protecting students' privacy, safety, and fair athletic competition requires maintaining the traditional and accurate understanding of sex.

Here, amici States have a strong interest in supporting the correct interpretation of Title IX promulgated by the U.S. Department of Education ("Department" or "DOE"). For years, the prior presidential administration sought to impose a radical reading of Title IX that would have required schools nationwide to allow biological males into female-only spaces based solely on self-declared gender identity. Amici States successfully resisted that lawless interpretation in court and in their own policies. They now support the Department's determination that such policies, like those adopted by the New York City Public Schools ("NYCPS"), raise serious Title IX concerns because, among other issues, they discriminate against biological females by threatening their privacy and safety.

Amici States also have critical reliance interests at stake. They enacted their own laws protecting privacy and safety in part based on the longstanding interpretation of Title IX that prevailed before the previous administration's 2021 guidance. At a minimum, the traditional state and federal interpretations were based on the same historical understanding and practices, which were nearly universal until recently. The current administration's interpretation aligns with that historical understanding. If this Court were to adopt NYCPS's view that Title IX *requires* transgender-inclusive

1

facility policies, it would call into question amici States' numerous laws and subject them to potential enforcement actions. Amici States therefore have a direct stake in this Court's resolution of these issues. Importantly, amici States also have a strong interest in upholding Title IX's "clear notice" requirement moving forward, as each of the amici States receive (and rely on) federal grants and are entitled to protection from federal government overreach through ambiguous directives.

Amici States thus file this brief to support the United States, and in particular to contend that the Secretary's concerns about NYCPS's Guidelines conflicting with Title IX are well-founded.

## INTRODUCTION

NYCPS asks this Court to compel the Department to continue funding grants despite the Secretary's determination that NYCPS's policies conflict with federal civil rights laws. NYCPS's theory is that its "Guidelines to Support Transgender and Gender Expansive Students" are not merely permitted by Title IX but required by it, such that the Secretary had no discretion to consider those policies in making grant continuation decisions. That theory is flat-out wrong.

NYCPS's Guidelines require public schools to allow any student who declares a gender identity different from the student's biological sex to access intimate facilities, including bathrooms, locker rooms, and showers, designated for the opposite sex. *See* N.Y.C. Dep't of Educ., *Guidelines to Support Transgender and Gender Expansive Students*, § Restrooms and Locker Rooms.[1] The Guidelines impose no verification requirements: no medical diagnosis, no parental consent, no demonstrated consistency. A biological male student need only declare a female gender identity to gain access to girls' locker rooms where female students are in various states of undress. The Guidelines further

---

[1] N.Y.C. Dep't of Educ., *Guidelines to Support Transgender and Gender Expansive Students* § Restrooms and Locker Rooms, Decl. of Melissa Aviles-Ramos ¶ 47, Ex. 5, ECF No. 6-5 (filed Oct. 16, 2025).

require schools to facilitate a student's "social transition" without notifying parents, and they allow biological males to compete on female athletic teams (and vice versa). *Id.*

The Secretary reasonably determined that these policies raise concerns (to say the least) about whether NYCPS is complying with Title IX's prohibition on sex discrimination. Title IX was enacted to protect women and girls by disallowing sex discrimination in education. *See, e.g., McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 286 n.11 (2d Cir. 2004). And Title IX and its regulations expressly allow schools to separate living spaces, restrooms, and similar facilities on the basis of sex. *See, e.g.,* 20 U.S.C. § 1686. School policies that expose female students to biological males in intimate settings such as showers and bathrooms, and that allow biological males to displace females in athletic competition, obviously conflict with Title IX. The Secretary was entitled to consider these concerns in exercising her discretion over grant continuation.

Again, amici States have firsthand experience with these issues. They have long maintained or have considered enacting commonsense laws protecting sex-separated facilities and athletic opportunities for both sexes at the behest of their citizens. "[A]cross societies and throughout history, it has been commonplace and universally accepted to separate public restrooms, locker rooms, and shower facilities on the basis of biological sex." *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 805 (11th Cir. 2022) (en banc). The Secretary's concerns about NYCPS's Guidelines reflect the same commonsense understanding that biological sex matters in contexts involving safety, privacy and fair competition. This Court should reject NYCPS's attempt to use judicial process to override the Secretary's reasonable exercise of administrative discretion.

Amici States write primarily to address the substantive question of what Title IX requires—a question with implications far beyond this case. Whatever the procedural posture, NYCPS's core claim is that Title IX compels schools to adopt gender-identity facility policies. If that claim is correct, amici

3

States' own laws are at risk. If it is wrong—as amici States submit it is—then NYCPS cannot claim that its policies were legally compelled, and the Secretary's concerns were, at minimum, reasonable.

Amici States take no position on the procedural aspects of the dispute between NYCPS and the Department. The substantive question of what Title IX means and requires is what matters most to amici States, and on that question, amici States stand firmly with the Secretary.

## ARGUMENT

### I.    Title IX Does Not Mandate the NYCPS Policies Here.

NYCPS cannot establish that its Guidelines are required by Title IX. Neither *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020), nor *Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020), supports the sweeping proposition that Title IX mandates the policies NYCPS has adopted. Nor does any precedent from the Second Circuit. Rather, Title IX's text, regulations, Supreme Court precedent, and circuit precedent counsel in precisely the opposite direction.

### A.    Title IX Clearly Does Not Match NYCPS's Policies.

Under Title IX, no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX clarifies, however, that "nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes." *Id.* § 1686. "[L]iving facilities" has consistently been understood to "include restrooms, lockers, and other school areas where disrobing takes place." Comment, *Implementing Title IX: The HEW Regulations*, 124 U. Pa. L. Rev. 806, 811 (1976); *see also* Jonathan H. Adler, *Auer Evasions*, 16 Geo. J.L. & Pub. Pol'y 1, 20 (2018) ("Title IX expressly allows for the maintenance of single-sex living facilities, such as dormitories, bathrooms, and the like."). As such, Title IX regulations have long envisioned "separate toilet, locker room, and shower facilities on the basis of sex," so long as the facilities "provided for students of one sex shall

4

be comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33. Similar regulations enshrine "separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." 34 C.F.R. § 106.41(b).

NYCPS's policies, to the contrary, eliminate separate sports teams based on biological sex, much as they prohibit separate toilet, locker room, and shower facilities based on sex.

## B. *Grimm* Was an As-Applied Decision with a Narrow Factual Predicate That Bears No Resemblance to NYCPS's Categorical Policies.

This Court should not treat *Grimm* as controlling or even persuasive, as NYCPS urges. Doc. 52 at 30. The correct path was taken by the Eleventh Circuit, sitting en banc, which reached the opposite conclusion in *Adams*. Expressly embracing Judge Niemeyer's *Grimm* dissent, the Eleventh Circuit held that a school policy requiring students to use bathrooms corresponding to their biological sex comported with Title IX and the Equal Protection Clause. *Id.* at 804–05, 812–18. *Adams* properly recognized that separating intimate facilities by biological sex has been "commonplace and universally accepted" throughout history, and it emphasized that its holding was "commensurate with the plain and ordinary meaning of 'sex' in 1972." *Id.* at 805, 817. The Eleventh Circuit indicated, moreover, that Title IX was not silent or neutral on this point. Rather, that court stated in its conclusion that under "the plain and ordinary meaning of the word 'sex'" in Title IX, "schools' living facilities, locker rooms, showers, and sports teams" should not be turned "into sex-neutral areas and activities." *Id.* at 817. Put differently, "[w]hether Title IX should be *amended* to equate 'gender identity' and 'transgender status' with 'sex' should be left to Congress—not the courts." *Id.* (emphasis added). School districts, it should go without saying, have no more ability to amend Title IX than courts do.

The Supreme Court's recent grants of certiorari (and arguments) in *Hecox v. Little* and *B.P.J. v. West Virginia*, cases concerning the intersection of transgender identity and sports, signal that *Grimm*'s reasoning may not survive review. *See Little v. Hecox*, No. 24-38 (U.S. cert. granted July 3, 2025, oral

argument held January 13, 2026); *West Virginia v. B.P.J.*, No. 24-43 (same). But even accepting *Grimm* on its own terms, it does not support NYCPS's position here.

The Fourth Circuit's decision in *Grimm* addressed an as-applied challenge to a specific school bathroom policy as applied to a specific transgender student. *See* 972 F.3d at 593. Gavin Grimm had been diagnosed with gender dysphoria by a licensed psychologist who provided a treatment letter recommending that Grimm be treated as male and use restrooms consistent with that identity. *Id.* at 598. Grimm underwent hormone therapy and chest reconstruction surgery, obtained a court order declaring Grimm to be male, and received an amended birth certificate from the State of Virginia with the sex listed as male. *Id.* at 600–01. The Fourth Circuit held that excluding Grimm from boys' restrooms under these specific circumstances violated Title IX and the Equal Protection Clause. *Id.* at 616–20. Even ignoring that other courts have completely disagreed with *Grimm*, even that court did not address—and its holding did not resolve—whether Title IX categorically allows or requires schools to permit bathroom access based solely on self-declared gender identity without medical diagnosis, treatment, legal documentation, or other verification.

In sum, *Grimm* involved a student who had a formal medical diagnosis of gender dysphoria from a licensed psychologist, was receiving ongoing treatment including hormone therapy and surgery, and had obtained legal recognition of gender through a court order and an amended birth certificate. *Grimm*, 972 F.3d at 598, 600–01. By contrast, the NYCPS Guidelines provide that "[s]tudents are not required to obtain parental consent or a court-ordered name and/or gender change" to be recognized according to their asserted gender identity.[2] Students "must be permitted to participate in all school activities (for example, overnight field trips) in accordance with their gender identity asserted at

---

[2] *Guidelines, supra* note 1, §§ Sports and Physical Education, Facilities (facility access based on asserted gender identity), Names and Pronouns ("Students are not required to obtain parental consent"), Supporting Students ("Sometimes transgender and gender expansive students begin their transition at school without a parent's knowledge").

school." *Id.* The Guidelines also require that transgender students "must be provided access to facilities (restrooms, locker rooms, or changing rooms) consistent with their gender identity asserted at school." *Id.* Similarly, "[g]enerally, a student must be permitted to participate in physical education, intramural sports, and competitive athletic activities and contact sports in accordance with the student's gender identity asserted at school." *Id.* The Guidelines further contemplate that schools may facilitate a student's gender transition without parental knowledge where the student has "safety concerns or concerns about a lack of acceptance." *Id.* Even if accepted—which, again, it should not be—*Grimm* did not mandate these sweeping policies based only on adolescent self-declarations.

### C. *Bostock* Does Not Extend to Title IX.

*Bostock* provides no support for NYCPS's position. This is first and foremost because the Supreme Court in *Bostock* expressly declined to address "bathrooms, locker rooms, or anything else of the kind" even under Title VII, which was the statute at issue in that case. 590 U.S. at 681. And since *Bostock*, the Court has never definitively held that *Bostock*'s reasoning extends beyond the Title VII context. *See, e.g., United States v. Skrmetti*, 605 U.S. 495, 498 (2025) (applying *Bostock* in the equal protection context without deciding the question); *see also Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005) ("Title VII … is a vastly different statute from Title IX."). Since *Bostock*, numerous courts have taken this "anything else of the kind" language seriously, declining to extend *Bostock* to other contexts. *See, e.g., Poe v. Drummond*, 149 F.4th 1107, 1122 (10th Cir. 2025) (emphasizing that the Supreme Court declined to apply *Bostock*'s reasoning "beyond Title VII"); *Pelcha v. MW Bancorp*, 988 F.3d 318, 324 (6th Cir. 2021) (declining to extend *Bostock* to the Age Discrimination Employment Act because "the Court in *Bostock* was clear on the narrow reach of its decision and how it was limited only to Title VII itself"); *Tennessee v. U.S. Dep't of Educ.*, 615 F. Supp. 3d 807, 817 (E.D. Tenn. 2022) (*Bostock*'s "holding did not 'sweep beyond Title VII to other federal or state laws that prohibit sex discrimination.'" (quoting *Bostock*, 590 U.S. at 681)); *Texas v. EEOC*, 633 F. Supp. 3d 824, 840 (N.D.

Tex. 2022) (declining to extend *Bostock*'s holding to allow expanded Title VII and Title IX rules imposing dress-code, bathroom, and pronoun accommodations). Indeed, in one case, a Tenth Circuit dissenter warned his colleagues that "[w]e ignore that [*Bostock*] language at our peril." *Fowler v. Stitt*, 104 F.4th 770, 802 (10th Cir. 2024) (Hartz, J., dissenting in part). Sure enough, the Supreme Court vacated that panel's mistaken decision to apply *Bostock* far beyond its context. *See Stitt v. Fowler*, 145 S. Ct. 2840 (2025).

Moreover, it is worth mentioning that the Title IX regulation approving separation "on the basis of sex" in the restroom, locker room, and shower contexts, 34 C.F.R. § 106.33, further renders irrelevant NYCPS's reliance on *Bostock* here. No such statute or regulation was present in *Bostock*, much less one that is indisputably constitutional. That is to say, the Supreme Court did not issue its ruling in *Bostock* in the face of a statute or regulation that expressly enshrined separation "on the basis of sex" in the specific context at hand. This structural distinction undermines any analogy to *Bostock*.

### D.  The Spending Clause's Clear-Notice Requirement Forecloses NYCPS's Claim of Legal Compulsion.

Unlike Title VII, Congress enacted Title IX pursuant to its Spending Clause powers. To comply with the Spending Clause, Congress must provide funding recipients with "unambiguous" notice of the conditions they are assuming. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). This clear-notice requirement cuts both ways: the federal government cannot enforce conditions that lack a clear statutory basis, and funding recipients cannot claim that unclear statutory text compels particular policies. *Id.* Accordingly, "the key is not what a majority of the Members of both Houses intend but what the States are clearly told regarding the conditions that go along with the acceptance of those funds." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 304 (2006). In *Arlington*, for instance, the Court refused to require states to pay expert fees under the Individuals with Disabilities Education Act ("IDEA") because the statute did "not even hint that acceptance of IDEA funds makes a State responsible for reimbursing prevailing parents for services rendered by

experts." *Id.* at 297. The same logic applies here: Title IX's text and regulations provide not even a hint that funding recipients must adopt the revolutionary gender-identity focused policies reflected in NYCPS's Guidelines. Rather, they are perfectly clear that the lines that must be drawn are based on biological sex, not gender identity. *See, e.g.*, *Adams*, 57 F.4th at 817.

Various courts have held that Title IX's text does not clearly require schools to provide facility access based on gender identity. The Ninth Circuit, for instance, recently held that transgender plaintiffs challenging Idaho's biological-sex facility policy "failed to meet [their] burden to show that the State had clear notice at the time it accepted federal funding that Title IX prohibits segregated access to the facilities . . . on the basis of transgender status." *Roe v. Critchfield*, 137 F.4th 912, 931 (9th Cir. 2025). Even more importantly, in 2024 the Supreme Court unanimously held that plaintiffs were entitled to preliminary injunctive relief from the Biden Administration's new rules purportedly extending *Bostock*'s reasoning to Title IX and elevating gender identity over biological sex. *See Department of Education v. Louisiana*, 603 U.S. 866, 867 (2024). (This was after a litany of lower courts enjoined the new rules, and the Biden Administration appealed to the highest court.) There, as Justice Sotomayor observed, "[e]very Member of the Court agrees respondents are entitled to interim relief" from the Biden Administration's regulations promulgated under Title IX "prohibiting schools from preventing individuals from accessing certain sex-separated spaces consistent with their gender identity." *Id.* at 868-869 (Sotomayor, J., dissenting in part).

This defeats NYCPS's defenses. If Title IX's text does not provide clear enough notice for the federal government to require states to adopt gender-identity policies—as *Louisiana* and *Critchfield* confirm—then NYCPS cannot claim that Title IX merely permits its Guidelines, either. That is to say, if the federal government cannot implement this view of Title IX's sex protections, because the view is clearly contradictory to Title IX's actual language and history, then why would a local school district be allowed to implement that same view in contravention of text and history? Title IX and its

9

regulations are not ambiguous about what they are designed to prohibit and protect, and they never have been. States have always been on notice that they must protect and provide for women in restrooms, locker rooms, sports, and the like.

### E. The Second Circuit's Own Precedent Does Not Require NYCPS's Policies.

Far from establishing that policies elevating gender identity over sex are mandated by Title IX, the Second Circuit has expressly declined to resolve that question, leaving NYCPS without any sort of claim that it is compelled by precedent to adopt its current policies. In *Soule v. Connecticut Ass'n of Schs.*, 90 F.4th 34 (2d Cir. 2023) (en banc), female high school athletes challenged Connecticut's policy allowing transgender athletes to compete on teams matching their gender identity, rather than their biological sex. The plaintiffs alleged that the policy violated Title IX by denying them equal athletic opportunity. After full briefing and en banc consideration, the Second Circuit expressly declined to resolve the Title IX question. The court stated: "The Court reaches no conclusion as to whether Plaintiffs have plausibly stated a Title IX violation. Nor does the Court opine on the question of whether—even if Plaintiffs have stated such a claim—they are entitled to any of the injunctive relief they seek." *Id.* at 54. Instead, the court remanded for the district court to address "the underlying merits question before or in tandem with the *Pennhurst* [notice] question." *Id.* The legal question NYCPS treats as practically settled is, in this Circuit, expressly unresolved. NYCPS certainly cannot claim that Second Circuit precedent *requires* such policies.

To be sure, NYCPS may respond that *Soule* involved athletics rather than facilities. But the legal question is the same: does Title IX require schools to treat students according to gender identity rather than biological sex? The Second Circuit declined to answer that question in *Soule*, and no subsequent decision has resolved it.

## II.    The Supreme Court's Recent Decision in *Skrmetti* Counsels for the Department.

The Supreme Court's recent landmark decision in *United States v. Skrmetti*, 605 U.S. 495 (2025), further undermines NYCPS's reliance on *Grimm* and *Bostock*.

### A.    Per *Skrmetti*, *Bostock* Does Not Automatically Extend Beyond Title VII.

*Skrmetti* held that Tennessee's law regulating hormones and surgical procedures for minors with gender dysphoria did not facially discriminate on the basis of sex under the Equal Protection Clause. In reaching that conclusion, as noted above, the Court applied *Bostock* but expressly indicated in doing so that *Bostock*'s reasoning does not necessarily extend to the Equal Protection Clause or any other statutory or constitutional contexts. 605 U.S. at 498. In other words, the Supreme Court did *not* hold that *Bostock* applied to equal protection claims. Rather, it simply held that even assuming (without deciding) that this was the case, Tennessee would still prevail. Thus, it was unnecessary to decide the issue. This non-decision is directly relevant here. NYCPS's merits defense depends on extending *Bostock*'s Title VII analysis to Title IX. But *Skrmetti* did not endorse the extension of *Bostock* to any other context.

### B.    *Skrmetti* Confirmed That "Sex" in Federal Law Refers to Biological Sex.

Critically, *Skrmetti* reiterated the bedrock principle that "sex" in federal law refers to biological sex. The Supreme Court rejected the argument that distinctions based on gender identity are inherently sex-based, and it explained that—as is obvious—a law can reference sex without discriminating on the basis of sex. 605 U.S. at 515–17. Throughout its ruling, the Court deployed the terms "biological" or "biological sex" nearly twenty times. And it defined "transgender" as meaning someone whose "gender identity does not align with their biological sex," 605 U.S. at 502, it recognized that biological sex can be male or female, *id.* at 513 n.2, and it observed that "only biological women can become pregnant," *id.* at 519.

11

This holding supports the Secretary's interpretation of Title IX and undermines the foundation of NYCPS's position. The Secretary's position is that Title IX's prohibition on "sex" discrimination refers to biological sex, and that policies requiring biological females to share intimate facilities and sporting fields with biological males likely discriminate against those females. *Skrmetti* vindicates that interpretation by making it clear that "biological sex" is the key prism through which to interpret the Constitution and federal laws.

### III.    Amici States' Experience Demonstrates That the Secretary's Concerns About NYCPS's Guidelines Are Well-Founded.

Amici States do not write on a blank slate. They have enacted laws and implemented policies protecting sex-separated facilities and athletic opportunities because their citizens demanded it, as did common sense and statutes like Title IX. That experience confirms that the Secretary's concerns about NYCPS's Guidelines are grounded in reality, not speculation.

### A.    Sex-Separated Facilities Reflect a Longstanding Historical Practice Rooted in Privacy and Safety.

The practice of separating intimate facilities by sex has deep historical roots. Indeed, "across societies and throughout history, it has been commonplace and universally accepted to separate public restrooms, locker rooms, and shower facilities on the basis of biological sex in order to address privacy and safety concerns arising from the biological differences between males and females." *Adams*, 57 F.4th at 805. Famously, proponents of the Equal Rights Amendment ("ERA") recognized that sex-separated facilities would survive constitutional scrutiny even under that amendment effort. As future Justice Ginsburg explained, the ERA "would coexist peacefully with separate public restrooms." Ruth Bader Ginsburg, *Sexual Equality Under the Fourteenth and Equal Rights Amendments*, 1979 WASH. U. L.Q. 161, 175. She further quipped that "[p]erhaps Congress found it hard to conceive of a plaintiff litigating the issue, or of a judge who would find man or woman harmed by that limited separation." *Id.* What was inconceivable then is now claimed to be legally mandated.

Of course, NYCPS argues that even if Title IX does not require its own views of Title IX, at a minimum, "it is clear that Title IX does not *prohibit* states" from incorporating those views. Doc. 52 at 31 (emphasis in original). But this is not at all "clear." Ginsburg, for example, also wrote that "[s]eparate places to disrobe, sleep, [and] perform personal bodily functions are permitted, *in some situations required*, by regard for individual privacy." Ruth Bader Ginsburg, *The Fear of the Equal Rights Amendment*, WASH. POST, Apr. 7, 1975, at A21 (emphasis added). And Title IX's proponents expressly sought to "to permit differential treatment by sex ... in sports facilities or other instances where personal privacy *must* be preserved." 118 Cong. Rec. 5,807 (1972) (emphasis added). Indeed, numerous courts have recognized not only that an individual has a "constitutionally protected privacy interest in his or her partially clothed body," but also that this "reasonable expectation of privacy" exists "particularly while in the presence of members of the opposite sex." *Doe v. Luzerne Cnty.*, 660 F.3d 169, 176–77 (3d Cir. 2011); *see also Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489, 494 (6th Cir. 2008) ("the constitutional right to privacy ... includes the right to shield one's body from exposure to viewing by the opposite sex"); *Sepulveda v. Ramirez*, 967 F.2d 1413, 1416 (9th Cir. 1992) (recognizing a parolee's right not to be observed by an officer of the opposite sex while relieving himself); *Lee v. Downs*, 641 F.2d 1117, 1119 (4th Cir. 1981) ("involuntary exposure of [genitals] in the presence of people of the other sex may be especially demeaning and humiliating"). NYCPS is wrong: Title IX does not protect what the Constitution forbids. Rather, it clearly protects the privacy of the sexes.

Yet NYCPS's Guidelines require students to surrender this very privacy interest across the board, with no chance of appeal or protest. A biological male who declares a female gender identity gains immediate access to girls' locker rooms, showers, and overnight accommodations. Female students would have no recourse; the Guidelines provide no mechanism for objection or accommodation. The Secretary was right to view these policies with the deepest concern.

**B. Amici States Have Heard Directly from Families Harmed by Policies Like NYCPS's Guidelines.**

Amici States have heard directly from constituents about the harms caused by policies like NYCPS's Guidelines. When Oklahoma enacted its school facilities law ("SB 615"), for instance, legislators reported that they "hear every day from parents who are concerned about school [bathroom] policies that affect their children." Press Release, Okla. Senate, *Bullard's Bill Signed to Protect Boys' and Girls' Bathrooms in Public Schools* (May 27, 2022).[3] Oklahoma's experience is instructive. Before SB 615, certain Oklahoma school districts adopted gender-identity bathroom policies similar to NYCPS's Guidelines. Parents reported concrete ways in which their children were harmed. One mother testified that her thirteen-year-old daughter, fearful of encountering biological males in the girls' restroom, "chose not to use the girls' bathroom all day," creating health risks including "toxic shock syndrome" and "urinary tract infections." *See* Decl. of Delicia Timmons ¶¶ 4–5, *Bridge v. Okla. State Dep't of Educ.*, No. 5:22-cv-00787-JD (W.D. Okla. Nov. 16, 2022), ECF No. 54-1. Another family's daughter "stopped drinking water in an attempt to not use the school bathrooms" due to privacy and safety concerns; she ultimately transferred to a school thirty minutes away. Decl. of R.A. ¶¶ 3, 6, *Bridge*, ECF No. 54-2. These are not abstract harms—they are the real-world consequences of policies like NYCPS's Guidelines.

Idaho's legislature similarly found that "requiring students to share restrooms and changing facilities with members of the opposite biological sex generates potential embarrassment, shame, and psychological injury to students, as well as increasing the likelihood of sexual assault, molestation, rape, voyeurism, and exhibitionism." IDAHO CODE ANN. § 33-6701(4).

---

[3] Available at https://oksenate.gov/press-releases/bullards-bill-signed-protect-boys-and-girls-bathrooms-public-schools (last visited Jan. 2, 2026).

In Virginia, a fifteen-year-old girl with disabilities has alleged that she was sexually assaulted in a girls' restroom at Stone Bridge High School by a biological male student who was permitted to enter girls' facilities under school policies. *See Doe v. Loudoun Cnty. Sch. Bd.*, No. 1:25-cv-01862, Doc. 1 at 1– 2 (E.D. Va. filed Oct. 24, 2025). The complaint alleges that school officials responded with deliberate indifference and subsequently denied that any restroom assault had occurred. *Id.* Similar concerns have arisen in other States where schools have adopted gender-neutral or self-identification bathroom policies. *See, e.g.*, Julia Silverman, *Tualatin High student sues school district for $3.7M after alleged rape at school*, THE OREGONIAN (August 9, 2024, 10:00 a.m.).[4] The Secretary's concerns reflect the real-world experiences that motivated the amici States to act.

### C. Title IX Recognizes That Biological Sex Remains Relevant in Certain Contexts.

Again, Section 1686 of Title IX expressly enshrines the use of sex-separated "living facilities." 20 U.S.C. § 1686. This provision reflects Congress's understanding that privacy interests justify separating the sexes in intimate settings. NYCPS's Guidelines effectively nullify this congressional judgment by prohibiting schools from using these federal privacy protections and requiring schools to treat gender identity as dispositive regardless of biological sex. Amici States submit that the Secretary's interpretation of Title IX—that it protects biological females from being forced to share intimate facilities with biological males—is not only permissible but obviously correct. Title IX was enacted to ensure that women and girls have equal opportunities in education and sports—and it has had a massive impact in those arenas over the past half-century. Policies that expose female students to biological males in vulnerable settings, and that allow biological males to take roster spots and scholarships from female athletes, undermine that impact and purpose.

---

[4] Available at: https://www.oregonlive.com/education/2024/08/tualatin-high-student-sues-school-district-for-37m-after-alleged-rape-at-school.html

15

**D. Amici States Have Significant Reliance Interests at Stake.**

Amici States also have significant reliance interests. They enacted their own laws protecting female students based on the longstanding interpretation of Title IX that prevailed before the 2021 guidance. That interpretation treated "sex" as referring to biological sex and required schools to maintain sex-separated facilities. If this Court were to hold that Title IX *requires* schools to allow facility access based on gender identity, amici States' own laws would be called into question.

Amici States urge this Court to reject NYCPS's attempt to override the Secretary's reasonable exercise of discretion. The Secretary's concerns about NYCPS's Guidelines are legally sound and factually grounded. NYCPS's policies are not required by Title IX, and the Secretary was entitled to consider them in making grant continuation decisions.

## CONCLUSION

For the foregoing reasons, this Court should deny Plaintiff's motion for summary judgment and grant Defendants' motion to dismiss.

January 21, 2026

Respectfully submitted,

s/ *Garry M. Gaskins, II*
_____
GARRY M. GASKINS, II*
   *Solicitor General*
ZACH WEST*
   *Director of Special Litigation,*
ELLEN CARR*
   *Assistant Solicitor General*

OFFICE OF THE OKLAHOMA
ATTORNEY GENERAL
313 NE 21st Street
Oklahoma City, OK 73105
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
Ellen.Carr@oag.ok.gov
*Counsel for State of Oklahoma*
*pro hac vice pending*

17

## ADDITIONAL COUNSEL

**Steve Marshall**
*Attorney General of Alabama*

**Stephen J. Cox**
*Attorney General of Alaska*

**Tim Griffin**
*Attorney General of Arkansas*

**Chris Carr**
*Attorney General of Georgia*

**Theodore E. Rokita**
*Attorney General of Indiana*

**Brenna Bird**
*Attorney General of Iowa*

**Kris W. Kobach**
*Attorney General of Kansas*

**Liz Murrill**
*Attorney General of Louisiana*

**Lynn Fitch**
*Attorney General of Mississippi*

**Austin Knudsen**
*Attorney General of Montana*

**Mike Hilgers**
*Attorney General of Nebraska*

**Alan Wilson**
*Attorney General of South Carolina*

**Marty Jackley**
*Attorney General of South Dakota*

**Jonathan Skrmetti**
*Attorney General of Tennessee*

**Ken Paxton**
*Attorney General of Texas*

**Derek Brown**
*Attorney General of Utah*

**Keith G. Kautz**
*Attorney General of Wyoming*

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Garry M. Gaskins, II, counsel for the amici States, having applied for admission to practice *pro hac vice* in this Court, certify, pursuant to Local Civil Rule 7.1, that the attached Brief complies with the word-count limitations, the body is printed in twelve-point type, the footnotes are printed in ten-point type, and the Brief contains 5,132 words.

Dated: January 21, 2026.

s/ *Garry M. Gaskins, II*

GARRY M. GASKINS, II*
  *Solicitor General*
  *Attorney for Amici States*
  *\*pro hac vice pending*

19