UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE BOARD OF EDUCATION OF THE CITY SCHOOL
DISTRICT OF THE CITY OF NEW YORK,

               *Plaintiff*,                               No. 1:25-cv-08547-AS

                           v.

UNITED STATES DEPARTMENT OF EDUCATION, LINDA
MCMAHON, in her capacity as Secretary of the United States
Department of Education, KIMBERLY M. RICHEY, in her capacity
as Assistant Secretary for Civil Rights, LINDSEY M. BURKE, in her
capacity as Deputy Chief of Staff for Policy and Programs,

               *Defendants*.

## MEMORANDUM OF LAW FOR AMICI CURIAE STATES OF NEW YORK, CALIFORNIA, COLORADO, DELAWARE, ILLINOIS, MAINE, MARYLAND, MASSACHUSETTS, MINNESOTA, NEVADA, NEW JERSEY, OREGON, RHODE ISLAND, VERMONT, AND WASHINGTON, AND THE DISTRICT OF COLUMBIA IN SUPPORT OF PLAINTIFF'S SUMMARY JUDGMENT MOTION, AND IN OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

LETITIA JAMES
 *Attorney General*
 *State of New York*
28 Liberty Street
New York, NY 10005
(212) 416-6102
blair.greenwald@ag.ny.gov

BARBARA D. UNDERWOOD
 *Solicitor General*
JUDITH N. VALE
 *Deputy Solicitor General*
MARK S. GRUBE
 *Senior Assistant Solicitor General*
BLAIR GREENWALD
 *Assistant Solicitor General*
    *of Counsel*

(*Additional counsel listed on signature pages.*)    Dated: February 13, 2026

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

INTERESTS OF THE AMICI STATES ............................................................... 1

ARGUMENT ....................................................................................................... 3

I.    Amici States Have Adopted Laws and Policies That Protect Transgender People from Discrimination and Confer Wide Societal Benefits ................................................. 3

    A.    Transgender Youth Face Pervasive and Harmful Discrimination That Causes Them Serious Health and Academic Harms. ...................................... 5

    B.    Amici States' Experiences Confirm That Protecting Transgender People from Discrimination Yields Broad Benefits Without Compromising the Privacy or Safety of Others. ..................................................................... 7

II.   At Minimum, Title IX Permits Policies That Promote Inclusion of Transgender Students ............................................................................. 13

CONCLUSION ................................................................................................... 17

## TABLE OF AUTHORITIES

**Cases**                                                                                           **Page(s)**

*Adams ex rel. Kasper v. School Bd. of St. Johns Cnty.*,
   57 F.4th 791 (11th Cir. 2022) ..............................................................................15

*Bostock v. Clayton Cnty.*,
   590 U.S. 644 (2020)....................................................................................4, 15

*Brown v. Board of Educ.*,
   347 U.S. 483 (1954)...........................................................................................7

*Dodds v. United States Dep't of Educ.*,
   845 F.3d 217 (6th Cir. 2016) ..............................................................................14

*Doe ex rel. Doe v. Boyertown Area Sch. Dist.*,
   897 F.3d 518 (3d Cir. 2018)................................................................................14

*Grimm v. Gloucester Cnty. Sch. Bd.*,
   972 F.3d 586 (4th Cir. 2020) ...........................................................................8, 14

*Parents for Privacy v. Barr*,
   949 F.3d 1210 (9th Cir. 2020) .............................................................................14

*Pennhurst State Sch. & Hosp. v. Halderman*,
   451 U.S. 1 (1981)............................................................................................16

*Roe v. Critchfield*,
   137 F.4th 912 (9th Cir. 2025) ..............................................................................16

*Soule v. Connecticut Ass'n of Schs., Inc.*,
   90 F.4th 34 (2d Cir. 2023) (en banc) ...................................................................16

*Tennessee v. Department of Educ.*,
   104 F.4th 577 (6th Cir. 2024) ..............................................................................14

*United States v. Skrmetti*,
   605 U.S. 495 (2025)........................................................................................15

*Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
   858 F.3d 1034 (7th Cir. 2017) .............................................................................14

**Laws**                                                                  **Page(s)**

*Federal*

20 U.S.C.
    § 1681.................................................................................................13
    § 1686.................................................................................................13

34 C.F.R.
    § 106.33..............................................................................................13
    § 106.41..............................................................................................13

*States (alphabetical by juridiction)*

California Educ. Code
    § 221.5 (2013).......................................................................................4

Massachussetts
    Gen. Laws ch. 76, § 5 (2012)....................................................................5
    603 Mass. Code Regs. 26.06 (2012)...........................................................5

New York Educ. Law
    § 11 (2012)...........................................................................................4
    § 12 (2012)...........................................................................................4

Pennsylvania
    16 Pa. Code § 41.206..............................................................................4

Washington Rev. Code Ann.
    § 28A.642.080.....................................................................................11

**Miscellaneous Authorities**

Affirming & Inclusive Schs. Task Force, Ill. Off. of the Governor, *Strengthening
    Inclusion in Illinois Schools* (2020), https://www.aclu-
    il.org/app/uploads/2020/01/affirming_and_inclusive_schools_task_force_report.pdf ..........12

Alberto Arenas et al., *7 Reasons for Accommodating Transgender Students at School*, Phi
    Delta Kappan (Sept. 1, 2016), https://kappanonline.org/arenas-gunckel-smith-7-reasons-
    for-accommodating-transgender-students-school/....................................................8

Am. Psych. Ass'n, *Answers to Your Questions About Transgender People, Gender
    Identity, and Gender Expression* (3d ed. 2014),
    https://www.apa.org/topics/lgbtq/transgender.pdf...................................................3

**Miscellaneous Authorities**                                                                    **Page(s)**

Am. Psych. Ass'n, *Guidelines for Psychological Practice with Transgender and Gender Nonconforming People*, 70 Am. Psych. 832 (2015), https://www.apa.org/practice/guidelines/transgender.pdf .......................................................3

Amira Hasenbush et al., *Gender Identity Nondiscrimination Laws in Public Accomodations: A Review of Evidence Regarding Safety and Privacy in Public Restrooms, Locker Rooms, and Changing Rooms*, 16 Sexuality Rsch. & Soc. Pol'y 70 (2019), https://link.springer.com/article/10.1007/s13178-018-0335-z ................................. 8-9

April J. Ancheta et al., *The Impact of Positive School Climate on Suicidality and Mental Health Among LGBTQ Adolescents: A Systematic Review*, 37 J. Sch. Nursing 75 (2021), https://pubmed.ncbi.nlm.nih.gov/33287652/ .......................................................... 6-7

Beatriz Pagliarini Bagagli et al., *Trans Women and Public Restrooms: The Legal Discourse and Its Violence*, 6 Frontiers Socio. 1 (Mar. 31, 2021), https://www.frontiersin.org/journals/sociology/articles/10.3389/fsoc.2021.652777/full ...........8

Brandon Truitt, *Woman Says Security Guard at Liberty Hotel in Boston Confronted Her in Bathroom, Asked to Prove Gender*, CBS News (May 7, 2025), https://www.cbsnews.com/boston/news/women-boston-liberty-hotel-bathroom-gender/.............................................................................................................................10

California Sch. Bds. Ass'n, *Final Guidance: AB 1266, Transgender and Gender Nonconforming Students, Privacy, Programs, Activities & Facilities* (2014), https://www.csba.org/Advocacy/~/media/CSBA/Files/Advocacy/ELA/2014_03_AB1266_FinalGuidance.ashx.............................................................................................12

Carlos Maza & Luke Brinker, *15 Experts Debunk Right-Wing Transgender Bathroom Myth*, Media Matters for Am. (Mar. 19, 2014), https://www.mediamatters.org/sexual-harassment-sexual-assault/15-experts-debunk-right-wing-transgender-bathroom-myth ..........9

Carlos Maza & Rachel Percelay, *Texas Experts Debunk the Transgender "Bathroom Predator" Myth Ahead of HERO Referendum*, Media Matters for Am. (Oct. 15, 2015), https://www.mediamatters.org/sexual-harassment-sexual-assault/texas-experts-debunk-transgender-bathroom-predator-myth-ahead-hero..........................................................10

Christopher Wiggins, *Cis Woman Confronted by Police Officers in Arizona Walmart Restroom for Looking Too Masculine Speaks Out (Exclusive)*, Advocate (Feb. 28, 2025), https://www.advocate.com/news/lesbian-mistaken-transgender-arizona-walmart .....................................................................................................................10

**Miscellaneous Authorities**                                          **Page(s)**

Christopher Wiggins, *Cis Woman Mistaken as Transgender Records Being Berated in Bathroom*, Advocate (May 26, 2023), https://www.advocate.com/news/2022/11/01/cis-woman-mistaken-transgender-records-being-berated-bathroom ........................................................................... 10

Colorado Ass'n of Sch. Bds. et al., *Guidance for Educators Working with Transgender and Gender Nonconforming Students* (n.d.), https://cdpsdocs.state.co.us/safeschools/Resources/One%20Colorado/OneCO%20Transgender_Guidance.pdf ........................................................................ 12

David Crary, *Debate Over Transgender Bathroom Access Spreads Nationwide*, Salt Lake Trib. (May 10, 2016), https://archive.sltrib.com/article.php?id=3875520&itype=CMSID ......................... 9

Emily A. Greytak et al., GLSEN, *Harsh Realities: The Experiences of Transgender Youth in Our Nation's Schools* (2009), https://files.eric.ed.gov/fulltext/ED505687.pdf ............... 5, 7

Fox News, *Manafort on Trump's Fight to Rally GOP, Defeat Democrats; Gov. McCrory on Showdown Over NC's Transgender Bathroom Law* (updated Jan. 23, 2017), https://www.foxnews.com/transcript/manafort-on-trumps-fight-to-rally-gop-defeat-democrats-gov-mccrory-on-showdown-over-ncs-transgender-bathroom-law ....................... 10

Gabriel R. Murchison et al., *School Restroom and Locker Room Restrictions and Sexual Assault Risk Among Transgender Youth*, 143 Pediatrics e20182903 (June 1, 2019), https://shine.lab.uconn.edu/wp-content/uploads/sites/3321/2021/06/murchison_pediatrics_2019__1_.pdf ............................ 8

Gerika Mudra, *I Filed a Discrimination Charge for What Happened to Me in a Buffalo Wild Wings Bathroom*, MSNBC (Aug. 15, 2025), https://www.msnbc.com/opinion/msnbc-opinion/minnesota-buffalo-wild-wings-server-teen-bathroom-gender-rcna225076?utm_source=substack&utm_medium=email ...................................... 10

GLSEN, *Improving School Climate for Transgender and Nonbinary Youth: Research Brief* (2021), https://files.eric.ed.gov/fulltext/ED617683.pdf .................................... 5

Illinois Dep't of Hum. Rts., *Non-Regulatory Guidance: Relating to Protection of Transgender, Nonbinary, and Gender Nonconforming Students Under the Illinois Human Rights Act* (2021), https://dhr.illinois.gov/content/dam/soi/en/web/dhr/publications/documents/idhr-guidance-relating-toprotection-of-transgender-nonbinary-and-gender-nonconforming-students-eng-web.pdf ............................................................................... 12

**Miscellaneous Authorities**                                                    **Page(s)**

Illinois State Bd. of Educ., *Non-Regulatory Guidance: Supporting Transgender, Nonbinary and Gender Nonconforming Students* (2020), https://www.isbe.net/Documents/ISBE-Guidance-Supporting-Transgender-Nonbinary-Gender-Nonconforming-Students.pdf ................................................................12

Jody L. Herman et al., Williams Inst., *How Many Adults and Youth Identify as Transgender in the United States?* (Aug. 2025), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Pop-Update-Aug-2025.pdf ..........................................................................................................3

Jody L. Herman et al., Williams Inst., *Safety and Privacy in Public Restrooms and Other Gendered Facilities* (Feb. 2025), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Bathroom-Access-Feb-2025.pdf ..........................................9

Jody L. Herman, *Gendered Restrooms and Minority Stress: The Public Regulation of Gender and Its Impact on Transgender People's Lives*, 19 J. Pub. Mgmt. & Soc. Pol'y 65 (2013), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Restrooms-Minority-Stress-Jun-2013.pdf ..........................................8

Joseph G. Kosciw et al., GLSEN, *The 2021 National School Climate Survey: The Experiences of LGBTQ+ Youth in Our Nation's Schools* (2022), https://files.eric.ed.gov/fulltext/ED625378.pdf ................................................. 5-8

Kansas Hum. Rts. Comm'n, *Guidance from the Kansas Human Rights Commission on Sex Discrimination in Employment, Public Accommodations, and Housing* (Sept. 18, 2020), http://www.khrc.net/pdf/KHRC%20Guidance%20on%20Sex%20Discrimination%20in%20Employment,%20Public%20Accommodations,%20and%20Housing%20on%20letterhead%20rev%20dwh.pdf ..........................................................................4

Letter from William G. Brooks III, Mass. Chiefs of Police Ass'n, & Bryan A. Kyes, Mass. Majority City Chiefs, to Sen. William N. Brownsberger & Rep. John V. Fernandes, Joint Comm. on the Judiciary (Oct. 1, 2015), https://www.mass.gov/files/documents/2016/08/wj/ew-le.pdf ..............................10

Luke Brinker, *California School Officials Debunk Right-Wing Lies About Transgender Student Law*, Media Matters for Am. (Feb. 11, 2014), https://www.mediamatters.org/diversity-discrimination/california-school-officials-debunk-right-wing-lies-about-transgender ...............................................9

Maryland State Dep't of Educ., *Providing Safe Spaces for Transgender and Gender Non-Conforming Youth: Guidelines for Gender Identity Non-Discrimination* (2015), https://www.mabe.org/wp-content/uploads/2016/04/Providing_Safe_Spaces.pdf .................12

**Miscellaneous Authorities**                                                   **Page(s)**

Massachusetts Dep't of Elementary & Secondary Educ., *Guidance for Massachusetts*
    *Public Schools: Creating a Safe and Supportive School Environment* (Oct. 28, 2021),
    https://www.doe.mass.edu/sfs/lgbtq/genderidentity.html .......................................................12

Matt DeRienzo, *Woman Mistaken for Transgender Harassed in Walmart Bathroom*,
    News-Times (May 16, 2016), https://www.newstimes.com/local/article/Woman-
    mistaken-for-transgender-harassed-in-7471666.php .................................................10

Matt Pearce, *What It's Like to Live Under North Carolina's Bathroom Law If You're*
    *Transgender,* L.A. Times (June 12, 2016), https://www.latimes.com/nation/la-na-
    north-carolina-bathrooms-20160601-snap-story.html .............................................14

Michelle M. Johns et al., *Transgender Identity and Experiences of Violence*
    *Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High*
    *School Students — 19 States and Large Urban School Districts, 2017*, 68 Morb. &
    Mortal. Wklyl. Rep. 67 (2019),
    https://pmc.ncbi.nlm.nih.gov/articles/PMC6348759/pdf/mm6803a3.pdf ................................5

Minnesota Dep't of Educ., *A Toolkit for Ensuring Safe and Supportive Schools for*
    *Transgender and Gender Nonconforming Students* (2017),
    https://education.mn.gov/mdeprod/idcplg?IdcService=GET_FILE&dDocName=MD
    E072543&RevisionSelectionMethod=latestReleased&Rendition=primary ...........................12

Movement Advancement Project, Local Nondiscrimination Ordinances (last visited
    February 13, 2026), https://www.lgbtmap.org/equality-
    maps/non_discrimination_ordinances.........................................................................4

Nat'l Ctr. for Educ. Stat., *Table 215.30: Enrollment, Poverty, and Federal Funds for the*
    *120 Largest School Districts, by Enrollment Size in 2021* (May 2023),
    https://nces.ed.gov/programs/digest/d22/tables/dt22_215.30.asp?current=yes ......................9

New Jersey State Dep't of Educ., *Transgender Student Guidance for School Districts*
    (2018), https://www.nj.gov/education/safety/sandp/climate/docs/Guidance.pdf ...................12

New York State Educ. Dep't, *Creating a Safe, Supportive, and Affirming School*
    *Environment for Transgender and Gender Expansive Students: 2023 Legal Update*
    *and Best Practices* (2023),
    https://www.nysed.gov/sites/default/files/programs/student-support-services/creating-
    a-safe-supportive-and-affirming-school-environment-for-transgender-and-gender-
    expansive-students.pdf ............................................................................... 4, 12-13

Nhan L. Truong et al., GLSEN, *Erasure and Resilience: The Experiences of LGBTQ*
    *Students of Color, Black LGBTQ Youth in U.S. Schools* (2020),
    https://files.eric.ed.gov/fulltext/ED603847.pdf .......................................................6

**Miscellaneous Authorities**                                                                    **Page(s)**

Nicolas A. Suarez et al., Ctrs. for Disease Control & Prevention, *Disparities in School Connectedness, Unstable Housing, Experiences of Violence, Mental Health, and Suicidal Thoughts and Behaviors Among Transgender and Cisgender High School Students – Youth Risk Behavior Survey, United States, 2023*, 73 Morb. & Mortal. Wkly. Rep. 50 (2024), https://www.cdc.gov/mmwr/volumes/73/su/pdfs/su7304a6-H.pdf ................................................................................................................5

Off. of Youth Engagement, District of Columbia Pub. Schs., *Transgender and Gender-Nonconforming Policy Guidance* (2015), https://dcps.dc.gov/sites/default/files/dc/sites/dcps/publication/attachments/DCPS%20Transgender%20Gender%20Non%20Conforming%20Policy%20Guidance.pdf ..................12

Oregon Dep't of Educ., *Supporting Gender Expansive Students: Guidance for Schools* (2023), https://www.oregon.gov/ode/students-and-family/equity/civilrights/Pages/Gender-Identity-Guidance.aspx .............................................12

Providence Pub. Sch. Dist., *Nondiscrimination Policy: Transgender and Gender Expansive Students* (n.d.), https://providencepublic.ic-board.com/Reference_Library/ESB_Policies_and_Regulations/Policies/Transgender%20Nondiscrimination%20Policy-6.27.2016-as%20approved-ref.pdf ................................12

R. Nath et al., The Trevor Project, *2024 U.S. National Survey on the Mental Health of LGBTQ+ Young People* (2024), https://www.thetrevorproject.org/survey-2024/assets/static/TTP_2024_National_Survey.pdf ...........................................6-7

Rachel Percelay, *17 School Districts Debunk Right-Wing Lies About Protections for Transgender Students*, Media Matters for Am. (June 3, 2015), https://www.mediamatters.org/sexual-harassment-sexual-assault/17-school-districts-debunk-right-wing-lies-about-protections .................................................9

Rhode Island Dep't of Elementary & Secondary Educ., *Guidance for Rhode Island Schools on Transgender and Gender Nonconforming Students* (2016), https://ride.ri.gov/sites/g/files/xkgbur806/files/2023-06/Guidance-Rhode-Island-Schools-Transgender-Gender-Nonconforming-Students.pdf ...................................12

S. Comm. on Educ., Bill Analysis for Assemb. B. 1266 (Cal. 2013), http://www.leginfo.ca.gov/pub/13-14/bill/asm/ab_1251-1300/ab_1266_cfa_20130610_160930_sen_comm.html .........................................9

Sandy E. James et al., Nat'l Ctr. for Transgender Equal., *Early Insights: A Report of the 2022 U.S. Transgender Survey* (2024), https://transequality.org/sites/default/files/2024-02/2022%20USTS%20Early%20Insights%20Report_FINAL.pdf ...........................................5

**Miscellaneous Authorities**                                                    **Page(s)**

Sandy E. James et al., Nat'l Ctr. for Transgender Equal., *The Report of the 2015 U.S. Transgender Survey* (2016),
https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf ...... 5-6, 14

Susanne Beauchaine et al., Wash. Off. of Superintendent of Pub. Instruction, *Prohibiting Discrimination in Washington Public Schools* (2012),
https://ospi.k12.wa.us/sites/default/files/2023-08/prohibiting_discrimination_in_washington_public_schools_february2012revisedsep2019disclaimer_1.pdf ................................................................................................. 11-12

Vermont Agency of Educ*., Continuing Best Practices for Schools Regarding Transgender and Gender Nonconforming Students* (2017),
https://education.vermont.gov/sites/aoe/files/documents/edu-best-practices%20-for-schools-regarding-transgender-and-gender-nonconforming-students.pdf .............................12

Wash. Interscholastic Activities Ass'n, *2023-2024 Handbook* (Oct. 10, 2023),
https://assets-rst7.rschooltoday.com/rst7files/uploads/sites/652/2023/10/19095638/2023-24-HANDBOOK-10-19-2023.pdf .........................................................................................11

Wash. State Hum. Rts. Comm'n, *Frequently Asked Questions Regarding WAC 162-32-060 Gender-Segregated Facilities* (2016),
https://www.hum.wa.gov/sites/default/files/public/rule-making/Questions%20and%20Answers%20Regarding%20WAC%20162.pdf.....................11

What We Know Project, Cornell Univ., *What Does the Scholarly Research Say About the Effects of Discrimination on the Health of LGBT People?* (2019),
https://whatweknow.inequality.cornell.edu/topics/lgbt-equality/what-does-scholarly-research-say-about-the-effects-of-discrimination-on-the-health-of-lgbt-people/ .....................6

## INTERESTS OF THE AMICI STATES

Plaintiff New York City Public Schools (NYCPS)[1] filed this lawsuit to vacate and set aside defendant U.S. Department of Education's (ED) sudden discontinuation of $36 million in federal grants because NYCPS's policies purportedly violate Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681. Under ED's novel statutory interpretation, Title IX purportedly prohibits NYCPS's inclusive policies (the "Guidelines"), under which transgender students can use bathroom and locker room facilities, and participate in activities, consistent with their gender identity. NYCPS has moved for summary judgment and vacatur of ED's discontinuation determination on multiple, independent grounds, including that ED's determination is contrary to law because it is based on an incorrect interpretation of Title IX.

The States of New York, California, Colorado, Delaware, Illinois, Maine, Maryland, Massachusetts, Minnesota, Nevada, New Jersey, Oregon, Rhode Island, Vermont, and Washington, and the District of Columbia file this brief as amici curiae in support of NYCPS's summary judgment motion, and in opposition to defendants' cross-motion for summary judgment.

Amici States submit this brief to make two points. First, the amici States describe their experiences administering inclusive laws and policies, including policies that ensure that transgender students have access to school facilities and activities consistent with their gender identity. Second, amici States agree with NYCPS that Title IX, at minimum, permits States and municipalities to adopt and enforce inclusive laws and policies in their own jurisdictions.

Amici States recognize that the Court need not reach these Title IX issues if the Court grants summary judgment in favor of NYCPS on independent grounds—such as, for example,

---

[1] As reflected in the case caption, the plaintiff is formally denominated as the Board of Education of the City School District of the City of New York. Plaintiff operates as NYCPS.

NYCPS's claim that ED failed to follow the necessary procedures for discontinuing the grants, or NYCPS's claim that ED's decision was arbitrary and capricious because (among other things) ED failed to consider certain criteria as required by regulation (*see* Pl.'s Mem. of Law in Support of Mot. for Summ. J. (Pl.'s Mem.) at 20-29 (Dec. 16, 2025), ECF No. 52). But as to the Title IX issues, other amici States supporting ED (referred to herein as "Oklahoma amici") have taken the extreme position that Title IX categorically bars NYCPS's inclusive policies. *See* Br. of Amici Curiae State of Oklahoma et al. (Okla. Br.) at 1-3, 9-10. The Oklahoma amici have made this argument even though defendants did not make it in their cross-motion papers. *See* Mem. of Law in Support of Defs.' Cross-Mot. to Dismiss or in the Alternative for Summ. J. at 28-29 (Jan. 14, 2026), ECF No. 57. Amici States submit this brief to explain that, if the Court were to consider the proper interpretation of Title IX, the Oklahoma amici are wrong. As NYCPS correctly explains, Title IX, at a minimum, permits inclusive policies that allow transgender students to use school facilities and participate in school activities consistent with their gender identity.

Amici States have strong interests in the Title IX issues that the Oklahoma amici's brief discusses. Amici States have adopted inclusive laws and policies and strongly support the right of transgender people to live with dignity, be free from discrimination, and have equal access to education, government-sponsored opportunities, and other incidents of life. Discrimination against transgender individuals causes tangible economic, educational, emotional, and health harms. Amici States' inclusive laws and policies aim to prevent these injuries and combat discrimination against transgender people, including by ensuring that they have access to school facilities and activities consistent with their gender identity. And amici States' experiences demonstrate that these policies promote inclusive environments that broadly benefit all, without compromising safety or privacy.

Amici States also have a strong interest in the proper application of Title IX. Properly understood, Title IX, at minimum, preserves amici States' sovereign authority to adopt and enforce inclusive laws and policies in their own jurisdictions. As NYCPS correctly points out (Pl.'s Mem. at 31), the Court need not decide whether Title IX *requires* inclusive policies like the NYCPS Guidelines to grant summary judgment to NYCPS—even though the Oklahoma amici repeatedly mischaracterize the Title IX issue in this way (*see* Okla. Br. at 1-3, 9-10, 16). Rather, if the Court considers the meaning of Title IX here (which it need not do), the relevant question would be whether Title IX *permits* inclusive policies. And on that point, NYCPS is correct that Title IX permits inclusive policies like the NYCPS Guidelines—as defendants do not contest here, although the Oklahoma amici do.

## ARGUMENT

I.    **AMICI STATES HAVE ADOPTED LAWS AND POLICIES THAT PROTECT TRANSGENDER PEOPLE FROM DISCRIMINATION AND CONFER WIDE SOCIETAL BENEFITS**

In the United States, over 2.8 million people—including approximately 724,000 youth between the ages of thirteen and seventeen—identify as transgender.[2] Transgender people have been part of cultures worldwide "from antiquity to the present day."[3] They contribute to our communities in myriad ways, including as students, teachers, essential workers, firefighters, police officers, lawyers, nurses, and doctors.

---

[2] Jody L. Herman et al., Williams Inst., *How Many Adults and Youth Identify as Transgender in the United States?* 2 (Aug. 2025). (For authorities available online, full URLs appear in the table of authorities. All URLs were last visited on February 13, 2026.)

[3] Am. Psych. Ass'n (APA), *Answers to Your Questions About Transgender People, Gender Identity, and Gender Expression* 1 (3d ed. 2014); *see also* APA, *Guidelines for Psychological Practice with Transgender and Gender Nonconforming People*, 70 Am. Psych. 832, 834 (2015).

Yet transgender people often experience discrimination that limits their ability to realize their potential. To combat such discrimination, States began providing civil rights protections for transgender people over a quarter century ago. Today, at least twenty-one States and the District of Columbia,[4] and at least 395 municipalities outside of those States,[5] offer express protections against discrimination based on gender identity in areas such as education, public accommodations, housing, and employment.[6]

For example, New York law expressly prohibits discrimination and harassment of students "on school property or at a school function" on the basis of gender identity in K-12 schools. N.Y. Educ. Law §§ 11(6), 12(1) (2012). And the New York State Education Department has made clear that transgender students in K-12 schools have the right to access school facilities and participate in activities consistent with their gender identity.[7] Similarly, both California and Massachusetts have long mandated that transgender students in K-12 schools be permitted to participate in school programs and activities consistent with their gender identity. *See* Cal. Educ. Code § 221.5(f)

---

[4] See Appendix, *infra*. At least two other States—Kansas and Pennsylvania—have interpreted their nondiscrimination laws as forbidding discrimination on the basis of gender identity. *See* Kansas Hum. Rts. Comm'n, *Guidance from the Kansas Human Rights Commission on Sex Discrimination in Employment, Public Accommodations, and Housing* (Sept. 18, 2020) (advising that Kansas laws prohibit discrimination based on "sex, without regard to heterosexual, homosexual, bisexual, transgender, queer or any other subcategory or derivative of the word 'sex'"); 16 Pa. Code § 41.206 (defining "sex" as including "a person's gender identity or gender expression" for purposes of nondiscrimination laws).

[5] *Movement Advancement Project, Local Nondiscrimination Ordinances* (last visited February 13, 2026).

[6] The U.S. Supreme Court has confirmed that longstanding federal law similarly prohibits employment discrimination based on gender identity. *See Bostock v. Clayton Cnty.*, 590 U.S. 644, 662 (2020).

[7] New York State Educ. Dep't, *Creating a Safe, Supportive, and Affirming School Environment for Transgender and Gender Expansive Students: 2023 Legal Update and Best Practices* 21-26 (2023).

(2013); Mass. Gen. Laws ch. 76, § 5 (2012); 603 Mass. Code Regs. 26.06(5) (2012). The experiences of amici States show that these policies ensure equal access to public facilities for transgender students and promote safe and inclusive school environments that benefit all.

## A.    Transgender Youth Face Pervasive and Harmful Discrimination That Causes Them Serious Health and Academic Harms.

Transgender youth experience discrimination, violence, and harassment at levels that exceed those experienced by their cisgender peers.[8] The 2015 and 2022 U.S. Transgender Surveys (USTS), the largest surveys of transgender people in the United States to date, examined the experiences of respondents who identified as or were perceived as transgender when in grades K-12. The surveys found that 80% reported mistreatment or negative experiences at school; 54% reported verbal harassment; 24% reported a physical attack; and 13% reported a sexual assault.[9] A 2021 survey of LGBTQ students in grades six to twelve showed that 74% experienced in-person victimization at school because of their gender expression, and 42% experienced online victimization because of their gender expression.[10] And in a 2024 survey, 65% of transgender and nonbinary

---

[8] Joseph G. Kosciw et al., GLSEN, *The 2021 National School Climate Survey: The Experiences of LGBTQ+ Youth in Our Nation's Schools* xxvii, 84 (2022); *see also* Nicolas A. Suarez et al., Ctrs. for Disease Control & Prevention, *Disparities in School Connectedness, Unstable Housing, Experiences of Violence, Mental Health, and Suicidal Thoughts and Behaviors Among Transgender and Cisgender High School Students – Youth Risk Behavior Survey, United States, 2023*, 73 Morb. & Mortal. Wkly. Rep. 50, 54 (2024); GLSEN, *Improving School Climate for Transgender and Nonbinary Youth: Research Brief* 1 (2021); Emily A. Greytak et al., GLSEN, *Harsh Realities: The Experiences of Transgender Youth in Our Nation's Schools* xi (2009); Michelle M. Johns et al., *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students — 19 States and Large Urban School Districts, 2017*, 68 Morb. & Mortal. Wkly. Rep. 67, 67-70 (2019).

[9] Sandy E. James et al., Nat'l Ctr. for Transgender Equal., *Early Insights: A Report of the 2022 U.S. Transgender Survey* 22 (2024); Sandy E. James et al., Nat'l Ctr. for Transgender Equal., *The Report of the 2015 U.S. Transgender Survey* 131-35 (2016).

[10] Kosciw et al., *supra*, at 86-87.

youth reported being discriminated against in the past year because of their gender identity.[11] And transgender youth of color, in particular, face unique difficulties.[12]

Discrimination against transgender youth can have serious health consequences. Research shows that discrimination against LGBTQ people, including discriminatory policies and the denial of opportunities, "increases the risks of poor mental and physical health" for LGBTQ people.[13] For example, LGBTQ students who experienced discriminatory policies or practices in school were found to have lower self-esteem and higher levels of depression than students who had not encountered such discrimination.[14] Respondents to the 2015 USTS who reported negative experiences in grades K-12 were more likely than other respondents to be under serious psychological distress, to have experienced homelessness, and to have attempted suicide.[15] Indeed, among respondents to the 2015 USTS, 40% had attempted suicide—a rate nearly nine times that of the general population (4.6%).[16] Similarly, in a 2024 mental health survey, almost half (46%) of transgender and nonbinary youth aged thirteen to seventeen reported having seriously

---

[11] R. Nath et al., The Trevor Project, _2024 U.S. National Survey on the Mental Health of LGBTQ+ Young People_ 15 (2024).

[12] _See_ Nhan L. Truong et al., GLSEN, _Erasure and Resilience: The Experiences of LGBTQ Students of Color, Black LGBTQ Youth in U.S. Schools_ 3, 37 (2020).

[13] What We Know Project, Cornell Univ., _What Does the Scholarly Research Say About the Effects of Discrimination on the Health of LGBT People?_ (2019).

[14] Kosciw et al., _supra_, at 43; _see also_ April J. Ancheta et al., _The Impact of Positive School Climate on Suicidality and Mental Health Among LGBTQ Adolescents: A Systematic Review_, 37 J. Sch. Nursing 75, 76 (2021).

[15] James et al., _The Report of the 2015 U.S. Transgender Survey_, _supra_, at 132.

[16] _See id._ at 114.

considered attempting suicide in the past twelve months.[17] Positive school climates, on the other hand, have been linked to lower suicidality in LGBTQ youth.[18]

Discrimination in school settings also negatively affects educational outcomes. A 2021 survey showed that LGBTQ students who had experienced discriminatory policies and practices had lower levels of educational achievement, lower grade point averages, and lower levels of educational aspiration than other students.[19] Discriminatory school climates have also been found to exacerbate absenteeism. A 2021 survey found that LGBTQ students who had experienced discrimination in their schools were almost three times as likely (43.3% versus 16.4%) to have missed school the prior month because they felt unsafe or uncomfortable.[20]

**B.    Amici States' Experiences Confirm That Protecting Transgender People from Discrimination Yields Broad Benefits Without Compromising the Privacy or Safety of Others.**

Policies that allow transgender students to access facilities and activities consistent with their gender identity create school climates that enhance students' wellbeing and facilitate their ability to learn.[21] These benefits redound to society as a whole because education advances not only students' individual interests but also prepares students to contribute to society—socially, culturally, and economically. *See, e.g.*, *Brown v. Board of Educ.*, 347 U.S. 483, 493 (1954).

---

[17] Nath et al., *supra*, at 3.

[18] *See id.* at 24 (reporting that 14% of LGBTQ youth in nonaffirming schools had attempted suicide in the last year, compared to 10% in affirming schools); Ancheta et al., *supra*, at 80.

[19] Kosciw et al., *supra*, at 35-37; *see also* Greytak et al., *supra*, at 25, 27 fig. 15 (showing that frequently harassed transgender students had significantly lower grade point averages than other transgender students.

[20] Kosciw et al., *supra*, at 36.

[21] *See, e.g.*, Br. of Amici Curiae Sch. Adm'rs from Thirty-One States & D.C. in Supp. of Resp't ("Br. of Amici Curiae Sch. Adm'rs") at 3-4, *Gloucester Cnty. Sch. Bd. v. G.G.*, 580 U.S. 1168 (2017) (No. 16-273), 2017 WL 930055.

Policies supporting transgender students, including by allowing them to use common restrooms consistent with their gender identity, can reduce the health and safety risks facing those students. Almost three in four (72.9%) of the transgender students surveyed in one study had avoided school restrooms because they felt unsafe or uncomfortable.[22] More than half (54%) of respondents in another study of transgender people reported negative health effects from avoiding public restrooms, such as kidney infections and other kidney-related problems.[23] *See also Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 600, 603, 617 (4th Cir. 2020). And a 2019 study showed that youth with restricted access to restrooms and locker rooms based on their sex assigned at birth were more likely to experience sexual assault, compared to their peers that did not face similar restrictions.[24]

In States allowing transgender students to use facilities corresponding to their gender identity, reviews of public school records have failed to turn up any examples of transgender students harassing others in restrooms or locker rooms.[25] Indeed, the experiences of school administrators

---

[22] Kosciw et al., *supra,* at 89 fig. 3.13.

[23] Jody L. Herman, *Gendered Restrooms and Minority Stress: The Public Regulation of Gender and Its Impact on Transgender People's Lives*, 19 J. Pub. Mgmt. & Soc. Pol'y 65, 75 (2013).

[24] Gabriel R. Murchison et al., *School Restroom and Locker Room Restrictions and Sexual Assault Risk Among Transgender Youth*, 143 Pediatrics e20182903, at 7-8 (June 1, 2019).

[25] Alberto Arenas et al., *7 Reasons for Accommodating Transgender Students at School*, Phi Delta Kappan (Sept. 1, 2016); *see* Beatriz Pagliarini Bagagli et al., *Trans Women and Public Restrooms: The Legal Discourse and Its Violence*, 6 Frontiers Socio. 1, 8 (Mar. 31, 2021); *see also* Amira Hasenbush et al., *Gender Identity Nondiscrimination Laws in Public Accommodations: A Review of Evidence Regarding Safety and Privacy in Public Restrooms, Locker Rooms, and Changing Rooms*, 16 Sexuality Rsch. & Soc. Pol'y 70, 80-83 (2019) (comparing criminal incident reports in localities with and without gender identity inclusive public accommodations nondiscrimination laws in Massachusetts).

in thirty-one States and the District of Columbia show that safety concerns are unfounded.[26] The Oklahoma amici's speculation that student safety will suffer if transgender people are treated fairly (*see* Okla. Br. at 14) is contrary to the actual experiences of States and localities where nondiscrimination has long been the law.[27]

For instance, a former county sheriff noted that Washington State has protected transgender people from discrimination for a decade "with no increase in public safety incidents as a result"; he emphasized "that indecent exposure, voyeurism, and sexual assault[] are already illegal, and police use those laws to keep people safe."[28] In 2013, the Los Angeles Unified School District—the second largest school district in the country with more than 400,000 enrolled students[29]—reported "no issues, problems or lawsuits as a result of [a 2004] policy" allowing students to use restrooms corresponding to their gender identity.[30] And according to the Massachusetts Chiefs of Police

---

[26] Br. of Amici Curiae Sch. Adm'rs at 14-16, *Gloucester Cnty. Sch. Bd.*, 580 U.S. 1168.

[27] Indeed, a survey of the largest school districts in twelve States with gender identity protections found that, years after implementing protections, "none of the schools have experienced any problems." Rachel Percelay, *17 School Districts Debunk Right-Wing Lies About Protections for Transgender Students*, Media Matters for Am. (June 3, 2015) (largest school districts in twelve States with gender-identity protection laws); *see also* Carlos Maza & Luke Brinker, *15 Experts Debunk Right-Wing Transgender Bathroom Myth*, Media Matters for Am. (Mar. 19, 2014) (law enforcement officials, government employees, and advocates for sexual assault victims); Luke Brinker, *California School Officials Debunk Right-Wing Lies About Transgender Student Law*, Media Matters for Am. (Feb. 11, 2014) (six of California's largest school districts, including two that have had antidiscrimination policies for more than a decade); Hasenbush et al., *supra*, at 70-83; Jody L. Herman et al., Williams Inst., *Safety and Privacy in Public Restrooms and Other Gendered Facilities* 1-6 (Feb. 2025) (using data from National Crime Victimization Survey to estimate impact of gender identity nondiscrimination laws for public accommodations on prevalence of violent victimization perpetrated by strangers).

[28] David Crary, *Debate Over Transgender Bathroom Access Spreads Nationwide*, Salt Lake Trib. (May 10, 2016) (quotation marks omitted).

[29] Nat'l Ctr. for Educ. Stat., *Table 215.30: Enrollment, Poverty, and Federal Funds for the 120 Largest School Districts, by Enrollment Size in 2021* (May 2023).

[30] S. Comm. on Educ., Bill Analysis for Assemb. B. 1266, at 8 (Cal. 2013).

Association and Massachusetts Majority City Chiefs, allowing people to use public bathrooms consistent with their gender identity "improve[s] public safety."[31] In Texas, officials in Austin, Dallas, and El Paso found no increase in restroom safety incidents as a result of those cities' policies allowing transgender people to use restrooms consistent with their gender identity.[32]

By contrast, policies requiring individuals to use bathrooms based on their sex assigned at birth have produced incidents that do threaten public safety for both transgender and cisgender individuals.[33] In one incident, for example, a restaurant employee accused an eighteen-year-old cisgender high school girl of being a man and harassed her to leave the women's restroom; the harassment ceased only after the student showed the employee her breasts.[34] In a similar incident, two male police officers followed a nineteen-year-old cisgender woman into a women's restroom and accused her of being a man; for her, too, the worst harassment ceased only after she showed police officers her breasts.[35]

---

[31] Letter from William G. Brooks III, Mass. Chiefs of Police Ass'n, & Bryan A. Kyes, Mass. Majority City Chiefs, to Sen. William N. Brownsberger & Rep. John V. Fernandes, Joint Comm. on the Judiciary (Oct. 1, 2015).

[32] Carlos Maza & Rachel Percelay, *Texas Experts Debunk the Transgender "Bathroom Predator" Myth Ahead of HERO Referendum*, Media Matters for Am. (Oct. 15, 2015); *see also, e.g.*, Fox News, *Manafort on Trump's Fight to Rally GOP, Defeat Democrats; Gov. McCrory on Showdown Over NC's Transgender Bathroom Law* (updated Jan. 23, 2017) (no known cases of people in North Carolina committing crimes in bathrooms under the cover of protections provided to transgender people).

[33] *See, e.g.*, Brandon Truitt, *Woman Says Security Guard at Liberty Hotel in Boston Confronted Her in Bathroom, Asked to Prove Gender*, CBS News (May 7, 2025); Christopher Wiggins, *Cis Woman Mistaken as Transgender Records Being Berated in Bathroom*, Advocate (May 26, 2023); Matt DeRienzo, *Woman Mistaken for Transgender Harassed in Walmart Bathroom*, News-Times (May 16, 2016).

[34] Gerika Mudra, *I Filed a Discrimination Charge for What Happened to Me in a Buffalo Wild Wings Bathroom*, MSNBC (Aug. 15, 2025).

[35] Christopher Wiggins, *Cis Woman Confronted by Police Officers in Arizona Walmart Restroom for Looking Too Masculine Speaks Out (Exclusive)*, Advocate (Feb. 28, 2025).

Amici States' experiences also show that nondiscriminatory policies have not generated privacy issues in women's restrooms, contrary to the claims of the Oklahoma amici (*see* Okla. Br. at 13-15). The risk that students will see others' intimate body parts, or have their intimate body parts seen by others, is not presented by ordinary use of women's restrooms, which usually have only private stalls. And in any event, even considering both men's and women's restrooms, concerns about the presence of others (transgender or not) can be addressed by individual students choosing to utilize a restroom stall or by increasing privacy options for all students, without singling out transgender people for stigmatizing differential treatment. For example, in Washington State, school districts must provide "[a]ny student—transgender or not—who has a need or desire for increased privacy, regardless of the underlying reason," with "access to an alternative restroom (e.g., staff restroom, health office restroom)."[36] All students with privacy concerns thus have "the option to make use of a separate restroom and have their concerns addressed without stigmatizing any individual student."[37] Similarly, students in Washington State are allowed to participate in physical education and athletic activities "in a manner that is consistent with their gender identity."[38] But rather than segregating transgender students in locker room settings, additional privacy is provided for any student who desires it by providing "a

---

[36] Susanne Beauchaine et al., Wash. Off. of Superintendent of Pub. Instruction, *Prohibiting Discrimination in Washington Public Schools* 30 (2012); *see also* Wash. State Hum. Rts. Comm'n, *Frequently Asked Questions Regarding WAC 162-32-060 Gender-Segregated Facilities* 3 (2016) (businesses need not "make any [structural] changes" or "add additional facilities," but "are encouraged to provide private areas for changing or showering whenever feasible" and "may wish to explore installing partitions or curtains for persons desiring privacy"); Wash. Rev. Code Ann. § 28A.642.080 (requiring implementation by January 31, 2020).

[37] Beauchaine et al., *supra*, at 30.

[38] *Id.*; Wash. Interscholastic Activities Ass'n, *2023-2024 Handbook* 37 (Oct. 10, 2023).

reasonable alternative changing area, such as the use of a private area (e.g., a nearby restroom stall with a door), or a separate changing schedule."[39]

New York and many other amici offer similar guidance to help schools maximize privacy while complying with laws prohibiting gender-identity discrimination—for instance, by offering privacy curtains and separate restroom and changing spaces to all who desire them.[40] And the experiences of school administrators in dozens of States across the country confirm that such policies can be implemented fairly, simply, and effectively.[41] For example, New York's guidance

---

[39] Beauchaine et al., *supra*, at 30-31; *see also* Providence Pub. Sch. Dist., *Nondiscrimination Policy: Transgender and Gender Expansive Students* 4 (n.d.) (student uncomfortable with gender-segregated facility may use "a safe and non-stigmatizing alternative," such as a privacy partition or separate changing schedule).

[40] **California**: California Sch. Bds. Ass'n, *Final Guidance: AB 1266, Transgender and Gender Nonconforming Students, Privacy, Programs, Activities & Facilities* 2 (2014). **Colorado**: Colorado Ass'n of Sch. Bds. et al., *Guidance for Educators Working with Transgender and Gender Nonconforming Students* 4-5 (n.d.). **Illinois**: Illinois Dep't of Hum. Rts., *Non-Regulatory Guidance: Relating to Protection of Transgender, Nonbinary, and Gender Nonconforming Students Under the Illinois Human Rights Act* 6-7 (2021); Illinois State Bd. of Educ., *Non-Regulatory Guidance: Supporting Transgender, Nonbinary and Gender Nonconforming Students* 10-11 (2020); Affirming & Inclusive Schs. Task Force, Ill. Off. of the Governor, *Strengthening Inclusion in Illinois Schools* 19-21 (2020). **Maryland**: Maryland State Dep't of Educ., *Providing Safe Spaces for Transgender and Gender Non-Conforming Youth: Guidelines for Gender Identity Non-Discrimination* 13-14 (2015). **Massachusetts**: Massachusetts Dep't of Elementary & Secondary Educ., *Guidance for Massachusetts Public Schools: Creating a Safe and Supportive School Environment* (Oct. 28, 2021). **Minnesota**: Minnesota Dep't of Educ., *A Toolkit for Ensuring Safe and Supportive Schools for Transgender and Gender Nonconforming Students* 10 (2017). **New Jersey**: New Jersey State Dep't of Educ., *Transgender Student Guidance for School Districts* 7 (2018). **New York**: New York State Educ. Dep't, *supra*, at 22-24. **Oregon**: Oregon Dep't of Educ., *Supporting Gender Expansive Students: Guidance for Schools* 24-26 (2023). **Rhode Island**: Rhode Island Dep't of Elementary & Secondary Educ., *Guidance for Rhode Island Schools on Transgender and Gender Nonconforming Students* 8-9 (2016). **Vermont**: Vermont Agency of Educ., *Continuing Best Practices for Schools Regarding Transgender and Gender Nonconforming Students* 6, 8 (2017). **District of Columbia**: Off. of Youth Engagement, District of Columbia Pub. Schs., *Transgender and Gender-Nonconforming Policy Guidance* 9 (2015).

[41] *See* Br. of Amici Curiae Sch. Adm'rs at 17-21, *Gloucester Cnty. Sch. Bd.*, 580 U.S. 1168.

for school districts explains how schools have accommodated transgender youth and fostered a "safe and supportive school environment."[42]

## II.   AT MINIMUM, TITLE IX PERMITS POLICIES THAT PROMOTE INCLUSION OF TRANSGENDER STUDENTS

As previously explained, the Court need not reach NYCPS's claim that ED acted contrary to law because the NYCPS Guidelines comport with the proper interpretation of Title IX. But in any event, the Oklahoma amici fundamentally err in arguing that, as to this claim, the relevant question is whether Title IX *requires* inclusive policies. Instead, if the Court were to reach the substantive Title IX issue, the relevant question would be whether Title IX at least *permits* inclusive policies. It does.

Title IX broadly prohibits sex discrimination in schools receiving federal funding. Under Title IX, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX and implementing regulations confirm that the nondiscrimination mandate generally prohibits sex-separated school programs, with some limited—and optional—exceptions. For example, recipients "may," but are not required to, "provide separate toilet, locker room, and shower facilities on the basis of sex." 34 C.F.R. § 106.33; *see id.* § 106.41(b) (allowing separate sports teams based on sex "where selection for such teams is based upon competitive skill or the activity involved is a contact sport"). Nor are recipients "prohibit[ed] . . . from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686.

---

[42] New York State Educ. Dep't, *supra*, at 7, 22-24.

Nothing in the text of Title IX or its implementing regulations supports the extraordinary claim that Title IX *mandates* that schools must exclude transgender students from facilities and activities consistent with their gender identity. Contrary to the suggestions of the Oklahoma amici (*see* Okla. Br. at 13, 15), Title IX at least permits recipients to adopt inclusive policies that treat transgender students consistently with gender identity in the context of school facilities and other activities. And certainly nothing in Title IX conscripts the States and local governments into policing the bodies of children, as would likely be necessary at least in some instances to enforce such a regime in the school setting. Indeed, exclusionary policies could require schools to police cisgender and transgender people alike, since many individuals—and minors in particular—may be superficially perceived as using the "wrong" restroom.[43]

Accordingly, courts have repeatedly concluded that transgender students' use of sex-separated spaces that align with their gender identity does not violate Title IX. *See, e.g.*, *Parents for Privacy v. Barr*, 949 F.3d 1210, 1228-29 (9th Cir. 2020); *Grimm*, 972 F.3d at 616-19; *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 534-35 (3d Cir. 2018); *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1046-50 (7th Cir. 2017); *Dodds v. United States Dep't of Educ.*, 845 F.3d 217, 221-22 (6th Cir. 2016) (per curiam). The Oklahoma amici do not cite any decision holding otherwise. *See* Okla. Br. at 5-6, 9-10. Indeed, even courts adopting a restrictive view of Title IX have recognized that Title IX does not require schools to separate school programs and facilities by "biological sex," and that schools "could also separate programs and facilities by gender identity." *Tennessee v. Department of Educ.*, 104 F.4th

---

[43] *See* James et al., *The Report of the 2015 U.S. Transgender Survey, supra,* at 225-27; *see also* Matt Pearce, *What It's Like to Live Under North Carolina's Bathroom Law If You're Transgender*, L.A. Times (June 12, 2016).

577, 610-11 (6th Cir. 2024); *cf. Adams ex rel. Kasper v. School Bd. of St. Johns Cnty.*, 57 F.4th 791, 815 (11th Cir. 2022) (holding that Title IX "permits" separating school bathrooms based on biological sex). Taken together, these decisions confirm that inclusive school policies for transgender students are consistent with Title IX's nondiscrimination mandate.

This understanding of Title IX is bolstered by the Supreme Court's decision in *Bostock v. Clayton County*, which explained that gender identity discrimination is sex discrimination under Title VII of the Civil Rights Act of 1964, *see* 590 U.S. at 660-61, 666-70. While acknowledging that "transgender status" is a distinct concept from "sex," the Court observed that sexual harassment and discrimination based on motherhood are also distinct concepts that still qualify as sex discrimination under Title VII. *Id.* at 660-61, 669. Similarly, amici States' and NYCPS's inclusive policies protect against sex discrimination and are thus consistent with the overarching purpose of Title IX.

Contrary to the assertions of the Oklahoma amici (*see* Okla. Br. at 11-12), the Supreme Court's decision in *United States v. Skrmetti*, 605 U.S. 495 (2025), does not alter that conclusion. In *Skrmetti*, the Court considered only claims brought under the Equal Protection Clause of the Fourteenth Amendment and did not consider any statutory claims—let alone claims under Title IX. *See* 605 U.S. at 500. Indeed, *Skrmetti* expressly declined to address whether the reasoning of *Bostock* would apply in other statutory contexts. *See id.* at 519-20.

Finally, the Oklahoma amici err in suggesting that NYCPS and other funding recipients "have always been on notice" of ED's novel interpretation of Title IX as categorically prohibiting inclusive policies. *See* Okla. Br. at 10. To the contrary, ED's novel interpretation would impose a new condition on the receipt of federal funds in violation of the Spending Clause. It is well settled that Congress must speak "unambiguously" when it places conditions on the receipt of federal

funds in the exercise of its Spending Clause power. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981); *see Soule v. Connecticut Ass'n of Schs., Inc.*, 90 F.4th 34, 52 (2d Cir. 2023) (en banc).[44] Here, the plain text of Title IX does not clearly prohibit inclusive policies like the NYCPS Guidelines. And neither the federal courts nor ED interpreted Title IX to impose such a prohibition—much less provided "unambiguous" notice of such a prohibition—when NYCPS accepted the federal grants. Rather, and particularly in light of *Bostock*, NYCPS reasonably understood the term "sex" in Title IX to be at least broad enough to allow the NYCPS Guidelines' inclusive policies. Indeed, even the Oklahoma amici's arguments indicate that Title IX is ambiguous on this point for purposes of the Spending Clause analysis. *See* Okla. Br. at 9; *see also Roe v. Critchfield*, 137 F.4th 912, 928-31 (9th Cir. 2025).

---

[44] In *Soule*, the Second Circuit vacated the dismissal of a Title IX complaint under the Spending Clause because of a separate threshold error in the district court's reasoning as to its jurisdiction. *See* 90 F.4th at 52-53. The Second Circuit did not decide whether the federal funding recipient's inclusive policy violated Title IX, nor whether the recipient had adequate notice under the Spending Clause. *See id.* at 52-55.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment in favor of plaintiff and award appropriate relief as plaintiff requests in its motion for summary judgment.

Dated:  New York, New York
           February 13, 2026

                                        Respectfully submitted,

                                        LETITIA JAMES
                                         *Attorney General*
                                         *State of New York*


                                   By:   /s/ Blair J. Greenwald
                                        BLAIR J. GREENWALD
                                        Assistant Solicitor General

BARBARA D. UNDERWOOD                     28 Liberty Street
 *Solicitor General*                     New York, NY 10005
JUDITH N. VALE                           (212) 416-6102
 *Deputy Solicitor General*              (212) 416-8962 (fax)
MARK S. GRUBE                            blair.greenwald@ag.ny.gov
 *Senior Assistant Solicitor General*
BLAIR J. GREENWALD
 *Assistant Solicitor General*
    *of Counsel*

(*Counsel listing continues on subsequent pages.*)

17

ROB BONTA
  *Attorney General*
  *State of California*
1300 I Street
Sacramento, CA 95814

ANDREA JOY CAMPBELL
  *Attorney General*
  *Commonwealth of Massachusetts*
One Ashburton Place
Boston, MA 02108

PHILIP J. WEISER
  *Attorney General*
  *State of Colorado*
1300 Broadway, 10th Floor
Denver, CO 80203

KEITH ELLISON
  *Attorney General*
  *State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155

KATHLEEN JENNINGS
  *Attorney General*
  *State of Delaware*
820 N. French Street
Wilmington, DE 19801

AARON D. FORD
  *Attorney General*
  *State of Nevada*
100 North Carson Street
Carson City, NV 89701

KWAME RAOUL
  *Attorney General*
  *State of Illinois*
115 South LaSalle Street
Chicago, IL 60603

JENNIFER DAVENPORT
  *Acting Attorney General*
  *State of New Jersey*
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625

AARON M. FREY
  *Attorney General*
  *State of Maine*
6 State House Station
Augusta, ME 04333

DAN RAYFIELD
  *Attorney General*
  *State of Oregon*
1162 Court Street NE
Salem, OR 97301

ANTHONY G. BROWN
  *Attorney General*
  *State of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

PETER F. NERONHA
  *Attorney General*
  *State of Rhode Island*
150 South Main Street
Providence, RI 02903

CHARITY R. CLARK
 *Attorney General*
 *State of Vermont*
109 State Street
Montpelier, VT 05609

BRIAN L. SCHWALB
 *Attorney General*
 *District of Columbia*
400 6th Street NW
Washington, D.C. 20001

NICHOLAS W. BROWN
 *Attorney General*
 *State of Washington*
P.O. Box 40100
Olympia, WA 98504

## CERTIFICATE OF COMPLIANCE

I hereby certify that according to the word count feature of the word processing program used to prepare this memorandum of law, the memorandum contains 5,291 words and complies with the word-count limitations of Local Civil Rule 7.1(c).


*/s/ Blair J. Greenwald*
BLAIR J. GREENWALD

**Appendix**

**State Statutes with Civil Rights Protections for Transgender People**

| | |
|---|---|
| **California**<br><br>*Cal. [subject] Code* | Civil Code § 51(b), (e)(6) —public accommodations<br><br>Education Code<br>    § 220 — education<br>    § 221.5(f) — education and school athletic participation<br><br>Government Code<br>    §§ 12926(o), (r)(2), 12940(a), 12949 — employment<br>    § 12955 — housing<br><br>Penal Code  §§ 422.55, 422.56(c) — hate crimes |
| **Colorado**<br><br>*Colo. Rev. Stat.* | § 24-34-301(10) — definition<br><br>§ 24-34-402 — employment<br><br>§ 24-34-502 — housing<br><br>§ 24-34-601 — public accommodations |
| **Connecticut**<br><br>*Conn. Gen. Stat.* | § 10-15c — schools<br><br>§ 46a-51(21) — definitions<br><br>§ 46a-60 — employment<br><br>§ 46a-64 — public accommodations<br><br>§ 46a-64c — housing |
| **Delaware**<br><br>*Del. Code Ann.* | tit. 6,<br>    § 4501 — public accommodations<br>    § 4603(b) — housing<br><br>tit. 19, § 711 — employment |

| | |
|---|---|
| **Hawaiʻi** | § 302A-461 — school athletics |
| *Haw. Rev. Stat.* | § 368D-1 — education |
| | § 489-2 — definition |
| | § 489-3 — public accommodations |
| | § 515-2 — definition |
| | § 515-3 — housing |
| **Illinois** | tit. 775, |
| *Ill. Comp. Stat.* | 5/1-102(A) — housing, employment, access to financial credit, public accommodations, and education |
| | 5/1-103(O-1) — definition |
| **Maine** | tit. 5, |
| *Me. Rev. Stat. Ann.* | § 4553(5-C), (10)(G) — definition |
| | § 4571 — employment |
| | § 4581 — housing |
| | § 4591 — public accommodations |
| | § 4601 — education |
| **Maryland** | Education § 26-704 — schools |
| *Md. Code Ann.* | State Government |
| | § 20-304 — public accommodations |
| | § 20-606 — employment |
| | § 20-705 — housing |
| **Massachusetts** | ch. 4, § 7, fifty-ninth — definition |
| *Mass. Gen. Laws* | ch. 76, § 5 — education |
| | ch. 151B, § 4 — employment, housing, credit |
| | ch. 272, §§ 92A, 98 — public accommodations |
| **Michigan** | § 37.2102(1) — employment, housing, public accommodations, education |
| *Mich. Comp. Laws* | |

| | |
|---|---|
| **Minnesota** | § 363A.03(50) — definition |
| *Minn. Stat.* | § 363A.08 — employment |
| | § 363A.09 — housing |
| | § 363A.11 — public accommodations |
| | § 363A.13 — education |
| **Nevada** | §§ 118.075, 118.100 — housing |
| *Nev. Rev. Stat.* | §§ 613.310(4), 613.330 — employment |
| | §§ 651.050(2), 651.070 — public accommodations |
| **New Hampshire** | § 354-A:2(XIV-e) — definition |
| *N.H. Rev. Stat. Ann.* | § 354-A:6 — employment |
| | § 354-A:8 — housing |
| | § 354-A:16 — public accommodations |
| | § 354-A:27 — education |
| **New Jersey** | § 10:5-5(rr) — definition |
| *N.J. Stat. Ann.* | § 10:5-12 — public accommodations, housing, employment, credit, contracting |
| | § 18A:36-41 — issuance of guidance concerning a supportive and nondiscriminatory environment for transgender students |
| **New Mexico** | § 28-1-2(T) — definition |
| *N.M. Stat. Ann.* | § 28-1-7(A) — employment |
| | § 28-1-7(F) — public accommodations |
| | § 28-1-7(G) — housing |
| **New York** | Executive Law §§ 291, 296 — education, employment, public accommodations, housing |
| *N.Y. [subject] Law* | |

| | |
|---|---|
| **Oregon**<br>*Ore. Rev. Stat.* | § 174.100(4) — definition |
| | § 659.850 — education |
| | § 659A.006 — employment, housing, public accommodations |
| **Rhode Island**<br>*R.I. Gen. Laws* | tit. 11, § 11-24-2 — public accommodations |
| | tit. 28, §§ 28-5-6(12), 28-5-7 — employment |
| | tit. 34, §§ 34-37-3(9), 34-37-4 — housing |
| **Utah**<br>*Utah Code Ann.* | § 34A-5-106 — employment |
| | § 57-21-5 — housing |
| **Vermont**<br>*Vt. Stat. Ann.* | tit. 1, § 144 — definition |
| | tit. 9, § 4502 — public accommodations |
| | tit. 9, § 4503 — housing |
| | tit. 21, § 495 — employment |
| **Washington**<br>*Wash. Rev. Code* | § 28A.642.010 — education |
| | § 49.60.030(1)(a)-(e) — employment, public accommodations, real estate transactions, credit transactions, and insurance transactions |
| | § 49.60.040(29) — definition |
| | § 49.60.180 — employment |
| | § 49.60.215 — public accommodations |
| | § 49.60.222 — housing |
| **District of Columbia**<br>*D.C. Code* | § 2-1401.02(12A-i) — definition |
| | § 2-1402.11 — employment |
| | § 2-1402.21 — housing |
| | § 2-1402.31 — public accommodations |
| | § 2-1402.41 — education |