# Exhibit B

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT SEATTLE

_____

                                )
STATE OF WASHINGTON, et al.,     ) C25-01228-KKE
                                )
                Plaintiffs,      ) SEATTLE, WASHINGTON
v.                              )
                                ) January 22, 2026 -
UNITED STATES DEPARTMENT OF      ) 10:00 A.M.
EDUCATION, et al.,               )
                                )
                Defendants.      ) MOTION HEARING
                                )
                                )
_____

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE KYMBERLY K. EVANSON
UNITED STATES DISTRICT JUDGE
_____

APPEARANCES:

| For the Plaintiff States: | Ellen E.  Range<br>Attorney General's Office<br>7141 Cleanwater Drive S.W.<br>P.O. Box 40111<br>Olympia, WA 98504-0111 |
| | Jennifer K. Chung<br>Attorney General's Office<br>800 Fifth Avenue, Suite 2000<br>Seattle, WA 98104 |
| | William McGinty<br>Attorney General's Office<br>P.O. Box 40100<br>1125 Washington St. S.E.<br>Olympia, WA 98504-0100 |
| For the Defendants: | Brian C. Kipnis<br>U.S. Attorney's Office<br>700 Stewart Street<br>Suite 5220<br>Seattle, WA 98101-1271 |

**Proceedings stenographically reported and transcript produced with computer-aided technology**

THE COURT:  Good morning.  Please be seated.

THE CLERK:  Now calling case C25-1228, assigned to this Court, the State of Washington, et al., versus United States Department of Education, et al.

May I have appearances, please, starting with plaintiffs' counsel.

MS. RANGE:  Yes, Your Honor.  Ellen Range, Washington State Assistant Attorney General here, on behalf of the Plaintiff States.  And with me, I have Jennifer Chung and William McGinty.

THE COURT:  All right.  Good morning, counsel.

MR. KIPNIS:  Good morning, Your Honor.  Brian Kipnis, Assistant United States Attorney, for the defendants.

THE COURT:  Good morning, Mr. Kipnis.

All right.  We are here this morning on what amounts to cross-motions.  The government has moved to alter or amend the judgment with respect to the timing for compliance with the Court's order, and the plaintiffs have filed a motion to enforce.

I anticipate that the parties would like to address the Court with respect to their motions, and I'll go ahead and hear from the government first, given that they filed first.

Mr. Kipnis?

MR. KIPNIS:  Just to clarify, Your Honor, would you like me just to address the motion to alter and amend first and then allow counsel to argue their motion?

THE COURT:  They're really two sides of the same coin,

and so...  Tell me how you prefer to proceed.

MR. KIPNIS:  I think I would prefer to proceed that way, Your Honor, because, with respect, I think that the motion to alter or amend asks for a simple bit of relief and the other motion asks for a lot more that I would like to respond to.  But I'm flexible either way, Your Honor.

THE COURT:  That's fine.  Go ahead.  Let's hear on the motion to alter or amend first.

MR. KIPNIS:  Contrary to the States' argument, there's only one single area in which the Department is out of compliance with the Court's order, and that is in respect to the timing for the process of issuing new continuation decisions, which the Court ordered be done by December 30th.  The Department did not ignore this deadline; it is not being intransigent.  It recognized immediately that compliance with this deadline was not possible, thus, it asked the Court to amend the order to impose a different date for compliance.  That motion is the one now before the Court.

The Department believes that it can now complete this process by February 6th, 2026.  That is just over two weeks from now.

THE COURT:  Mr. Kipnis, when you say "complete this process," what process do you mean?  Do you mean the issuing of the new decisions or the actual issuing of funding?

MR. KIPNIS:  So the way we envision that it would work -- it's actually -- it's sort of a not-later-than date.

Some decisions might be issued before February 6th, but as we envision at how it would work is that for grantees that are now decided to be continued, that they would receive full funding for the calendar year, and that funding would be available to them within two or three business days of February 6th.

THE COURT:  Is it the Department's expectation that, to the extent decisions are made earlier on a rolling basis, that those grantees would be funded earlier?

MR. KIPNIS:  Yes, Your Honor.

THE COURT:  Or is it -- it's not sort of like a switch at the end?

MR. KIPNIS:  No, no.  It's simply once the continuation decision is made, that is the -- that is the switch, right.  That allows the funding to flow.  So in every case that there is a continuation decision, the expectation is that the funding would be there within two to three business days.

THE COURT:  And have any continuation decisions been made yet?

MR. KIPNIS:  Not yet, Your Honor.

THE COURT:  Okay.  Well, we're only about two weeks out, so...

MR. KIPNIS:  I appreciate that.  I appreciate that.  And I have discussed that with them.

THE COURT:  Well, I have concerns because the initial order set a deadline that was missed and then was extended --

just by virtue of asking for the extension, it was de facto extended.  But are they working on it?  Is it in process?

MR. KIPNIS:  Yes.  So as far as looking behind the -- into the tents, Your Honor, we have had conversations about understanding the Court's order, what they are permitted to do under the Court's order, that has required some time to filter that through counsel.  I understand that it would be conveyed to the staff who actually do this.  There is a process of education and, for lack of a better term, training because the Court's order does require a different process than they would normally follow and it does limit the types of information that they can look at, which also required some further discussion as to what, as we read the Court order, would be appropriate to examine and what would not be.

The States oppose this motion, but their opposition amounts to, basically, an exercise in finger pointing that really leads us nowhere.

The primary basis upon which plaintiffs oppose the department's motion is their --

THE COURT REPORTER:  Sorry, Mr. Kipnis.  Can you --

MR. KIPNIS:  Slow down?

THE COURT REPORTER:  Yes, slow down.

MR. KIPNIS:  I will endeavor to do so.

Let me start that portion over.  Plaintiffs oppose this motion but their opposition amounts to no more than an exercise

in finger pointing leading to nowhere.

The primary basis upon which plaintiffs oppose the Department's motion is their suggestion that the Department should have commenced the process of making new continuation decisions at the time of the preliminary injunction, but that is not what the preliminary injunction required.  The non-continuation decisions had not been set aside at that point.  Plaintiffs had only shown a likelihood of prevailing on the merits.

More importantly, the preliminary injunction did not require the Department to commence reconsideration of any of the non-continuation decisions at that point.  The Court's order was a preservation of the status quo as to some grantees, and any effort to undertake review at that point would have been wasted effort because the Court's later order on the cross-motions for summary judgment placed limitations on the reconsideration process, or the new consideration process, that were not present in the preliminary injunction motion or the preliminary injunction order.

Because February 6th is only two weeks away, the grantees have received interim funding, and plaintiffs have presented no evidence that an earlier deadline is or was feasible, the Department's motion should be granted.

Nothing is gained by denying the motion and holding the Department to a deadline that has now been shown to be infeasible

and has now passed.

THE COURT:  All right.

Ms. Range.

MS. RANGE:  So, Your Honor, I would be responding to their motion to amend and discussing our motion to enforce as well.

THE COURT:  Please.  Thank you.

MS. RANGE:  Yes.

Good morning, Your Honor.  I am Ellen Range, Washington State Assistant Attorney General, here on behalf of the Plaintiff States.

Defendants have spectacularly failed to comply with the Court's order and, in so doing, are set to accomplish what litigation could not -- an end of the programs that they have tagged as DEI.

A month ago, our grantees thought they had won.  They were celebrating a lawful process that reliably provided continuation awards by the end of the year, but that deadline has passed, and grantees are enduring an unfamiliar continuation process, with no ability to plan for the future.

Defendants' solution, a Rule 59(e) motion, is no solution at all because that could have -- because that rule does not allow parties to repeat arguments or introduce new evidence that could have been raised before, and the five-week interim awards do not alleviate plaintiffs' harm, as defendant suggests.  Instead, the

Court should institute plaintiffs' proposed compliance plan designed to ameliorate the escalating harms suffered by grantees and ensure defendants' compliance with the Court's orders.

We appreciate counsel's offer, or Ed's offer, I should say, that they have seen the light and they now intend to comply with the Court's order.  We still insist, Your Honor, that this Court should provide this compliance plan so we're not back here in two months decrying an interpretation that they took that was in violation of this Court's orders.

THE COURT:  What do you mean by that, Ms. Range, with respect to "an interpretation that they took"?  Do you mean of the summary judgment order?

MS. RANGE:  Correct, Your Honor.

So we have concerns from our meet-and-confer that they intend to review for discriminatory practices -- and this is just one example, Your Honor, and I will get into other ones later -- but that's very concerning to us because this Court specifically enjoined the directive procedure as part of the summary judgment order, and that would have prohibited them to do that type of review.

I raised that at the December 31st hearing, and the Carr declaration that was submitted afterwards did not address that.  So the Carr declaration talked about their process, and she could have, at that point, refuted that they intended to do that, but she did not, and so that still stands as a concern for us, Your

Honor.

THE COURT:  Ms. Range, can I ask you just to pull the microphone a little bit more straight toward you?

MS. RANGE:  Yes.  Yes.

THE COURT:  Just so I can hear you better.

MS. RANGE:  Yes.

THE COURT:  Thank you.

MS. RANGE:  So I will start, Your Honor, by briefly addressing the Rule 59 motion before addressing the need for a robust compliance plan.

The facts of this case do not square with the rare circumstances that the Ninth Circuit has approved for upending the finality of a Court's judgment.  There is no newly discovered evidence.  In their summary judgment opposition, defendants could have described the purported impossibility of making continuation awards by the end of the year, as plaintiffs requested, but chose not to.  There was also no interceding change in the law and there is no manifest injustice where the Court set the deadlines for the end of the year, following defendants' representations to Courts that they could and, in fact, planned to make continuation decisions by the end of the year.  Defendants only argued against this deadline, without supporting evidence, at the summary judgment hearing, and that was upon questioning by this Court. So it's not clear that they even intended to volunteer that, you know, it would take months, until this Court asked or Your Honor

asked defendants' counsel whether they could do so.

So Rule 59(e) motions are not for relitigating results a party does not like, and defendants' motion should be denied.

Turning to our motion to enforce, given defendants' former and current noncompliance, plaintiffs need the Court to use its inherent equitable powers to order and enforce a compliance plan. Courts may issue orders to enforce compliance with an order of the Court. Specifically, the orders that need enforcement are the Court's orders enjoining defendants from implementing discontinuances through other means, discontinuing grants based on performance issues caused by the discontinuances, and implementing the directive procedure.

Having retained jurisdiction on remand, the Court may use its authority to impose a compliance plan and modify the deadlines it already set for compliance.

Plaintiffs are asking for a compliance plan with three aspects: First, that this Court governs the process by which the continuation decisions will be made, order that the interim awards be increased from five weeks to six months, and provide transparency through status reports, accounting, and discovery. A robust compliance plan is necessary in light of defendants' prior failure to comply with court orders and their recent actions in initiating the continuation process.

The PI enjoined the implementation of discontinuances through other means. That meant that it should have returned the PI

grantees to the status quo where they would have been treated the same as the non-discontinued grantees. But, instead, defendants initiated a separate continuation process for the other grantees and awarded continuations in December for the grantees that were not discontinued and did not do the same for our PI grantees. And that's made clear, Your Honor, in the Sharp declaration at Docket 332 at paragraph 4.

Defendants' actions with respect to the current continuation process raises concerns that they are implementing the discontinuances through other means for three primary reasons. First, there's a simple and obvious point that by failing to make continuation decisions in December when they were supposed to, defendants have continued implementing the discontinuances that the Court has already vacated.

Second, defendants are asking for performance data they did not request from the non-discontinued grantees. For most non-discontinued grantees, they made the decision based on the annual performance reports supported in the spring, and that is made clear, Your Honor, in the Sharp declaration, Docket 332, at paragraphs 4 through 5 and 11 through 13, as well as the Kilgus declaration at Docket 314 at paragraph 7. And Kilgus worked for the nonprofit that worked on a national level collecting this performance data and providing it to defendants, so he is in the perfect position to understand what kind of performance data they were actually collecting.

For non-discontinued-grantee first years, they requested updated performance data that was from January 1st through to August, but they excluded discontinued grantees from that process. So, again, that's at the Kilgus declaration, Docket 314 at paragraph 8. Non-discontinued grantees received their continuation awards in early December based on this performance data, but for discontinued grantees in Plaintiff States, defendants are asking for additional performance data that they did not request from other grantees. And that's clear, Your Honor, from the exhibit to the Carr declaration at Docket 349-1 at page 2. There, for first-year grantees -- and keep in mind, for first-year grantees -- they were only four months in before they were told that their grants were discontinued. So for these grantees, they're being told that they need to provide performance data from August 1st through December 31st. This is like in the time when they're supposed to be closing out these grants. I mean, this just -- it doesn't make any sense why they would be asking for that specific time range. And it's concerning because the Court specifically ordered defendants to not discontinue based on performance issues caused by discontinuances.

Third, defendants have stated that, without appropriations, they do not have sufficient funds to fund grantees for operations in 2026. Now, we have just heard, now, that it sounds like we are going to get fully funded for the full year, but we still

have concerns because they have also represented that there's no funds for 2027, and we haven't heard otherwise on that. And, normally, fiscal year 2026 funds would be available for that continuation award. And according to the Byrd declaration that was submitted, Your Honor, instead of having 200 million BSCA funds, the Bipartisan Safer Communities Act funds, instead of having 200 million available, they only have 60 million available, and that's because they've spent this money, they've, you know, had it go out the door going to new grants and by front-loading the grantees that received continuations in December, in early December, and front-loading the new grants.

THE COURT: Ms. Range, can you elaborate? What do you mean that you just learned that you may get full funding?

MS. RANGE: Well, counsel just represented -- so previously, at the December 31st hearing, counsel said that we were correct in our fears that they were not going to have funds for our grantees to operate throughout the rest of the year. And, of course, this is very alarming for our grantees, right? Just now, we have heard that there will be funds, and so that's great, so happy to hear it. But our grantees need to know if there is money available in 2027, and if there is not, they need to know that now, they need to understand that so they can plan for, you know, their budgets and to make decisions about whether they want to even participate. So this is important information that we're going to be looking for, Your Honor.

THE COURT:  So let me just pause you right there.  A couple questions.  One, is 2027 funding within the scope of this litigation?  And, also, in a continuation decision that the grantees will be receiving, whether that's February 6th or January 30th, would that information normally be provided?

MS. RANGE:  So, Your Honor, you enjoined that grantees -- or that defendants could not recompete funds, and the idea, the object of that, was to make sure that there would be funds that would be available for our grantees.  And we think that they're implementing discontinuances through other means, such that they're exhausting funds that should normally be available to our grantees at the end of this year, and that they are doing that in an effort to implement these discontinuances through different means other than the best interest determination that is now -- that Your Honor has found as contrary to law.

THE COURT:  I don't think that really answers my question.

MS. RANGE:  Oh, I'm sorry.

THE COURT:  So when you receive a notice, and I understand, based on the record, historically, these are received at the end of the year; you get the notice of continuation.  It sounds like past practice has been that they're routinely continued, that there is not -- at least I'm not aware of anything in the record suggesting that they are not.  So when you

receive that award, say at the end of 2025, would it tell you about 2027 or would it just say your five-year grant, you're getting Year 4, it's starting January 1st?

MS. RANGE:  Yes, Your Honor.  So you're right, in that you would only -- when you received your GAN, you're only getting funding for one year.

THE COURT:  Okay.

MS. RANGE:  That is correct, Your Honor.

However, it has also been the practice of this program to use fiscal year of, say, 2025 for operations in 2026.  Fiscal year 2026 for operations in 2027.  Well, lo and behold, these fiscal year 2026 funds, they only have 60 million left out of 200 million, so that is abnormal, and that's why we have serious concerns that they would be implementing these discontinuances through other means by exhausting funds, when they did not have to do that.

So in light of defendants' actions, plaintiffs request an enforcement order designed to effectuate the Court's prior orders.  Continuation decisions would need to be made by January 29th and awards by January 30th.

Now, I would note we appreciated Your Honor's questioning about these decisions and then the resulting awards and whether there would be a deadline for that, because in the proposed order that they proposed, they only provided a deadline for the decisions; there was no deadline for awards resulting from those

decisions.  And we think, given our very recent history, we need deadlines for both.

And we're also requesting status reports explaining discontinuances and the basis for, if defendants show -- you know, if they're going to downgrade any of these award amounts, we need to have an explanation for that within 24 hours of the decision deadline set by this Court.

We ask that this Court prohibit defendants from treating any discontinued grantees in Plaintiff States worse than similarly situated grantees who receive continuation awards, and that is, Your Honor, in their use of additional performance data that they did not request from the continued grantees in early December, and also clarify that they cannot use exhausted funds as a basis for discontinuance if defendants created the conditions for the lack of funds, including by front-loading or awarding new grants.

So, again, as of today, it sounds like that might not be an issue, but we think it needs to be a part of a Court order and so we can then come back, if need be, and point to that.

Plaintiffs' request for six-month interim awards is also within this Court's enforcement powers, and I would like to start by updating our request as it stands today and address why these awards are necessary and explain why the Tucker Act does not apply.

Plaintiffs are requesting that the Court enter a minute order, sometime today or tomorrow, ordering defendants to issue

six-month interim awards within 48 hours. And these awards are necessary for two reasons. First, they alleviate at least some of the harm caused by defendants' failure to comply with the Court's December deadlines. Defendants' actions have caused chaos and confusion at a time when plaintiffs were supposed to have certainty. We have students who are leaving mental health graduate programs, program staff and school-based mental health providers have been let go. And that was documented, Your Honor, at Docket 288 at Note 7. And defendants further, in part, agreed. They offered these five-week awards as necessary to mitigate the irreparable harm caused by their noncompliance with the Court's orders. But to do this, to actually even come close to mitigating this harm, grantees need six-month awards today. Our grantees have upfront costs covering the school year, and for most grantees, the six-month funding could get them through the end of the school year, paying for scholarships, salaries, and providing mental health services to kids who are attending through the school year. These costs do not accrue on a week-by-week basis. And for one example, Your Honor, in Maine, the Welter declarant described how these five-weeks awards have not inspired the budgetary confidence necessary to hire a mental health provider in a rural school district where the services are no longer available.

On the other hand, it is hard to see what harm defendants can claim, considering that they told the Ninth Circuit that they did

not have another lawful basis for discontinuing plaintiffs' grants, so that they would be forced to issue continuation awards by the end of the year if they did not get a stay.  Well, they didn't get a stay, Your Honor.  So given their plan to issue continuation awards, there should be no harm that defendants could claim from this remedy.  Second, this Court enjoined defendants from implementing the discontinuance decision by other means, and failing to make any continuation decision at all, as ordered by the Court after their prior unlawful decision was vacated, does exactly that.

This Court may award these interim awards because they are a form of equitable relief in service of enforcing the Court's orders and remedying harm caused by defendants' noncompliance.

This equitable relief does not implicate the Tucker Act. This act only applies when claims are based on money-mandating statutes or contracts, and that is not the case here, where plaintiffs have no contractual right to six-month interim awards. Rather, they possess protective injunction rights, established under the Court's orders, where they should not be suffering further harm from defendants' illegal actions.  To obtain relief from defendants' noncompliance with court orders, plaintiffs have no other place to look but this Court and this enforcement action.

THE COURT:  Ms. Range, is this essentially a contempt proceeding under another name?

MS. RANGE:  No, Your Honor.  We've moved for a motion to enforce because we think a contempt finding is a serious finding.  And so if, you know, we are proceeding in that direction, we would want to first get discovery from defendants, as we've requested, so we can get on the record, you know, fully not just their failure to comply, with defendants missing the December compliance deadlines, which is obvious and fully documented, but also their failure to comply with the preliminary injunction, which we think is quite serious.

They did not initiate the continuation process for our PI grantees and, instead, set them aside, and that's fully against the preliminary injunction, and we also have concerns about this continuation process.  And so if we're going to move for contempt, we don't want to do it in a piecemeal fashion; we want to address everything at once, Your Honor.

THE COURT:  And do you have any authority that would support the Court's ability, outside of the contempt context, to award a six-month monetary payment?

MS. RANGE:  Yes, Your Honor.  So contempt -- or enforcement motions derive their authority from the same exact authority for contempt motions.  It's the inherent equitable power of the Court to enforce your orders.  And so for us, you know, the fact that the equitable monetary relief in the Ninth Circuit case, the *Northwest Environmental Defense Center vs. Bonneville Power Administration*, there, the Court ordered a

federal agency continue payment of funds while the administrative agents -- or while the agency was revisiting an arbitrary and capricious decision.  So we think that that, Your Honor, is good authority for this Court to issue those awards.

THE COURT:  I read that case, and I do have questions as to whether that posture remains good law.

MS. RANGE:  Yeah, I hear you.  Because at least for there, the equitable remedy that was awarded, that was a part of the -- it's review of the agency action, correct?  So it was looking at and it was finding that there was an arbitrary and capricious action by the agency.

But here, Your Honor, we are outside of that because this is about this Court's ability to enforce its own order.  So we're not -- the concern under *NIH* is that this Court would be enforcing a contractual right, and then, again, here, we don't have a contractual right to that six months.  Instead, this Court would be enforcing its own orders, and this is the remedy to defendants' noncompliance.

THE COURT:  And is that true?  Is it truly enforcing the Court's orders, where the Court did not order payment, the Court ordered decisions?

MS. RANGE:  Yes, Your Honor, because as long as they are not doing the continuation decisions, they are implementing their discontinuances through other means.  So we are in a situation where our grantees are hurting because of defendants'

noncompliance with that court order, and what we need is -- you know, in assessing a remedy for this Court, it's looking at the equities and fashioning a remedy that would put plaintiffs back where they belong.  And for us, according to defendants in the representations to the Ninth Circuit, they were going to have to issue these continuation awards because there was no other basis for them to find that a discontinuation should be implemented because the only thing they had was that best interest determination.

So given that situation, at this point in time, our grantees should have these continuation awards in effect.  So this is a sort of remedy that not only brings plaintiffs back to where they belong, but it also makes it so there's not a perverse incentive for defendants to not comply with this Court's orders.  Because as long as they're not complying, they're winning this litigation.  And so any noncompliance on their behalf, the consequences should fall on defendants, not on the plaintiffs.

The plaintiffs also require an accounting and discovery.  And for these requests, we stand on our briefing, Your Honor, but I do want to further explain why the Byrd declaration does not provide us with the information we need.

The Byrd declaration did not account for fiscal year 2025 funds.  There are two sources of funds, the Bipartisan Safer Communities Act funds and regular appropriations, and the declaration discussed the BSCA funds and the appropriations for

fiscal year 2026, but he didn't address the regular fiscal year 2025 appropriations, and that means there's $211 million that's not accounted for. We don't know how much of that is used, how much of that is left, and whether there's impoundment at issue. Those funds are relevant because they did not lapse under the Court's order, and that's something that the Byrd declaration didn't even recognize. And so that's one reason.

Also, the expenditures are unclear. We are still unclear where the 208 million that funded the new grants comes from. If these awards depleted funds for PI grantees, it would have been in direct contravention of the preliminary injunction.

It also did not say the total for front-loading grantees and where this money came from. The Byrd declaration at paragraph 7 only attests to 6 million of fiscal year 2026 funds that were used for front-loading, but we know just on the basis of them awarding $208 million to only about 35 grantees that there were significantly more than that in front-loading.

We also have concerns that defendants again are going to claim exhaustion of funds as a basis for discontinuing grants. And that's not just for this year, Your Honor. We have grave concerns for 2027 because, as I explained earlier, normally, for fiscal 2027 -- or, sorry, normally for operations in 2027, fiscal year 2026 funds would remain unobligated until the end of 2026 and there would be $200 million in BSCA funds. But, now, here we are at the beginning of the year and there's only 60 million

left, according to the Byrd declaration, and that's due to defendants' practice of front-loading and new awards that went out.

So we need to know, essentially, if defendants gave away the store, in violation of the Court's order, and if there's anything we can do about it.  We need to know if our grantees should be prepared for there to be a lack of funds for 2027, just for their own planning purposes.

So unless Your Honor has further questions, I'll conclude.

THE COURT:  What's the plaintiffs' position with respect to the timeline that Mr. Kipnis discussed regarding -- it sounds like there will be forthcoming, hopefully soon, rolling decisions, followed by a few days afterward with funding for those grants that are -- grantees that are continued.  I believe I understood Mr. Kipnis to say that the government was proposing February 6th as the no-later-than date for both funding and decisions.

Does that result in a gap for the plaintiffs' grantees for those who are continued or does that not?

MS. RANGE:  Well, they would have to -- if those GANs are issued as Mr. Kipnis described, potentially after February 6th, then they would again have to be backdated in order for there not to be a gap.

But our concern more is, how long plaintiffs, our grantees, would have to wait in order to find out because there's this --

hanging over everyone's head is this degree of uncertainty.  We were supposed to have certainty at the end of December and they don't have that.  And so we proposed January 29th as the decision deadline and January 30th for the resulting awards to go out, and that's supported, Your Honor, by defendants' actions for the continuation awards that went out in early December.

So we had the end of the government shutdown that happened on November 12th and then awards were going -- continuation awards were going out on December 5th, and that's made clear by the Sharp declaration.  And so that's a time span of 21 days.  And if defendants initiated the continuation process for us on January 9th, then they certainly should be able to issue those GANs within 21 days, which would be January 30th.  So that's, Your Honor, why we think that that is the deadline that should apply.

THE COURT:  All right.  Thank you, Ms. Range.

Mr. Kipnis.

MR. KIPNIS:  Your Honor, the States' motion to enforce seeks to compel the Department's compliance with orders that the Court never made.

Starting with the preliminary injunction, the States suggest that instead of preserving the status quo, the Court intended to place the Department under an affirmative mandate to initiate the process of making new continuation decisions at that point.  That is not correct.  The States did not request and the preliminary

injunction contains no affirmative mandate requiring the Department to commence making new continuation decisions at that point.

The States tried to support their argument by relying on an isolated sentence in the Court's memorandum opinion, but they do not cite any provision in the Court's preliminary injunction language that requires this, and the reason for that is because the language is not there.  Self-evidently, defendants cannot be held to account for failing to abide by an order that the Court never made.

It also bears mention, too, to the extent that plaintiffs seek -- have indicated that they seek to compel compliance with the preliminary injunction or to seek contempt sanctions for violating the preliminary injunction, first of all, that preliminary injunction was in no way violated, but, second of all, that preliminary injunction has expired.  Now that the Court has issued a judgment in the case, the preliminary injunction no longer exists as a matter of law.  To cite a case for that, Your Honor, *U.S. Philips Corp vs. KBC Bank*, 590 F.3d 1091, Ninth Circuit, 2010, at page 1093.

Also, Your Honor, the fact that the Department is requesting updated performance data from the non-continued grantees in no way indicates that the Department will disobey this Court's order that it not discontinue grants based on performance issues arising from the additional non-continuation decisions.  The

Department, in requesting updated performance reports, is simply following its standard practice in requesting the most current performance information to inform its continuation decisions, and that is something that the Court did find was appropriate in its order, that that was information that the Department was within its right to consider in making continuation decisions.

The States are also incorrect that the Department is treating other grantees more favorably. The Department has requested the very same information from all grantees. It is the government shutdown that accounts for the time differential. As to grantees who did not receive non-continuation notices, the Department expected to make continuation decisions in September and October and requested updated performance information at that time, and that was when it was expected that decisions would be made on those grants, but it was only because of the government shutdown that the Department's decision, based on this information, was delayed until December.

In similar fashion, when the Court ordered the Department to make new decisions on the non-continued grantees, it requested the same information from them; however, because the Court's order came out on December 23rd, the request for current information was made only recently in response to the Court's order. To the extent that the State is accusing the Department of not -- of refusing to answer grantees' questions, it has not and it is still not refusing to answer grantees' questions;

however, those questions should be posed directly to the Department by the grantees themselves concerning specific concrete facts so that they can be answered by the Department authoritatively and directly by Department personnel.

The State does object -- or the Department does object to the States' repeated use of information obtained in informal conversations between counsel and then reporting it inaccurately to the Court.  In that respect, Your Honor, they have never identified any misrepresentation that this counsel has made or the Department has made to the Court, notwithstanding the representation in their former argument to the contrary.

I want to turn to the question of interim funding.  It's a little -- apart from the legality of this, which is nonexistent, the question has to be asked, why did the grantees need six months of interim funding, even if it was possible, in light of the fact that the Department is committed to making these decisions not later than February 6th?

Excuse me.

Some, maybe all, of the grantees will be continued, or most -- we don't know what the number is -- but as I have represented to the Court, it's the Department's intention to fund those grantees for calendar year 2026.  If they receive favorable decisions, they don't need interim funding; they certainly don't need six months of interim funding.  As to grantees who receive, again, non-continuation decisions, they are not entitled to

funding; they are still not continued.  And so under those circumstances, the Court would be, essentially, awarding them federal funds that they are not entitled to and that the Department could never recover, and that is harm.  Contrary to the States' representation that six months of interim funding would cause the Department no harm, it certainly would cause the Department harm.

Now, the States' request that the Court order that the non-continued grants be funded, despite having represented previously that this Court could never be required to order the Department to fund these agreements, this is simply a ruse to get around the Court's jurisdictional limitations.

If the awards are based on the grants, then certainly there is a Tucker Act problem.  If the awards are, essentially, compensatory damages, this Court's jurisdiction is based on the APA, and under the APA, monetary damages are not available.  Compensatory damages are not available to be awarded by the Court.

The plaintiffs have dressed this request up as a compliance measure, but there is no order requiring the Department to expend federal funds on these grant agreements as to which the Court needs to compel compliance.  Plaintiffs make no serious argument that they're not estopped from making this request.  All of the elements of judicial estoppel are present, and plaintiffs make no argument to the contrary.  The law simply does not permit

plaintiffs to mislead the Court and the Court of Appeals about their intentions.  Plaintiffs unambiguously represented that they would never seek an order requiring the Department to fund these agreements, and, yet, here we are.

THE COURT:  Well, to that point, Mr. Kipnis, what about plaintiffs' point that -- and I know it wasn't you; it was different counsel for the government -- represented to the Ninth Circuit that there was no basis, other than the jurisdictional argument they were making in support of the stay, on which to discontinue the grants, such that they would have to continue them by the end of the year?  That was the argument made to the Ninth Circuit.

MR. KIPNIS:  Well, I think that -- if I'm understanding that argument, Your Honor -- I'm sorry, Your Honor.  Can you repeat that question?  I'm not sure I understood it.

THE COURT:  Certainly.

So Ms. Range has argued, and I recall this representation, that the government, in the Ninth Circuit argument on the motion to stay, said that if the stay was not granted, the government would have to fund the grants by the end of the year; that there was no other basis on which to deny them if the stay was not granted, and the stay was not granted.

MR. KIPNIS:  They would have no other basis to fund the agreements by the end of the year?

I think if I'm understanding that argument, Your Honor, it's

simply stating that under the Court's preliminary injunction -- honestly, Your Honor, I don't understand the argument myself.  I can't explain that.

To the point, however, Your Honor, I don't think that counsel was arguing that there was a basis to fund the agreements other than -- that there was a basis to fund the agreements except for if continuation awards were made.  Perhaps that was what was meant.  I don't know, Your Honor.

That said, Your Honor, it's been our consistent position throughout that requesting funding in these proceedings is not jurisdictionally permissible because of Tucker Act limitations.  It would require it to be exclusively within the jurisdiction of the Court of Federal Claims.  And to the extent plaintiffs would represent -- would make that request to the Court, then we would be running into a problem with the *NIH* case, with the *State of California* case.  That would have required the Court, I believe, based on the rationale of her ruling against -- denying my motion to dismiss, to basically recognize that jurisdiction was in the Court of Federal Claims, not in this court, and that certainly was the basis for the Court of Appeals to essentially deny the stay, which was the representation that at no point were the States seeking that there would be an award of compensation from the Department.  And based on that representation expressed in the Court of Appeals opinion, the stay request was denied.  So there's definitely been a change of position both, I think, by

this Court and by the Court of Appeals.

Now, the Department has never taken the position they do not need to fund the grants at all.  This is a representation that the States made in their memorandum, and it grossly misstates the Department's position.  As I indicated to you, Your Honor, today, if the Department decides to continue a grant agreement, its intention is to fund those agreements for the entirety of calendar year 2026.

2027, calendar year 2027, has never been an issue in this litigation.  In order to qualify for funding in California -- in calendar year 2027, a grantee would have to go through a new continuation process and receive a new favorable continuation decision before being entitled to grant money.  So there is no -- not only is there no basis in the Court's order to compel compliance that would somehow require the Department to make guarantees about calendar year 2027 funding, there's no grantee at this point that's entitled to calendar year 2027 because every grantee -- not just these grantees, but every grantee -- who has a continuing grant needs to go through a continuation process again each year.

THE COURT:  I just want to make sure I understand what you just said, Mr. Kipnis.

MR. KIPNIS:  Sure.

THE COURT:  So in your reply brief, you had indicated that the government has the authority at all times to issue

partial payments to grantees, and I believe that was in the context of supporting the five weeks of payments. There was not a citation to that representation, and I'm wondering -- it may be irrelevant based on what you just said -- I was wondering if that was a practice or if that was something that the grantees, you know, have always had to contend with. But it sounds like what you are saying is that to the extent grantees receive continuation awards, they will be for the entirety of the year; is that correct?

MR. KIPNIS: So, yeah, that -- I made that representation with respect to the interim awards, and I think there is -- there is sort of a conflation of the interim-awards discussion with the grant funding. That said, this is a standard practice of the Department, and I was only making that point, yes, to indicate that there is flexibility in the Department to cover shortfalls, if shortfalls need to be covered. The way that the Department -- and also to indicate that, yes, no grantee is entitled to full funding on day one of their grant agreement. That is normally the way it's done. But as I'm informed, that sometimes the Department, in order to stretch its funds and maybe cover more grantees, might only partially fund a grant so that it can partially fund a bunch of grants, and then fill in with money later, when money is expected, because of the other great uncertainty in this process, which is: What will Congress do? And so it is a common practice. I don't know that it's -- I

don't know that there's any particular statute -- as far as I know, there's no statute or regulation that applies. There's nothing in the grant agreements that says, as far as I know, that day one, the grant has to be funded fully for the year. It's just budgetary flexibility that's normal day-to-day operations for the Department. But the proposal here is not to do that. The proposal was simply -- the representation was basically made to say, through this budget flexibility, they do think they can cover the grants, they do believe they could cover the interim funding.

Similarly, the States' request for an accounting and discovery as a supposed compliance measure has no basis in a lawsuit that is not about money. Plaintiffs did not state a cause of action for accounting or seek an accounting as a remedy in their complaint. Such a request should not be countenanced here, as there's no applicable waiver of sovereign immunity that makes the federal government liable for an accounting, even if one had been requested in the complaint, which it was not.

Plaintiffs' claim for an accounting is largely based on concerns about what the Department might do in the future based on, it seems, suspicions and, to some level, some paranoia; however, the only thing that's in issue in this litigation, Your Honor, the only thing that the Court ordered, was that the Department issue new non-continuation decisions. That is something the Department proposes to do. It's regretful that we

could not meet the deadline that the Court initially ordered, but the Department has proposed a new deadline to comply, and, hopefully, the Court will see fit to move that deadline so that the Department can do what it has indicated that it will do. That is the single issue of compliance in this case.

And while plaintiffs attempt to frame their request for an accounting as part of a compliance plan, there's no call for such a measure to enforce compliance with requirements that do not exist in the court order.  In other words, there has been no lack of compliance that would or could justify such a measure.  As I said, the Court required the Department to issue new continuation decisions for these 138 grant agreements.  Nothing more.

Plaintiffs ask this Court to overstep its boundaries in asking for measures that will permit the States to intrude on the Department's decision-making process while the process is under way.  The law is very clear here.  The Court has identified for the Department what it needs to do:  Issue new administrative decisions that conform to its ruling.  Having done so, the Court has executed its role under the APA.  At this point, it is for the Department to exercise its administrative discretion and make new continuation decisions.

The States ask the Court to presume that the Department will not do what it said it will do or not do it lawfully.  The Court may not engage in that presumption.  There is a presumption of regularity that applies here.  The Department will do what the

Court has asked it to do.

Any intervention in the Department's process before it makes new final decisions is premature and without a jurisdictional basis.  To allow plaintiffs to insert themselves in the middle of this process, with their proposed runaway compliance plan, should be flatly rejected as an unlawful and unwarranted intrusion on the agency's administrative process.

Finally, the declaration of Mr. Byrd completely refutes the plaintiffs' insinuation that the Department is engaging in some devious plot to move government funding around so as to deny funding to grantees benefited by the judgment.  The budgetary process is fully explained.  Front-loading is not some mysterious process that the Department instituted in this instance to shuttle away money from the grantees.  That's a notion that is just wild.

When the Department uses front-loading, as it did in this case, it is often because there are expiring funds in a budget allocation, and in order to use those funds all up before it expires and they no longer have access to it, they will often, as they did here, front-load grants.  As I said before when we were talking about this in the context of interim funding, as needed, the government has -- the Department has discretion to obligate and deobligate funds.  So if it were for some reason to run short on funds because of front-loading, something that we don't expect to occur here, that front-loading can be deobligated and the

funds can be reobligated elsewhere.  That is the flexibility that they have.  But this is not a process that was used to, essentially, undermine the Court's jurisdiction here.  There's just no basis for that.

Also, the Byrd declaration demonstrates that the Department didn't structure its budget request in order to short itself on funding for these grant agreements.  It simply proposed a different funding mechanism, where the funds would go, and it made a request for funding in that funding mechanism.  It didn't matter anyway because Congress marked up bills from both sides of the house -- or both sides of Congress essentially allocated a very sufficient amount of money in the pot that the Department was asking it to zero out.  So that also is wild suspicion that doesn't indicate anything.

The Byrd declaration sets out the very sources that the Department has to draw on to fund these agreements, as well as possible funding sources available in the future, depending on Congressional action, the great unknown.  Okay.  What Congress does in the future, whether we are going to have a budget at the end of the month, these are unknowns that every grantee has some unfortunate exposure to because that is the way government works. And when you take a grant, you essentially take with the grant the uncertainties that come with having a grant from -- you know, that is fund funded through Congressional action.

In short, there's no legal basis for the Court to micromanage

the Department's funding decisions, and plaintiffs' motion gives it no reason to do so.

If the Court doesn't have any more questions, I'll...

THE COURT:  Well, what's the status of the concern about discriminatory practices and additional work with the grantees to address those alleged practices?  I think that was discussed.  Ms. Range raised it now, but I recall it being discussed in the emergency hearing on New Year's Eve.

MR. KIPNIS:  Well, part of this is a phenomenon that I'm complaining about, where statements that I make are taken out of context, that are made between counsel informally.

We had a hypothetical discussion at one point about what things the Department might consider in making new grant decisions.  I'm not somebody who's very -- not at all educated about that process.  One of the things we did talk about, I said perhaps maybe it's this, I didn't say it was necessarily that, and from that point on, Ms. Range has portrayed that as I said they were going to do that.

I don't personally know what role, and I'm not sure they entirely know, what role the fact that some grantees may have measures that are perhaps beyond what is allowable under the discrimination laws, what that may -- what role that may play in the process.  The Department does know that they can only rely on performance data for that information.  It's also a question of whether -- to the extent that's a new priority or not.  I don't

believe it is a new priority, Your Honor, but that's just my opinion, because antidiscrimination provisions in grants have probably been in every grant agreement since the 1960s.  It's a very standard provision in grant agreements.

So the bottom line is, Your Honor, I don't know, and to the extent that it has been portrayed to this Court that I made representations that it would necessarily be a part of the process, that's false too.

Overall, Your Honor, I think that the notion that the Department is going to do something that it's not supposed to do, so that the Court should now intercede on the assumption that the Department is not going to comply with its orders, that should not be the way things work.  The Department exercises administrative discretion.  It should be allowed to fail.  If it does fail, then there will be consequences.  However, trying to act prophylactically to control the Department's discretion, without any failure of any compliance requirement by this Court except for timing, is just simply not the way that this Court should work.  It's not the way that the Executive Branch should be allowed to do its business.

The Court should simply act on the motion to extend the deadline, hopefully, favorably to the government, and allow the government to proceed and make these non-continuation decisions.

I did, excuse me, want to clarify one thing because I'm not sure if the Court misunderstood what I said or maybe just

misstated.  But as we envision it, the non-continuation decisions will all be made by no later than February 6th, I think is the date, and then the money that comes with getting a favorable continuation decision will be available to the grantees, we expect, within two to three business days.  So they should know, if they have a favorable continuation, they can start acting on that, and the money will be there presumably in the next two to three days is what we're expecting.

THE COURT:  And then would those awards, to the extent grantees receive favorable decisions, then be backdated to avoid a gap?

MR. KIPNIS:  Yes.  Well, they have some funding already to act on.  We have already provided them some funding.  And then, yes.  I mean, they are available for use during the calendar year for expenses.

THE COURT:  All right.  Thank you, Mr. Kipnis.

MS. RANGE:  So, Your Honor, I will just address a few points made by Mr. Kipnis.

So the suggestion that the order -- this Court was required to set out an affirmative mandate to initiate the continuation process as part of the preliminary injunction is a narrow, crimped understanding of what it means to enjoin discontinuances, in that they cannot be implemented through other means.  If you are not initiating the continuation process, you are implementing that discontinuance.

In regards to -- you know, they stated -- defendants have stated that they requested the same information from our grantees that they requested from the grantees that received continuation awards in early December.  The record shows otherwise.

We were requested for performance data -- our first-years were requested for performance data from August 1st through December 31st.  There's no way that that information was requested from grantees who received continuation awards in early December.  That's just like factually impossible.

And, also, what is made clear in the Sharp declaration, as well as the Kilgus declaration -- and Mr. Kilgus, again, has this national perspective where he was able to attest that the decisions that were made, those continuation decisions, were made based on the annual performance reports submitted in the spring.

In regards to this issue around the Tucker Act, prospective funding is not compensatory damages.  So their argument to say that the six-month awards would somehow be compensating us for past monetary damages is inaccurate.  We would be asking for six-month awards as part of this Court's equitable remedy, and it is not pursuant to some contract that we have at hand.

In regards to the representations that were made before the Ninth Circuit, I do have that, Your Honor, for your reference. Defendants represented that they had not identified any other reason to discontinue the grants without a stay and would, therefore -- this is a quote -- "have little choice" but to issue

any continuation awards before the appropriation expired on December 31st.  And they also stated that the appeal would be mooted shortly because "the funds are likely to be obligated...to one set of recipients or another."  And then, again, they said, "We can't use the money for two purposes.  That's why we're coming to the Court and saying we need resolution of this relatively quickly because we need to be able to parcel this out in an orderly fashion before the end of the year."  So certainly those were the factual representations that they made to the Ninth Circuit, and facts shouldn't change based on the legal arguments of the day.

In regards to the 2027 operations and the continuation decision that would happen at the end of the year, we are not saying that we are entitled to continuation awards for 2027.  We are saying that defendants cannot implement discontinuances through other means.  That is, they cannot create conditions for discontinuances based on a lack of funds.

And this practice of theirs -- first of all, these new grants that were awarded on December 11th, that competition did not need -- those awards did not need to go out before our multiyear grants received their continuation awards at the end of the year, as defendants purported to be planning to do.  So that should have happened first, before the new awards went out the door, so they would then know how much money needed to be available.

And this process -- this practice of front-loading is

unusual, as is attested by Declarants Sharp and Kilgus where -- you know, Byrd was able to point to other places where front-loading did occur, but we would point out, Your Honor, that the TRIO grant programs are currently under litigation, so the fact that they're front-loading there suggests that they might be obligating funds away from their disfavored grantees there.

But we also supplied for this Court a -- it was a notice, I think, of obligated funds by the Department of Ed that was a part of the HEP-CAMP litigation, and that was attached as an exhibit as part of the Joint Status Report, and that's how we first learned of this practice by defendants to squirrel away funds into other grants, and, therefore, it would then deprive the litigating grantees of any funds should a continuation award be granted.

And I would point Your Honor to the notice inviting applications for this recent grant competition, and in there, there's language that says that the Department anticipates making awards for the full 48 months using available appropriations. Now, that language, if you were to go back -- so I know our complaint and in our motion for preliminary injunction, we walked through the various invites for these grant competitions. If you were to go back through and look, that language doesn't appear anywhere. They've never, for these programs, front-loaded these grants. Brand-new grants, they're loading up with all this money. They have never done that before. So this is unusual.

It does raise concerns, especially if suddenly -- usually we have 60 million -- or $200 million of fiscal year 2026 funds, and those are the funds that would be used for 2027 operations, and, lo and behold, we don't have that money anymore. So that's why an accounting is necessary and discovery is necessary as well, Your Honor.

Lastly, Your Honor, I will just address this discriminatory practice, this representation made to me by counsel. And you have just squarely asked counsel: Well, are they doing this? Is this something that they're doing? It is very frustrating. In my mind, it is something that counsel should know. If that is a representation that he made to me during the meet-and-confer, that that was happening, and now the answer is "I don't know if it's happening," isn't that something that should be found out and either refuted, "No, we're not doing it" or confirmed? But either way, the sort of evasiveness around what it is that they're doing during this continuation process is precisely what raises concerns for us. We're happy to hear otherwise, we're happy to have that refuted, but the Carr declaration didn't do it. We wanted the Carr declaration to say, "No, we're not doing this." And that's precisely because this Court has enjoined implementation of the directive procedure. And so if that's what they're doing, they're, again, hunting for discrimination practices, when that's what they were told to do as part of this February 5th memo, and that's what they're doing, well, they have

been enjoined from that. And there is this other -- there's this whole other administrative apparatus for hearings in regards to investigations for violations of federal civil rights law, and that is the administrative process that should be followed if, indeed, that is what they're doing. And so that's why we need that kind of transparency from defendants. Because there's a regulation that is squarely on point that says that before you discontinue grants, you need to have a notice to the grantees, you need to work with them so they can make amends, and only if they fail to make amends, then you can discontinue. Oh. I think you also have to have a hearing and then you can discontinue the grants.

So there's these whole procedural protections that we are not being granted, if that is indeed what they're doing here. So we need to know that. And, you know, I have squarely asked that, and I have gotten zero answer. So that also was part of, you know, why we feel this need to tell this Court as to what's going on because we're trying to get answers and we're not getting any.

THE COURT: Well, to that end and with that concern in mind, I did offer to hold an evidentiary hearing in this case.

MS. RANGE: Yes, Your Honor. And -- that's accurate, Your Honor. And I think, for us, the Carr declaration, we were really focused on the amount of time. The reason why we were initially thinking that we would need to have an evidentiary hearing was when they were saying that this might take 105 days,

and we were desperate to have that happen sooner.  So when she submitted the February 5th -- or not February 5th; I think it was January -- I'm losing track of time here -- January 6th, I think it was, she submitted her amended declaration, and she said that these awards could happen by February 6th.  We weren't going to keep going after that as far as the timeline.  Instead, you know, it's our position that this Court can take judicial notice of the fact that it only took them three weeks following the end of the government shutdown to get out those continuation awards on December 5th, and that should be sufficient, Your Honor.

THE COURT:  All right.  Thank you, Ms. Range.

The Court will take a brief recess and reconvene in about five minutes.

MS. RANGE:  Thank you.

(Recessed.)

THE COURT:  Please be seated.

All right.  The Court is prepared to issue an oral ruling on the pending motions.  I will follow up with a written order memorializing my ruling this morning.

By way of some background, as the parties are well aware, the Court previously found that the government had acted unlawfully in discontinuing the grants at issue in this case.  The Court set aside those discontinuation decisions and ordered the government to issue new decisions in full compliance with the law.

The government's motion to amend the judgment does not change

the substance of the Court's prior order but requests only an extension of time to account for the practical realities of bureaucracy, and to ameliorate the harm to grantees that would result from an extension of time, the government offered, and has now awarded, interim funding in the meantime.

The Plaintiff States are frustrated with the government's inability to comply with the original deadlines set by the Court's orders.  The Court shares that frustration.  As the plaintiffs have argued throughout this litigation before this Court and the Ninth Circuit, the government has repeatedly at least suggested that it could make lawful continuation decisions quickly, should it be ordered to do so by the end of 2025.

This Court issued a comprehensive decision on the parties' cross-motions for summary judgment on December 19th, just a week after the hearing in this case, and after the Court ordered that relief, the Court invited the parties to propose a schedule for compliance, which the Court entered on December 23rd and which required new decisions by December 30th and new awards by December 31st.

Throughout that process, the government failed to adequately apprise the Court or the plaintiffs of its compliance capability, instead waiting until late on December 30th to alert the Court for the first time that this schedule was impossible.

The government should have marshaled its best information to share on December 23rd, so that the Court could have set

realistic deadlines initially, instead of waiting until its compliance period had run and claiming impossibility when it was too late.

But however troubling this state of affairs, and it is indeed troubling, the Court must act from where we find ourselves now, not where we wish we were or where we expect that we should be. The Court understands the motivation for Plaintiff States' motion to enforce compliance. The Plaintiff States prevailed in this litigation, and they are entitled to relief. The government was wrong in discontinuing the grants and, again, in failing to timely issue lawful continuation decisions, and, yet, the Court will deny without prejudice plaintiffs' motion, not because the Court is walking back any substantive part of the summary judgment order, but because Plaintiff States have not persuaded the Court that it has the authority to significantly expand the relief provided to Plaintiff States for the purpose of ensuring compliance with prior orders.

Just as the Court has required the government to comply with the law in rendering its continuation decisions, so must the Court in fashioning relief. In this posture, the Court lacks authority to order the specific payment amounts the Plaintiff States request. The Court is committed to ensuring compliance and enforcing the substance of the summary judgment order, and the government's motion does not seek to shirk that obligation.

Because the government has shown that a brief extension of

its deadline to comply is necessary under the circumstances, the Court will grant the motion to amend for the narrow purpose of extending the government's deadlines to make new continuation decisions and issue new awards.  The government must make new decisions no later than February 6th and issue new awards no later than February 11th, backdated to avoid any gap to grantees. The government must file a status report no later than February 12th to confirm that they have complied with this order.

As stated in the Court's prior order, the Court retains jurisdiction to enforce this order in this case.

As I noted at the outset of this oral ruling, I will issue a written order memorializing these findings, but I wanted there to be no doubt that the Department should continue its work at a rapid pace and not wait for any adjudication to continue with that work.

So with that, that is the Court's decision on the motions today, and we will be in recess.

Thank you, counsel.

THE CLERK:  All rise.

(Adjourned.)

CERTIFICATE

I, Nickoline M. Drury, RMR, CRR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do certify that the foregoing is a correct transcript, to the best of my ability, from the record of proceedings in the above-entitled matter.


/s/ Nickoline Drury

Nickoline Drury

Nickoline Drury, RMR, CRR - Federal Court Reporter - (206)370-8508 - 700 Stewart Street, Suite 17205, Seattle, WA  98101